**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

_____
                                                          )
PERMAPOST PRODUCTS, INC., *et al.*,            )
                                                          )
            Plaintiffs,                              )
                                                          )
            v.                                       ) Civil Case No. 1:13-cv-01736 (ESH)
                                                          )
THE HONORABLE JOHN M. McHUGH, *et al.,*    )
                                                          )
            Defendants.                            )
_____)

**MEMORANDUM IN SUPPORT OF UNITED STATES'
MOTION TO DISMISS PLAINTIFFS' COMPLAINT**

Almost one year ago, the Court dismissed a lawsuit by five of the Plaintiffs in this case
(trade associations representing manufacturers and sellers of pressure-treated wood), who sought
declaratory and injunctive relief against the Secretary of Army, the United States Corps of
Engineers ("Corps"), and the Acting Secretary of Commerce for alleged violations of the Clean
Water Act ("CWA"), Endangered Species Act ("ESA"), National Environmental Policy Act
("NEPA"), Administrative Procedure Act ("APA"), and Regulatory Flexibility Act ("RFA") in
taking various agency actions. *See Western Wood Preservers Institute, et al. v. McHugh, et al.*,
925 F.Supp.2d 63 (D.D.C. 2013), recons. granted in part, 292 F.R.D. 145 (D.D.C. 2013).  The
agency actions at issue were:  (1) the Corps' issuance of "Regional Conditions" in Alaska and
Oregon that applied to nationwide permits under the CWA to prohibit permittees from using
products treated with creosote and pentachlorophenol ("pressure-treated wood") in projects
constructed in or over certain waters in those two states; (2) the Corps' development of
"Standard Local Operating Procedures for Endangered Species" ("SLOPES") applicable to the

construction or maintenance of certain in-water and over-water structures in Oregon; and (3) the National Marine Fisheries Service's ("NMFS") issuance of a "Biological Opinion" under the ESA on the "SLOPES IV" procedures at issue in this case.  The five trade associations challenged these actions on various procedural and substantive grounds.

The Court in *Western Wood Preservers* granted the government's motion to dismiss, finding that the Court either lacked jurisdiction under Fed. R. Civ. P. 12(b)(1), or that the trade associations failed to state a claim under Fed. R. Civ. P. 12(b)(6).  *Western Wood Preservers*, 925 F. Supp. 2d at 70, 72-75.  The primary basis for the Court's dismissal for lack of jurisdiction was the trade associations' failure to establish standing and, specifically, to identify any concrete injury-in-fact.  *Id.*  The Court also found that the trade associations failed to state a claim against the Corps under the RFA, and against NMFS under the ESA for its issuance of the Biological Opinion.  *Id.* at 75-76.

Less than nine months after the Court's dismissal in the *Western Wood Preservers* case, these same trade associations, along with four individual companies, filed the instant lawsuit against Defendants, the Honorable John M. McHugh (Secretary of the Army), U.S. Army Corps of Engineers ("Corps"), NMFS, and Penny S. Pritzker (Secretary of Commerce) (collectively "United States").  With two exceptions, this current suit is virtually identical to the previously deficient lawsuit.  The first exception is the addition of four Plaintiffs who are individual companies that sell or manufacture pressure-treated wood and who are members of one or more of the five plaintiff trade associations.  The second exception is that Plaintiffs have not asserted any NEPA claims in this suit (as they did in the previous suit).  Other than that and some minor additions to the descriptions of the trade associations to reflect the membership of the particular individual companies, the complaints and claims in the two cases are identical.

2

The trade associations' addition of the four individual member companies does not save their current lawsuit from dismissal and, in particular, from fatal deficiencies in standing. Like the trade associations, the individual companies are not actually regulated by any of the agency actions at issue; rather, third party permittees who are not before this court are the entities regulated by these agency actions. This fact dooms Plaintiffs' lawsuit because it presents hurdles for causation and redressability in establishing Article III standing that Plaintiffs have not overcome. The four individual companies' lack of standing negates any claim that the trade associations have associational standing on behalf of their member companies. Thus, the only way for the trade associations to establish standing and for the case to proceed is if the trade associations have organizational standing to sue on their own behalf. Unfortunately for them, the same causation and redressability hurdles also negate their standing. Thus, with no Plaintiff possessing standing for any of their eleven claims, the Court should dismiss the Complaint in its entirety for lack of jurisdiction under Fed. R. Civ. P. 12(b)(1) on Article III grounds.

Alternatively, none of the Plaintiffs has prudential standing for Claims 1-4, 6, 7, and 11 under the CWA, APA, or RFA. Here again, the fact that Plaintiffs are not regulated by the challenged agency actions delivers a critical blow to their standing. Plaintiffs' economic interests are not even arguably within the "zone of interests" *protected or regulated* by these statutes. Thus, the Court has no jurisdiction over Claims 1-4, 6, 7, and 11 for lack of prudential standing.

In addition, Plaintiffs have failed to state a claim under Fed. R. Civ. P. 12(b)(6) for claims 6 and 11 under the RFA. Once again, Plaintiffs' deficiency in this regard boils down to the fact that they are not regulated by the agency actions at issue. As the *Western Wood Preservers* court determined, the RFA's judicial review provision only allows suit by small

3

businesses "to which the proposed rule will apply." *Id.* at 75-76. Here, the "proposed rules" (assuming *arguendo* the agency actions constitute rules) unquestionably do not apply to *any* of the Plaintiffs. Thus, they have no claim under the RFA.

## BACKGROUND

### I.   STATUTORY AND REGULATORY BACKGROUND

#### A.   The Clean Water Act

The Clean Water Act, 33 U.S.C. §§ 1251-1387 ("CWA"), establishes a comprehensive program designed to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). To achieve this goal, the CWA prohibits the discharge of any pollutant, including dredged or fill material, into navigable waters unless authorized by an individual or general permit issued by the Corps. *Id.* §§ 1311(a), 1344(a), (e).

Individual permits require a case-by-case review, including site-specific documentation, public comment, and a formal determination. *Id.* § 1344(a); 33 C.F.R. Parts 323, 325. As an alternative to individual permits, Section 404(e) authorizes the Corps to issue general permits on a state, regional, or nationwide basis "for any category of activities involving discharges of dredged or fill material," as long as "the activities in such category are similar in nature, will cause only minimal adverse environmental effects when performed separately, and will have only minimal cumulative adverse effect on the environment." 33 U.S.C. § 1344(e)(1); 33 C.F.R. § 322.2(f)(1). Unlike individual permits, general permits are not issued to specific parties; instead, general permits authorize any party to undertake the limited activities that fall within their scope. *See Riverside Irrigation Dist. v. Stippo*, 658 F.2d 762, 764 (10th Cir. 1981). General permits cannot be issued for more than five years. 33 U.S.C. § 1344(e)(2).

Corps regulations set out policies and procedures used to issue, condition, modify, suspend, or revoke nationwide permits ("NWPs"), one form of general permit.  33 C.F.R. Part 330.  Corps District and Division Engineers have discretionary authority to (among other things) condition or restrict an NWP based on concerns for the aquatic environment or other public interest factors.  *Id.* § 330.1(d).  For example, District Engineers may impose regional conditions to ensure that NWP activities have only minimal adverse effects and are in the public interest. 76 Fed. Reg. 9174, 9177 (Feb. 16, 2011); 33 C.F.R. §§ 330.5(c)(1)(i),  330.1(d).  If a party determines that its proposed activities comply with all applicable terms and conditions of an NWP (including any regional conditions), then the party (under certain NWPs) "may assume an authorization" to proceed with a project, subject to the Corps' authority to determine otherwise. *Id.* § 330.2(c).  "This assumption is subject to the [District Engineer's] authority to determine if an activity complies with the terms and conditions of an NWP[,]" 33 C.F.R. § 330.2(c), including whether the activity complies with regional conditions and has only minimal adverse effects.

Although some NWPs are self-executing, others (such as those authorizing discharges into wetlands) require a pre-construction notification seeking verification from the Corps that the activity complies with the NWP.  *Id.* § 330.6(a); *see id.* §§ 330.1(e)(1), (3).  The District Engineer then evaluates the proposed activities "on a case-by-case basis to ensure that they will have no more than minimal adverse effects . . . ."  76 Fed. Reg. at 9175.  Thus, the District Engineer retains authority to determine whether any activity authorized under an NWP will have no more than minimal adverse effects.  Activities that are not authorized under an NWP "still may be authorized by an individual . . . permit."  33 C.F.R. § 330.1(c); *see also id.* § 330.1(d)

(District Engineer may notify prospective permittee to apply for regional general permit or individual permit where proposed activity does not meet conditions of NWP).

### B.      The Endangered Species Act

The Endangered Species Act ("ESA") provides for listing species as "threatened" or "endangered" if warranted, as well as for designation of their "critical habitat."  16 U.S.C. § 1533(a).  Once listed, certain protections apply.  ESA Section 7(a)(2) provides that federal agencies must ensure that any action authorized, funded, or carried out by such agency is not likely to "jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of habitat of such species which is determined by the Secretary . . . to be critical. . . ."  *Id.* § 1536(a)(2).  "Secretary" as used in the ESA means the Secretary of the Interior or the Secretary of Commerce, who in turn have delegated their responsibilities to the U.S. Fish and Wildlife Service ("FWS") and the National Marine Fisheries Service ("NMFS"), respectively.  *Id.* § 1532(15).[1]  The ESA requires the action agency to consult with FWS or NMFS whenever a federal action "may affect" an endangered or threatened species.  50 C.F.R. § 402.14(a).

Section 7 of the ESA and its implementing regulations set out detailed consultation procedures designed to provide action agencies with expert advice to determine the biological impacts of their proposed activities.  16 U.S.C. § 1536(b); 50 C.F.R. Part 402.  "Formal consultation" is described at length at 50 C.F.R. § 402.14.  Formal consultation culminates in the issuance of a "biological opinion" by NMFS or FWS, which advises the action agency whether jeopardy is likely to occur for any listed species, whether critical habitat is likely to be destroyed

---

[1]  In general, FWS has authority over terrestrial species and NMFS has authority over marine species.  *See, e.g., Nw. Res. Info. Ctr. v. NMFS*, 56 F.3d 1060, 1065 (9th Cir. 1995).

or adversely modified, and, if so, whether "reasonable and prudent alternatives" exist to avoid a jeopardy or adverse modification situation.  *Id.* § 402.14(h)(3).

### C.      The Regulatory Flexibility Act

The Regulatory Flexibility Act ("RFA"), 5 U.S.C. §§ 601-612, requires agencies to conduct a "regulatory flexibility analysis" for certain proposed and final rules.  *Id.* §§ 603, 604. Section 603 of the RFA requires proposed rules that are estimated to have a significant impact on a substantial number of small entities to have an initial regulatory flexibility analysis describing, among other things, the impact the rule may have on such entities.  *Id.* § 603.  Section 604 similarly provides that final rules subject to the RFA that will have a significant impact on a substantial number of small entities require a final regulatory flexibility analysis.  *Id.* § 604.

Section 611 of the RFA provides that "a small entity that is adversely affected or aggrieved by final agency action is entitled to judicial review of agency compliance with" specified subsections of the statute.  *Id.* § 611(a)(1).  The D.C. Circuit has interpreted this language to mean that only "small entities which will be subject to the proposed regulation[s]" are allowed to bring suit under the RFA.  *Cement Kiln Recycling Coal. v. EPA*, 255 F.3d 855, 869 (D.C. Cir. 2001).  An agency's compliance or noncompliance with the RFA "shall be subject to judicial review *only* in accordance with [Section 611]."  5 U.S.C. § 611(a)(5)(c) (emphasis added).

## II.     FACTUAL BACKGROUND

### A.      The Regional Conditions

On February 16, 2011, the Corps proposed to re-issue 48 existing nationwide permits under the CWA with some modifications and to issue two new nationwide permits for the five-year period 2012-2017.  *See* 76 Fed. Reg. 9174-01, 9175; ECF #1 ("Complaint") ¶ 19.  Shortly

thereafter, on February 25, 2011, the Portland District of the Corps announced proposed regional conditions applicable to activities in waters within the State of Oregon, including a condition precluding prospective nationwide permittees from allowing wood products treated with "biologically harmful leachable components," *e.g.*, various wood preservatives, "to come into contact with waters or wetlands" in the State of Oregon.  Complaint ¶ 20.  On March 4, 2011, the Alaska District of the Corps also provided notice of regional conditions that would preclude nationwide permittees from using products treated with creosote and pentachlorophenol in certain waters in the State of Alaska.  *Id.* ¶ 21.

On February 21, 2012, the Corps issued or re-issued the nationwide permits as proposed.  *See* 77 Fed. Reg. 10,184; Complaint ¶ 22.  On March 16, 2012, the Northwestern Division of the Corps approved the proposed regional conditions for the Portland District.  Complaint ¶ 23.  On March 19, 2012, the Pacific Ocean Division of the Corps approved the proposed regional condition for the Alaska District.  *Id.* ¶ 24.  These two conditions are referred to collectively as the Regional Conditions.

## B.     The "SLOPES IV" Procedures and ESA Consultation

Since 2001, the Corps has had "Standard Local Operating Procedures for Endangered Species" ("SLOPES") that streamline ESA consultation for certain recurring activities subject to the regulatory jurisdiction of the Portland District.  Complaint ¶ 28.  For each successive set of SLOPES procedures, the Corps has received a biological opinion from NMFS concluding that the procedures were not likely to jeopardize the continued existence of endangered or threatened species, or to destroy or adversely modify their critical habitat.  *Id.*

In 2011 the Corps, with input from NMFS, developed a new set of proposed SLOPES procedures ("SLOPES IV") applicable to construction or maintenance of certain in-water and

over-water structures in Oregon.  *See id.* ¶¶ 29-30.  These procedures set out a process under which the Corps will determine whether individual actions fall within the range of effects considered in an anticipated biological opinion, and will confirm with NMFS that the action is consistent with all provisions of that opinion.  Complaint ¶ 30.  Two of the design criteria included in SLOPES IV provide that wood treated with pesticidal compounds may not be used below the ordinary high water mark, or as part of an in-water or overwater structure.  *Id.* ¶¶ 30-32; SLOPES IV at 8 ¶ 26; *see also id.* at 7 ¶ 21 (proposal to use wood pilings treated with pesticides or preservatives would require individual consultation).

On November 4, 2011, the Corps wrote to NMFS requesting consultation under Section 7 of the ESA on the proposed action of adopting SLOPES IV.  Complaint ¶ 29.  NMFS issued a biological opinion ("Biological Opinion") concluding that the SLOPES IV procedures for activities involving in-water and overwater structures are not likely to jeopardize the continued existence of endangered and threatened species or result in the destruction or adverse modification of their designated or proposed critical habitat.  Complaint ¶ 29.  The Biological Opinion states that if a project being permitted by the Corps satisfies the design criteria analyzed in the opinion (i.e., the SLOPES IV criteria) and falls within the effects analyzed in that opinion, the Corps can issue a permit without consulting further with NMFS.  *Id.* ¶¶ 31-32.  If, on the other hand, a proposed project does not meet the SLOPES IV criteria, the Corps can and will need to request individual consultation with NMFS pursuant to Section 7 of the ESA with regard to that project.  *Id.* With regard to treated wood in particular, the Biological Opinion states that any proposal to use such wood to construct pilings "is not covered by this consultation and will require individual consultation."  Biological Opinion at 9.

### III.     THE *WESTERN WOOD PRESERVERS* CASE

On October 3, 2012, a Second Amended Complaint was filed in the case of *Western Wood Preservers Institute, et al. v. McHugh, et al.*, Case No. 12-1253-ESH (D.D.C.), by five trade associations against the United States Secretary of the Army, the Corps, and the Acting Secretary of Commerce.  These trade associations represented manufacturers, distributers, and suppliers of treated wood and related products throughout the United States.   Their twelve-count complaint challenged the two Regional Conditions, the SLOPES IV operating procedures, and the SLOPES IV Biological Opinion on the ground that these agency actions were in violation of procedural requirements under the APA, the ESA, NEPA, RFA, and the Corps' CWA regulations.

On February 27, 2013, the Court in *Western Wood Preservers* issued an Order and Memorandum Opinion granting the United States' motion to dismiss on jurisdictional grounds under Fed. R. Civ. P. 12(b)(1) and (6).  *See Western Wood Preservers Inst., et al. v. McHugh, et al.*, 925 F.Supp.2d 63 (D.D.C. 2013).  Specifically, the *Western Wood Preservers* Court found it had no jurisdiction over plaintiffs' claims under the APA, CWA, NEPA, and ESA because plaintiffs lacked standing on either constitutional or prudential grounds.  The Court further found that plaintiffs' allegations under the RFA failed to state a claim under Fed. R. Civ. P. 12(b)(6).  On reconsideration, the court concluded that plaintiffs had stated an ESA-related claim against NMFS under the APA but otherwise reaffirmed its dismissal of Plaintiffs' ESA-related claim against NMFS on standing grounds.  *Western Wood Preservers Institute, et al. v. McHugh*, 292 F.R.D. 145 (D.D.C. 2013).

## IV.  PLAINTIFFS' COMPLAINT IN THE INSTANT CASE

On January 1, 2014, the five trade associations from *Western Wood Preservers*, along with four individual member companies who sell or manufacture pressure-treated wood, filed the instant Complaint.[2]  Aside from the four new parties, the only differences between the *Permapost* Complaint and the *Western Wood Preservers* Complaint is the omission of any NEPA claim from the *Permapost* Complaint and the trade associations' slight revisions to their organizational descriptions to reflect the membership of the four individual companies.  Other than that, the Complaint still challenges the Corps' issuance of the Regional Conditions, the SLOPES IV procedures, and NMFS' Biological Opinion.  Essentially, Plaintiffs claim:  (1) the Corps' issuance of the Regional Conditions was without notice and comment procedures under the APA or Corps' CWA regulations, *see* Complaint Claims 1-4; (2) the Corps failed to consult with NMFS and FWS under the ESA in issuing the Regional Conditions, *see id.* Claim 5; (3) the Corps' Regional Conditions are arbitrary and capricious under the APA for failure to include certain determinations required by the CWA and failing to consider certain NMFS guidelines under the ESA, *see id.* Claims 7, 8; (4) the SLOPES IV procedures and Biological Opinion are arbitrary and capricious under the APA because the Corps and NMFS ignored NMFS' guidelines and other SLOPES procedures, *see id.* Claims 9, 10; and (5) the Regional Conditions and SLOPES IV procedures violated the RFA by failing to include a regulatory flexibility analysis, *see id.* Claims 6, 11.

---

[2] The four new parties are:  Permapost Products, Inc.; J.H. Baxter & Co.; Conrad Forest Products, Inc.; and Western Wood Structures, Inc.

## STANDARD OF REVIEW

Before the Court can consider the merits of Plaintiffs' Complaint, it must first determine whether Plaintiffs have properly invoked the Court's jurisdiction. *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94 (1998) ("Without jurisdiction the court cannot proceed at all in any cause.") (citation omitted). One prerequisite to a court's exercise of subject matter jurisdiction is that a plaintiff must have standing. *Nat'l Ass'n of Home Builders v. U. S. Army Corps of Eng'rs,* 417 F.3d 1272, 1286 (D.C. Cir. 2005). Plaintiffs bear the burden of establishing each element of standing, which is determined on a claim-by-claim basis. *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 561 (1992); *DaimlerChrysler Corp. v. Cuno,* 547 U.S. 332, 352 (2006).

On a motion to dismiss under Fed. R. Civ. P. 12(b)(1), the plaintiff bears the burden of demonstrating subject matter jurisdiction. *See Erby v. United States*, 424 F. Supp. 2d 180, 182 (D.D.C. 2006). On a motion to dismiss under Fed. R. Civ. P. 12(b)(6), by contrast, the moving party has the burden of demonstrating that a plaintiff has failed to state a claim for which relief may be granted. *Kimberlin v. U.S. Dep't of Justice*, 150 F. Supp. 2d 36, 41 (D.D.C. 2001), *aff'd*, 318 F.3d 228 (D.C. Cir. 2003). In either case, the Court must accept the factual allegations of the Complaint as true, and must give Plaintiffs the benefit of all inferences to be drawn from those allegations. *See, e.g., Best v. United States*, 522 F. Supp. 2d 252, 254-55 (D.D.C. 2007); *Kimberlin*, 150 F. Supp. 2d at 41. The Court need not, however, accept Plaintiffs' legal conclusions as true. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *see also Kowal v. MCI Commc'ns Corp.*, 16 F.3d 1271, 1276 (D.C. Cir. 1994).

## ARGUMENT

**I.   NONE OF PLAINTIFFS HAS ARTICLE III STANDING.**

The "irreducible constitutional minimum of standing" requires that:  (1) the plaintiff has

suffered an injury in fact; (2) the injury complained of is fairly traceable to the challenged action

of the defendant; and (3) it is likely that the injury will be redressed by a favorable decision.

*Lujan*, 504 U.S. 560-61 (internal citations omitted); *Fla. Audubon Soc'y v. Bensten*, 94 F.3d 658,

663 (D.C. Cir. 1996) (en banc).  If any one of these essential elements is lacking, there is no

"case or controversy" under Article III of the Constitution, and the case must be dismissed for

lack of subject matter jurisdiction.  *Lujan*, 504 U.S. at 560.  Here, the last two elements are

lacking and the Court should dismiss Plaintiffs' entire Complaint on Article III grounds.

The standing analysis logically begins with whether the individual companies, who have

been added to this lawsuit, have standing.  Presumably these four companies were added to

address the deficiencies in "injury-in-fact" that the Court found in *Western Wood Preservers*.

*See* 925 F. Supp. 2d at 69-73.  The United States, however, will not challenge the allegations of

injury claimed by any of the Plaintiffs because the glaring deficiencies in causation and

redressability are more than sufficient to defeat the companies' standing.[3]  These deficiencies are

due to the obvious fact that none of the Plaintiffs (including the individual companies) is

regulated by the agency actions at issue; rather, those actions regulate third parties (permittees

who are using nationwide permits under the CWA) who are not parties to this lawsuit.  Without

standing by the individual companies, the trade associations do not have associational standing to

sue on those company members' behalves.  Thus, the only way Plaintiffs can satisfy Article III

---

[3] If any claims survive this Motion to Dismiss, the United States reserves it right to challenge
Plaintiffs' allegations of injury at the summary judgment stage.

standing is if the trade associations have organizational standing to sue on their own behalves. Again, however, the elements of causation and redressability prevent the trade associations' standing.  Thus, none of the Plaintiffs have Article III standing for any of their claims.

Causation and redressability must be addressed for each Claim and, thus, it is helpful to understand that Plaintiffs' alleged injuries fall into one of two types:  procedural or substantive. Claims 1-6 and 11 assert procedural injuries based on the Corps' or NMFS' alleged failure to follow certain procedures under the APA, the Corps' CWA regulations, the ESA, or the RFA in issuing the Regional Conditions, *e.g.*, Claim 1 alleges that the Corps failed to provide notice and comment under the APA for the Regional Conditions, and Claim 5 alleges the Corps failed to initiate consultation with FWS and NMFS on the Regional Conditions, which violates the ESA and APA.  Claims 7-10, however, allege substantive injuries based on the allegations that the Regional Conditions, SLOPES IV, or SLOPES IV Biological Opinion are arbitrary and capricious under the APA because of purported failures to include certain explanations or considerations, *e.g.*, Claim 7 alleges the Corps' Regional Conditions are arbitrary and capricious under the APA because they do not adequately explain why there will be no more than "minimal adverse environmental effects."  Regardless of which type of injury is at issue, however, the result is the same:  none of Plaintiffs' alleged procedural or substantive injuries is fairly traceable to the agency actions at issue or will be redressed by a favorable decision from this Court.

**A.    The Substantive Injuries The Individual Companies Alleged With Regard To Claims 7-10 Are Not Fairly Traceable To The Challenged Agency Actions And Will Not Be Redressed By A Favorable Decision From This Court.**

Causation and redressability are lacking for the individual companies with regard to the alleged substantive injuries at issue in Claims 7-10.  One thing is clear from Plaintiffs' Complaint:  none of the Plaintiffs is a party who actually is regulated by any of the agency

14

actions at issue.  Specifically, there are no allegations in the Complaint that any of the Plaintiffs is a permittee or potential permittee under the CWA.  The only entities regulated by the agency actions at issue are those who have tried to use or will try to use an NWP in Alaska or Oregon to construct a project in or over waters of the United States.  There are no allegations that any of the Plaintiffs is such an entity; rather, each Plaintiff either is a company who supplies materials to potential permittees, or a trade association that represents companies who may supply potential permittees.  Notably, no party seeking to rely upon the NWPs in Alaska or Oregon has challenged the Regional Conditions, SLOPES IV procedures, or the SLOPES IV Biological Opinion.

In a situation such as this, where the asserted injuries arise not from the government's regulation of the plaintiff, but from agency actions that govern third parties, "it becomes substantially more difficult" to establish standing.  *Nat'l Wrestling Coaches Ass'n v. U.S. Dep't of Educ.*, 366 F.3d 930, 938 (D.C. Cir. 2004) (citing *Lujan*, 504 U.S. at 562); *see Grocery Mfrs Ass'n v. EPA*, 693 F.3d 169, 175 (D.C. Cir. 2012) (fact that EPA actions did not directly impose regulatory restrictions or other burdens on petitioners made task of establishing standing more difficult).  That is because Article III requires that federal courts act "only to redress injury that fairly can be traced to the challenged action of the defendant, *and not injury that results from the independent action of some third party not before the court.*"  *Simon v. e. Ky. Welfare Rights Org.*, 426 U.S. 26, 41-42 (1976) (emphasis added); *see Fla. Audubon Soc'y*, 94 F.3d at 669-71. In cases where "the necessary elements of causation and redressability" both turn on third-party choices, plaintiffs bear an increased burden to "adduce facts showing that those choices have been or will be made in such manner as to produce causation and permit redressability . . . ."  *Lujan*, 504 U.S. at 562.

15

As to causation, Plaintiffs must show that "'it is substantially probable . . . that the challenged acts of the defendant, not of some absent third party, will cause the particularized injury of the plaintiff.'"  *Ctr. for Biological Diversity v. U.S.  Dep't of the Interior*, 563 F.3d 466, 478 (D.C. Cir. 2009) (quoting *Fla. Audubon Soc'y*, 94 F.3d at 663).  The allegations in the Complaint, even when read in the light most favorable to Plaintiffs, show that the individual companies' alleged injuries, *e.g.*, loss of business and money, are not the direct result of the challenged agency actions; rather, they were caused or will be caused (if at all) by the independent actions of third parties and, more specifically, by the permittees who are the actual regulated parties.  Importantly, a permittee's decision whether to forego the use of pressure-treated wood to avail itself of the nationwide permit process, or whether to continue to use pressure-treated wood and go through the individual permit process, is a decision based on various considerations, such as whether the permittee will have "the staff or funds to prepare for and conduct" the ESA consultation process.  Complaint ¶ 7; *see id.* ¶ 10 (alleging that U.S. Forest Service is "increasingly reluctant to specify treated wood in their contracts due to the need for individualized ESA consultation required to use treated wood for a project").  Thus, the permittee makes its decision whether to forego pressure-treated wood to use an NWP based on financial, staffing, and other considerations.  It is that business decision by the permittee – not the agency actions at issue – that is the direct cause of the individual companies' purported injuries.  This remote and indirect causation of the agency actions is insufficient for purposes of standing.  "Such a causal chain cannot adequately establish causation because [Plaintiffs] rely on the speculation that various different groups of actors not present in this case" – namely the actual permittees, their contractors, and customers – "might act in a certain way in the future." *Ctr. for Biological Diversity*, 563 F.3d at 479.

16

Moreover, Plaintiffs' speculation that permittees may act or have acted in a certain way requires an assumption that the permittee's choice of material is driven *solely* by permitting considerations, as opposed to the cost of the material, its suitability in a given application, its appearance, or any of the other factors that may influence that decision.  Such "purely speculative" exercises are insufficient to establish causation.  *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 42 (1976); *see Nat'l Wrestling Coaches Ass'n*, 366 F.3d at 938 ("mere 'unadorned speculation' as to the existence of a relationship between the challenged government action and the third-party conduct 'will not suffice to invoke the federal judicial power'") (quoting *Simon*, 426 U.S. at 44)).

As to the redressability prong, the individual companies have offered nothing to substantiate their claims that a favorable decision from this Court would redress their injuries. Even without the pressure-treated wood prohibition in the Regional Conditions, a District Engineer retains the authority to determine that any activity otherwise authorized under an NWP will cause more than minimal adverse effects and, thus, would require an individual permit.  33 C.F.R. §§ 330.1(d), 330.5(c)(1)(i); 76 Fed. Reg. at 9177.  Thus, the District Engineers in Alaska and Oregon – even without the Regional Conditions – could determine that use of pressure-treated wood in any particular NWP-authorized activity would cause more than minimal adverse effects and, thus, require use of a different material if the activity is to proceed under an NWP, or require an individual permit under Section 404 of the CWA.  *See* 33 C.F.R. § 330.1(c). Similarly, the SLOPES IV biological opinion does not ban the use of treated wood.  While SLOPES IV provides an efficient streamlining mechanism for consulting on a defined range of similar projects, it does not preclude the Corps from seeking individual consultation on any projects or actions that do not fit the SLOPES criteria.  Thus, if an individual seeking to use

17

treated wood in waters or wetlands applies for an individual Section 404 permit, the Corps can conduct an individual consultation with NMFS under Section 7 of the ESA. *Western Wood Preservers Inst.,* 925 F. Supp. 2d at 68-69 ("If, however, a proposed project did not comply with the design criteria in the SLOPES IV procedures, that would not prevent the issuance of a permit for that project, the Corps would simply need to request additional consultation from the NMFS").

Thus, it is just as plausible that even without the treated wood provision in the Regional Conditions and SLOPES IV procedures, the Corps may require use of an individual permit for projects using pressure-treated wood. In that case, the Corps would need to request individual consultation under the ESA. Also, the permittee could decide to use material other than pressure-treated wood to still avail itself of the NWP. *Compare Simon*, 426 U.S. at 43 ("it [was] just as plausible that the hospitals to which [the plaintiffs] may apply for service would elect to forego favorable tax treatment to avoid the undetermined financial drain of an increase in the level of uncompensated services").

This case is similar to the situation in *National Wrestling Coaches Association v. Department of Education*, 366 F.3d 930 (D.C. Cir. 2004), where the court also found causation and redressability lacking in a challenge to governmental actions that applied to third parties who were not before the court. In that case, several membership organizations representing men's wrestling coaches, athletes, and alumni claimed to have been injured by the elimination of men's wrestling programs at certain universities. The organizations challenged guidance documents issued by the Department of Education to clarify how the Department would assess compliance under Title IX of the 1972 Education Act Amendments, which prohibited discrimination on the basis of sex in federally funded educational programs and activities. *Id.* at 934-35. The

18

organizations claimed they were injured by the decision of some educational institutions to eliminate or reduce the size of men's wrestling programs to meet the requirements of the guidance and continue to receive federal funding.  The court found that plaintiffs lacked standing:

> [I]t is clear that appellants have no standing to pursue this challenge, because they have not demonstrated that their alleged injuries will be redressed by the requested relief.  The direct causes of appellants' asserted injuries – loss of collegiate-level wrestling opportunities for male student-athletes – are the independent decisions of educational institutions that choose to eliminate or reduce the size of men's wrestling teams.
>
> * * *
>
> Moreover, other reasons unrelated to the challenged legal requirements may continue to motivate schools to take such actions.

366 F.3d at 936-37, 939, 940.

The individual companies' allegations here similarly fail.  The direct cause of their injuries is the independent decisions of permittees who are not before this Court, and there is nothing in the Complaint to indicate that those permitting decisions will be any different if Plaintiffs receive a favorable ruling here.  The individual companies therefore have failed to establish the existence of causation and redressability for their alleged substantive injuries in Claims 7-10.

**B.    Plaintiffs' Complaint Does Not Establish That It Is Substantially Probable That The Alleged Procedural Violations Have Caused Or Will Cause Injury To The Individual Companies' Interests.**

Plaintiffs' alleged procedural injuries in Claims 1-6 and 11 fare no better when it comes to standing.  "[T]he omission of a procedural requirement does not, by itself, give a party standing to sue."  *Ctr. for Biological Diversity*, 563 F.3d at 479 (citation omitted).  "A plaintiff may establish standing based on a procedural injury only if (1) the government violated a

procedural right that was designed to protect their threatened concrete interest, and (2) the violation in fact resulted in injury to that concrete, particularized interest." *Western Wood Preservers*, 925 F. Supp.2d at 72-73 (citing *Ctr. for Law & Educ. v. Dep't of Educ.*, 396 F.3d 1152, 1157 (D.C. Cir. 2005)); *see Fla. Audubon Soc'y*, 94 F.3d at 664 (plaintiffs are still required to demonstrate "a causal connection between the government action that supposedly required the disregarded procedure and some reasonably increased risk of injury to [the plaintiff's] particularized interest"); *Ctr. for Biological Diversity*, 563 F.3d at 479 ("[A] plaintiff may have standing if it can show that an agency failed to abide by a procedural requirement that was 'designed to protect some threatened concrete interest' of the plaintiff.") (quoting *Defenders of Wildlife*, 504 U.S. at 573 n.8).

Here, "the government action that supposedly required the disregarded procedure" in Claims 1-5 was the adoption of the Regional Conditions and SLOPES IV procedures; but, for the same reasons discussed above, those actions do not have a sufficient causal connection with Plaintiffs' alleged injuries to satisfy the standing requirements.  There is an important distinction to be made here, which is the difference between "'the procedural right' and the 'concrete interest' in a procedural-rights case." *Ctr. for Law and Educ.*, 396 F.3d at 1159.  Plaintiffs "must show *both* (1) that their procedural right has been violated, *and* (2) that the violation of that right has resulted in an invasion of their concrete and particularized interest." *Id.* (emphasis in original).  Thus, it is not enough for standing purposes that the individual companies allege that the United States committed a procedural violation; those companies also must show that violation caused Plaintiffs' particular injuries.  The Complaint fails to do so.

The chain of causation between the alleged procedural violations in Claims 1-5 for the agency actions at issue and the individual companies' injuries in lost business and profits, is

"speculative at best." *Ctr. for Law and Educ.*, 396 F.3d at 1159.  As discussed above, these

economic injuries are the result of independent decisions of third parties (the permittees) who are

not before this Court.  *See id*. at 1161 (finding that the alleged injuries were not "fairly traceable"

to the agency rules and, instead, were "the result of the independent action" of a third party).  For

example, Claim 1 alleges the Corps failed to provide notice and comment on the Regional

Conditions, in violation of the APA.  Even if the Corps violated this procedural requirement, the

Regional Conditions themselves have not caused the economic injuries alleged by the individual

companies;[4]  rather, those economic injuries were caused by permittees who must make their

own independent decisions based on those Regional Conditions.  Thus, the same speculative

---

[4]  Although it is unnecessary to resolve this issue for purposes of this motion, Plaintiffs are
incorrect that notice-and-comment rulemaking was required.  The APA defines the term "rule" to
include "the whole or part of an agency statement of general or particular applicability and future
effect designed to implement, interpret, or prescribe law or policy or describing the organization,
procedure, or practice requirements of an agency[.]"  5 U.S.C. § 551(4).  "Rule making" is the
"agency process for formulating, amending, or repealing a rule."  *Id.*. § 551(5).  Plaintiffs
mistakenly assert that the Regional Conditions constitute a substantive rule subject to the notice-
and-comment rulemaking provisions of the APA, 5 U.S.C. § 553.

The procedural requirements for notice and comment under Section 553 of the APA do not apply
to "interpretative rules, general statements of policy, or rules of agency organization, procedure,
or practice. . . ."  5 U.S.C. § 553(b), (d).  The U.S. Court of Appeals for the D.C. Circuit further
articulated a four-part test for distinguishing between substantive rules and statements of policy
or interpretive rules in *American Mining Congress v. Mine Safety & Health Administration*, 995
F.2d 1106, 1108-09 (D.C. Cir. 1993):

> (1) whether in the absence of the rule there would not be an adequate legislative
> basis for enforcement action or other agency action to confer benefits or ensure
> the performance of duties, (2) whether the agency has published the rule in the
> Code of Federal Regulations, (3) whether the agency has explicitly invoked its
> general legislative authority, or (4) whether the rule effectively amends a prior
> legislative rule.

None of the *American Mining* factors suggests that the Regional Conditions at issue here may be
fairly construed as a substantive or legislative rule.

causal chain that defeats the individual companies' standing for their substantive claims, also defeats their standing for their procedural claims.

Finally, for the procedural injuries alleged in Claims 6 and 11 under the RFA, causation and redressability are similarly lacking.  As discussed *infra* at Section III, the regulatory flexibility analysis required under the RFA is for the benefit of "small entities which will be subject to the proposed regulation . . . ."  *Cement Kiln*, 255 F.3d at 869.  Again, the individual companies are not subject to any of the challenged agency actions.  For this reason, the individual companies do not actually have any procedural injury under the RFA because that statute does not apply to non-regulated entities.  Moreover, causation is lacking because there can be no procedural injury under the RFA if the challenged agency actions do not regulate the companies who claim injury.  Further, a decision by the Court that the challenged agency actions did not contain a regulatory flexibility analysis will not redress the companies' injuries because the Corps is required to conduct such an analysis only for regulated entities.

For these reasons, the individual companies do not have Article III standing for any of the claims in the Complaint.

### C.   The Trade Associations Do Not Have Article III Standing To Sue On Behalf Of Their Members Or On The Associations' Own Behalves.

The five trade associations may sue on behalf of their members (associational standing) or in their own right (organizational standing).  Neither type of standing exists here for the trade associations.

### 1.   The lack of standing by the individual companies defeats associational standing for the trade associations.

The trade associations do not have associational standing to sue on behalf of their members.  To assert associational standing, the trade associations must "show that (1) a member

'would have standing to sue in [its] own right,' (2) 'the interests the association seeks to protect are germane to its purpose' and (3) 'neither the claim asserted nor the relief requested requires that an individual member of the association participate in the lawsuit.'" *Grocery Mfrs. Ass'n*, 693 F.3d 169, 174-75 (D.C. Cir. 2012) (quoting *Sierra Club v. EPA*, 292 F.3d 895, 898 (D.C. Cir. 2002)).  Here, associational standing fails on the first element:  the standing of individual members in their own right.  In *Western Wood Preservers*, the court found that the trade associations failed to demonstrate associational standing because they failed to identify "any specific member who has suffered either" lost profits or procedural harm.  *Western Wood Preservers*, 925 F. Supp.2d at 70.  Presumably to cure that deficiency, Plaintiffs added to the current lawsuit the four individual companies who are members of one or more of the five trade associations.  Assuming for the sake of argument that the injuries alleged by those four member companies are sufficient, those individual companies still have failed to sufficiently allege facts to support causation and redressability, as discussed above.  *See supra* Section I.A., B.  Because those individual companies do not have standing in their own right, the trade associations to whom they belong to not have standing to sue on those companies' behalves.

> **2.      The trade associations have not established injury, causation, or redressability sufficient for organizational standing.**

The only way for this lawsuit to proceed in the absence of standing by the individual members is if Plaintiffs demonstrate organizational standing for the trade associations to sue in their own right to protect their organizational interests.  The trade associations must demonstrate the same three elements for Article III standing:  (1) injury-in-fact, (2) that is fairly traceable to the defendants' challenged conduct, (3) which is likely to be redressed by a favorable decision. *See NB ex rel. Peacock v. Dist. Of Columbia*, 682 F.3d 77, 81 (D.C. Cir. 2012).  Although a

decision on issues of standing is not a decision on the merits and, thus, the doctrine of res judicata does not apply, it is worth noting that the trade associations' claims with respect to their organizational standing have not changed from the *Western Wood Preservers* case other than to identify individual member companies who allegedly suffered injury.  Those individual member companies' alleged injuries, however, are not relevant for purposes of the trade associations' organizational standing.  Thus, for all relevant purposes, the trade associations' claims of organizational injury are the same as those found deficient in *Western Wood Preservers*.

Specifically, in *Western Wood Preservers*, the court analyzed three types of injury-in-fact alleged by the trade associations:  environmental injury, procedural injury, and informational injury.[5]  *Western Wood Preservers*, 925  F. Supp. 2d at 70.  As to environmental injury, the court found that the trade associations did not "suffer any possible environmental harm in a 'personal and individual way'" because they were "not themselves located near the areas affected by the challenged regulations."  *Id.* at 71.  Moreover, their "purported organizational interests in using treated wood in environmentally-responsible ways" were insufficient to establish injury under Supreme Court precedent.  *Id.*  The trade associations' claims of environmental injury here are

---

[5] The court did not actually analyze the trade associations' alleged informational injury.  First, the court found this asserted injury to be raised only by the two claims concerning the preparation of an environmental impact statement under the National Environmental Policy Act ("NEPA") for the Regional Conditions and SLOPES IV procedures.  *Western Wood Preservers* 925 F. Supp. 2d at 72.  The Court, however, declined to address whether the asserted informational injury for those claims was sufficient because it ultimately found that the trade associations did not have prudential standing for those NEPA claims.  The *Permapost* Complaint does not contain any NEPA allegations and, thus, the portion of the *WWPI* court's analysis of informational injury is irrelevant.  Second, the Court found that any informational injury for alleged violations of the APA, ESA, and Corps' CWA regulations were more properly alleged as procedural injuries.  *Id.* at 72.

24

no different from their same claims that were rejected in *Western Wood Preservers* and thus, for the same reasons, are insufficient for purposes of organizational standing.[6]

As to procedural injury, the Court noted that the trade associations must show that "(1) the government violated a procedural right that was designed to protect their threatened concrete interest, and (2) the violation in fact resulted in injury to that concrete, particularized interest." *Id.* at 72-73 (citing *Ctr. for Law & Educ.*, 396 F.3d at 1159). Under that test, the Court reiterated its findings as to environmental injury and concluded that the trade associations failed to show the second prong of that test: "any injury to a concrete, particularized interest of theirs." *Western Wood Preservers,* 925 F.Supp.2d at 73. The Court therefore did not address the first prong. Here, again, given the identical nature of the trade associations' claims for organizational standing, they still fail to meet that second prong of the procedural injury test. Moreover, as discussed above, the alleged procedural violations did not "in fact result[]" in that injury under the second prong. *See supra* at 19-22. The trade associations therefore do not have any procedural injury.

In addition, for the reasons discussed above, the trade associations also fail to establish causation and redressability. The chain of causation between the alleged violations for the agency actions at issue and the trade associations' environmental or procedural interests are "speculative at best," *Ctr. for Law and Educ.*, 396 F.3d at 1159. Again, the independent decisions of the permittees are the direct cause of the trade associations' injuries. Thus, the trade associations have failed to demonstrate any of the three irreducible minimums for Article III standing to sue on their own behalves.

---

[6] The allegations of environmental injury by individual member companies, *e.g.,* that individual companies are located near the areas affected by the challenged agency actions, is irrelevant for organizational standing and would only be relevant for purposes of associational standing.

Because *no* Plaintiff – no individual company or trade association – has demonstrated its standing, the Court should dismiss Plaintiffs' Complaint in its entirety under Fed. R. Civ. P. 12(b)(1).

## II.    ALTERNATIVELY NONE OF THE PLAINTIFFS HAS PRUDENTIAL STANDING FOR CLAIMS 1-4, 6, 7, AND 11.

Even if the Plaintiffs establish Article III standing, they have failed to demonstrate prudential standing for Claims 1-4, 6, 7, and 11.  Those claims are based, either in whole or part, on the APA.  Because Plaintiffs are suing under the APA, the interests they assert "must be 'arguably within the zone of interests to be protected or regulated by the statute' that [they] say[] was violated." *Mendoza v. Solis*, 924 F. Supp. 2d 307, 320 (D.D.C. 2013) (citation omitted).[7] The "'zone of interests' requirement is a gloss on the meaning of 5 U.S.C. § 702 . . . which limits the universe of persons permitted to sue under the APA to those 'adversely affected or aggrieved by agency action.'" *Id.* at 320 (citations omitted).  "This test is not meant to be especially demanding . . . and it does not require an indication or congressional purpose to benefit the would-be plaintiff." *Id.* (citations and internal quotation marks omitted).  Here, Claims 1-4, 6, 7, and 11 must be dismissed for lack of prudential standing.

Claims 1 and 2 allege that the United States violated the APA's notice and comment requirements, 5 U.S.C. § 553(b) and (c), in issuing the Regional Conditions and that this failure violated APA Section 706.  The D.C. Circuit, however, has rejected attempts to so broadly

---

[7] The United States is not making a prudential standing argument for Claims 5 and 8-10 under the ESA.  *Bennett* concluded that the ESA citizen suit provision, 16 U.S.C. § 1540(g), which provides "any person may commence a civil suit," effectively negates the zone of interests test with respect to claims arising under the citizen suit provision.  Therefore, the United States is not asserting that the zone of interests test applies to Plaintiffs' ESA-related claims against the Corps or the APA-based claims against NMFS concerning its biological opinion, which arguably falls within the ESA zone of interests, as construed by *Bennett*.  *See* 520 U.S. at 176-77.

construe the "zone of interest" test under the APA as to confer standing on *any* entity who claims to have been deprived of access to the APA's general rulemaking requirements.

In *Capital Legal Foundation v. Commodity Credit Corp.*, 711 F.2d 253 (D.C. Cir. 1983), the plaintiff brought an APA claim challenging the agency's failure to provide notice and comment rulemaking on guidance letters.  The court rejected plaintiff's argument that if the agency would have proceeded with APA notice and comment rulemaking, the plaintiff could have "exercised its APA-created public participation right to comment."  *Id.* at 260.  The court concluded that if the APA were read so broadly, then "every asserted violation by an agency of its own regulations could be recharacterized 'de facto rulemaking' outside the APA, and therefore arguably open to challenge as procedurally-flawed by any person who claims he, she, or it would have participated had the rulemaking occurred inside the APA.  We are certain that Congress, in adopting the APA, had no such universal standing design in mind."  *Id.*  To allow Plaintiffs to bring a general APA rulemaking challenge to agency actions that do not actually apply to any of the Plaintiffs would open the door to allowing any entity who has some tangential interest in an agency's actions to bring an APA procedural challenge claiming the agency should have conducted notice and comment rulemaking.  Such a result cannot be what Congress intended under the APA, particularly where, as here, the plaintiffs have no standing to challenge the agency's substantive decisions (as discussed above).  *See Wilderness Soc'y v. Griles*, 824 F.2d 4, 19 (D.C. Cir. 1987) ("Since plaintiffs lack standing to challenge [the agency's] substantive actions, they indeed lack standing to challenge procedural defects in the process that produced those actions.").

Claims 3, 4, and 7 require looking outside the APA to the CWA to determine what "zone of interests" are to be protected or regulated by that statute.  Each of those claims asserts

violations of the CWA or the Corps' regulations under the CWA, which Plaintiffs claim violates

the APA's general "arbitrary and capricious" standard under Section 706.  When a plaintiff

brings its APA claim based on the protections of an independent substantive statute, the court

looks to the interests sought to be protected by that substantive statute.  *See Mendoza*, 924 F.

Supp. 2d at 320-21 (even where plaintiff's claim was brought solely under the APA's notice and

comment rulemaking requirements, court looked to the substantive statute (the Immigration and

Naturalization Act) under which the agency issued the guidance letters to "delineate the zone of

interests" to be protected or regulated); *Scheduled Airlines Traffic Offices, Inc. v. Dep't of Def.*,

87 F.3d 1356, 1359 (D.C. Cir. 1996) (although plaintiff brought suit under the APA, court

looked to the zone of interests protected or regulated by the Miscellaneous Receipts Act).[8]  Thus,

Plaintiffs' interests must be "arguably within the zone of interests to be *protected* or *regulated* by

the statute[s] in question," which is the CWA.  *Id.* (emphasis added) (quoting *Clarke v. Sec.*

*Indus. Ass'n*, 479 U.S. 388, 396 (1987)).  They are not.

      First, Plaintiffs are not actually "regulated" by the agency actions at issue and their

complaint makes no claim that they are.  Thus, their interests are "clearly not within the zone of

interests 'regulated' by" the CWA.  *Scheduled Airlines*, 87 F.3d at 1359 (plaintiff was not a

government official or agency regulated by the statute and, thus, its interest was not within those

"regulated" by the act).

---

[8] On this point, the United States disagrees with the footnote 2 of the *Western Wood Preservers*
opinion where the court stated "although it may well be true that plaintiffs lack prudential
standing under the CWA, that is irrelevant here, where it does not appear that plaintiffs' claims
arise under the CWA.  Instead, the claims challenged by defendant arise directly under the APA
and allege violations of its rulemaking provisions."  925 F. Supp. 2d at 74 n.2.  As discussed
above, case law supports looking to the "zone of interests" of the substantive statute under which
the agency actions were undertaken.

Second, Plaintiffs' interests also are not within those "protected" by the CWA.  A party may demonstrate that its interests are within the zone of those "protected" by a statute "in one of two ways:  'if it is among those [who] Congress expressly or directly indicated were the intended beneficiaries of a statute,' . . . or if it is a 'suitable challenger' to enforce the statute – that is, if its 'interests are sufficiently congruent with those of the intended beneficiaries that the litigants are not more likely to frustrate than to further statutory objectives.'"  *Id.* (quoting *Hazardous Waste Treatment Council v. Thomas*, 885 F.2d 918, 922 (D.C. Cir. 1989)).  Plaintiffs cannot make either of those demonstrations here.

The purpose of the CWA is to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters."  33 U.S.C. § 1251(a).  To further this goal, the Section 404 permitting program "insure[s] that the public interest in environmental safety and quality is preserved."  *Deltona Corp. v. Alexander*, 682 F.2d 888, 892 (11th Cir. 1981).  Plaintiffs have not specifically alleged, however, that they or their members will suffer (or are even threatened with) any reduction in environmental quality as a result of the Corps' adoption of the Regional Conditions.  Instead, they allege that they will sell less treated wood because the Regional Conditions exist.

There can be no reasonable argument that in enacting the CWA Congress intended would-be sellers of treated wood to be the beneficiaries.  Nor do Plaintiffs' interests in increased treated wood sales make them "peculiarly suitable challengers" to the Corps' adoption of regional conditions.  In fact, the D.C. Circuit has repeatedly found a lack of prudential standing where parties relied on purely economic interests that are inconsistent with the purposes served by environmentally protective statutes.  *See, e.g., Hazardous Waste Treatment Council v EPA*,

861 F.2d 277, 282-85 (D.C. Cir. 1998)("*HWTC II*"); *Hazardous Waste Treatment Ass'n v. EPA*, 885 F.2d 918 (D.C. Cir. 1989) ("*HWTC III*").

In *HWTC II*, the D.C. Circuit held that a trade association lacked standing to pursue claims as a representative of hazardous waste treatment firms arguing that EPA regulations adopted under the Resource Conservation and Recovery Act ("RCRA") would diminish the market for those firms' services. *HWTC II*, 861 F.2d at 280.  The court noted that "judicial intervention may defeat statutory goals if it proceeds at the behest of interests that coincide only accidentally with those goals."  *Id.* at 283.  More particularly, the relief sought by the plaintiffs in that case (an extension of certain regulatory deadlines) "might benefit [their profits] . . . but harm the environment."  *Id.* at 284.  The court thus held that the interests asserted by the treatment firms fell "outside the critical zone."  *Id.*[9]  In *HWTC III*, the D.C. Circuit concluded even more strongly that an argument that waste treatment firms (or trade associations acting on their behalf) were suitable challengers to regulations that did not regulate the firms themselves, but allegedly would damage their competitive position, "flies in the face of common sense."  *HWTC III*, 885 F.2d at 924.  As the court explained:

> The ultimate interest of those firms is in making money, of course.  Their immediate interest is in more stringent treatment standards, on the theory that such standards will result in their selling more treatment services, which will, in turn, generate more earnings.  *But there is not the slightest reason to think that treatment firms' interest in getting more revenue by increasing the demand for their particular treatment services will serve RCRA's purpose of protecting health and the environment.*

---

[9]  In so holding, the court recognized but distinguished cases finding prudential standing for firms that sell to regulated parties and complain of regulatory restrictions that would curtail such sales.  *Id.* at 285.  The Regional Conditions do not in any way restrict the individual companies from selling to parties in Oregon and Alaska.  As discussed *supra* Section I.A, B, any lost treated wood sales in Oregon or Alaska are the result of third parties' choice of permitting methodology, not of the Regional Conditions themselves.

*Id.* (emphasis added); *see also id.* at 925 ("The watchword of those firms must be, in short, that treatment is good and more treatment is better – whether the effect on health and the environment is good, bad, or indifferent."); *Cement Kiln Recycling v. EPA*, 255 F.3d 855, 870-71 (D.C. Cir. 2001) (per curiam) (firms that claimed economic and competitive injury lacked prudential standing to challenge regulation under Clean Air Act).

Like the waste treatment firms in *HWTC III*, Plaintiffs' "watchword" is presumably that treated wood sales are good and more sales are better, regardless of the effect on the environment.  There is no reason to believe that, as advocates of treated wood sales, Plaintiffs or their members are "peculiarly suited" to challenge regional conditions that may decrease such sales (at least to the extent that parties opt to use other materials in order to take advantage of the nationwide permitting process).  Plaintiffs thus have failed to demonstrate that they are within the zone of interests protected by the CWA.  *See Borough of Carlstadt v. U. S. Army Corps of Eng'rs*, No. 05-2771, 2006 WL 305314 at * 8 (D.N.J. Feb. 8, 2006) ("purely economic" interests unrelated to quality of aquatic resources or protection of wetlands were not within zone of interests protected by Section 404 of Clean Water Act).

Finally, as to Claims 6 and 11, Plaintiffs also do not fall within the zone of interests regulated or protected by the RFA.  Congress' concern in passing the RFA "was the high cost to small entities of compliance with uniform regulations, and the remedy Congress fashioned – careful consideration of those costs in regulatory flexibility analyses – is accordingly limited to small entities subject to the proposed regulation."  *Mid-Tex Elec. Coop., Inc. v. Fed. Energy Regulatory Comm'n*, 773 F.2d 327, 342 (D.C. Cir. 1985).  As established, Plaintiffs are not regulated by either the Regional Conditions or the SLOPES IV procedures.  Further, as discussed *infra* Section III, these non-regulated entities are neither among the intended beneficiaries of the

RFA nor suitable challengers under a statute that Congress intended to cover only those who suffer economic costs because of regulation.  Plaintiffs therefore do not have prudential standing for Claims 6 and 11 under the RFA.

### III.   THE COURT ALTERNATIVELY SHOULD DISMISS PLAINTIFFS' RFA CLAIMS FOR FAILURE TO STATE A CLAIM.

The Court alternatively should dismiss Plaintiffs' Claims 6 and 11 under Fed. R. Civ. P. 12(b)(6) for failure to state a claim.  RFA Section 604 provides that final rules subject to the RFA that will have a significant impact on a substantial number of small entities require a final regulatory flexibility analysis.  5 U.S.C. § 604.  Claims 6 and 11, respectively, allege the Corps was required to conduct a regulatory flexibility analysis under RFA Section 604 in adopting the Regional Conditions and SLOPES IV procedures.  Setting aside whether the Corps was required to comply with this procedure, Plaintiffs suffer the same hurdle here that they suffered in *Western Wood Preservers* for their RFA claims:  they do not fall under the judicial review provision in RFA Section 611, 5 U.S.C. § 611.  Thus, they have failed to state a claim under the RFA.

RFA Section 611 provides that an agency's compliance with the RFA "shall be subject to judicial review *only* in accordance with" that Section.  5 U.S.C. § 611(c) (emphasis added).  Under Section 611, "a small entity that is adversely affected or aggrieved by final agency action" is entitled to judicial review of noncompliance with specified sections of the statute.  *Id.* 611(a).  This is where Plaintiffs' claims falter under D.C. Circuit case law:  the RFA does not require an agency to consider the impact an action will have on entities that are not directly regulated by that action.  *See Mid-Tex Electric Coop. v. FERC*, 773 F.2d 327, 342-43 (D.C. Cir. 1985) (Congress "did not intend to require that every agency consider every indirect effect that any

32

regulation might have on small businesses in any stratum of the economy"); *Cement Kiln Recyclers*, 255 F.3d at 869 (court has consistently rejected contention that RFA applies to small businesses indirectly affected by regulation of other entities).  The *Western Wood Preservers* Court agreed with these cases:  "Neither plaintiffs nor their members are subject to the proposed regulations contained in the Regional Conditions or the SLOPES IV procedures.  Instead, those regulations affect individuals seeking to comply with nationwide permitting requirements or to undertake in-water or over-water construction projects. . . . Plaintiffs and their members are only affected by the regulations indirectly, when those regulated entities make business decisions about which building materials to use in their projects."  *Western Wood Preservers*, 925 F. Supp. 2d at 76.

Thus, as the *Western Wood Preservers* court found, "because neither plaintiffs nor their members are properly considered 'subject to the requirements of this rule,' the Corps was not obligated to consider whether there would be 'a significant economic impact' on them, and even if one were to assume the facts alleged by plaintiffs to be true, they have not stated a claim for which relief may be granted under the RFA."  *Id.* at 76.  Nothing has changed in this lawsuit. The addition of four individual member companies who claim to be "small businesses" still are not entities who are "subject to the requirements" of the Regional Conditions or the SLOPES IV procedures.  Thus, they are not entitled to judicial review under RFA Section 611 and have failed to state a claim on which relief can be granted.

## CONCLUSION

Plaintiffs' re-filing of their claims did not cure the fundamental defects that prompted the Court to dismiss the prior, related lawsuit, *Western Wood Preservers Inst. v. McHugh,* 925 F. Supp. 2d 63 (D.D.C. 2013).  For the foregoing reasons, the United States respectfully request the

Court to dismiss Plaintiffs' Complaint in its entirety due to Plaintiffs' failure to establish their

Article III standing.  In addition, none of the Plaintiffs has prudential standing for Claims 1-4, 6,

7, and 11 under the CWA, APA, or RFA.  Finally, Plaintiffs have failed to state a claim under

Fed. R. Civ. P. 12(b)(6) for claims 6 and 11 under the RFA.

Respectfully submitted,

ROBERT G. DREHER
Acting Assistant Attorney General
Environment & Natural Resources Division

 /s/ *Michele L. Walter*
MICHELE L. WALTER, DC Bar # 487329
Trial Attorney
Environmental Defense Section
U.S. Department of Justice
601 D St., NW, Suite 8000
Washington, D.C. 20004
Telephone: 202.514.2795
Facsimile:  202.514.8865
michele.walter@usdoj.gov

 */s/ Mark Arthur Brown*
MARK ARTHUR BROWN
 DC Bar # 470050
Senior Trial Attorney
Wildlife and Marine Resources Section
U.S. Department of Justice
P.O. Box 7611
Washington, D.C. 20044 7611
Telephone: (202) 305 0204
Facsimile: (202) 305 0275
Email:  mark.brown@usdoj.gov

*Counsel for Defendants*

DATED:  February 10, 2014

### CERTIFICATE OF SERVICE

The undersigned hereby certifies that on February 10, 2014, a copy of the foregoing was

served on the counsel of record who are registered with the Court's ECF system:


_____/s/ Michele L. Walter_____
MICHELE L. WALTER