UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **PERMAPOST PRODUCTS, INC.;** | ) | Civil No. 13-1736-ESH |
| **TREATED WOOD COUNCIL**; **J. H.** | ) | |
| **BAXTER & CO.**; **CONRAD FOREST** | ) | |
| **PRODUCTS, INC.**; **WESTERN WOOD** | ) | |
| **PRESERVERS INSTITUTE**; **WESTERN** | ) | |
| **WOOD STRUCTURES, INC.**; **RAILWAY** | ) | |
| **TIE ASSOCIATION**; **SOUTHERN** | ) | |
| **PRESSURE TREATERS'** | ) | |
| **ASSOCIATION**; and **CREOSOTE** | ) | |
| **COUNCIL**, | ) | |
| Plaintiffs, | ) | |
| v. | ) | |
| **THE HONORABLE JOHN M. McHUGH**; | ) | |
| **U.S. ARMY CORPS OF ENGINEERS**; | ) | |
| **NATIONAL MARINE FISHERIES** | ) | |
| **SERVICE**; and **PENNY S. PRITZKER**, | ) | |
| Secretary of Commerce, | ) | |
| Defendants | ) | |

_____  )

# PLAINTIFFS' OPPOSITION TO DEFENDANTS'

# MOTION TO DISMISS

Mark C. Rutzick, Inc.
12402 Myra Virginia Ct
Oak Hill, Virginia 20171
Phone/Fax:  703-870-7347  ●  E-mail:  markrutzick@rutzick.com

**Table of Authorities**

Introduction and Summary of Argument ................................................................................1

Statement of Facts Alleged in the Complaint ......................................................................4
A.      Treated Wood.................................................................................................4
B.      The Plaintiffs ................................................................................................6
1.      The four individual company plaintiffs ......................................................6
2.      The five association plaintiffs ...................................................................10
C.      Clean Water Act permitting .....................................................................11
1.      Statutory prohibitions and permits .........................................................11
2.      The permitting decisions challenged in this case ....................................13
D.      Standard Local Operating Procedures for Endangered Species..............15
E.      Prior litigation ..........................................................................................16
F.      The complaint filed in this case.................................................................17

Argument ............................................................................................................................20
I.      THE COMPETITOR STANDING DOCTRINE PROVIDES ARTICLE III STANDING FOR ALL THE CLAIMS IN THIS CASE ......................................................20
A.      Article III standing requirements .............................................. .......... ..............20
B.      At the pleading stage, Plaintiffs have only a "relatively modest" and "not onerous" burden to allege general facts that "embrace those specific facts that are necessary to support the claim," and the Court must  assume those facts to be true and "draw all inferences in favor of the nonmoving party." ........................................................................................20
C.      Defendants' Article III causation/redressability argument ignores, and is contrary to, the well-established doctrine of "competitor standing" recognized by the Supreme Court and the D.C. Circuit ...........................................................................................................21
D.      WWPI has organizational standing to challenge the USACE decisions, apart from standing to represent its members, based on the economic harm that has occurred and is threatened to WWPI's income generated by the BMP Mark Program ....................................25
E.      Plaintiffs need not show that the absence of notice and comment injured them by altering the result of the rulemaking proceeding, and Plaintiffs have alleged that the Regional Conditions are causing them harm ..............................................................................................27
II.      PLAINTIFFS HAVE PRUDENTIAL STANDING ..............................................28
A.      Plaintiff Western Wood, a party directly regulated by USACE, has prudential standing to challenge the Regional Conditions and SLOPES IV Procedures ...........................28
B.      All the Plaintiffs have prudential standing for their CWA claims because economic interests were Congress' primary concern in 33 U.S.C. § 1344, and Plaintiffs' interests are congruent with those of the parties regulated by that statute ...........................................................29
1.      Supreme Court and D.C. Circuit expansion of prudential standing over three decades ......29
a.      Congruence of interest with Congress' objectives in a statute, rather than status as a party that is "regulated or protected," determines the zone of interests .................................................30
b.      Prudential standing under environmental laws is not confined to the "pure of heart" seeking to expand environmental protection, but must be determined from the specific statute giving rise to a plaintiffs' claims and will include economic interests where the specific statutory section at issue indicates congressional interest in economic impacts ................................30
c.      Defendants rely on outdated doctrines that have been rejected by the Supreme Court and the D.C. Circuit, and cite 1980's precedents that employed the subsequently-rejected doctrines ............................................................................................................................32

Mark C. Rutzick, Inc.
12402 Myra Virginia Ct
Oak Hill, Virginia 20171
Phone/Fax:  703-870-7347  ●  E-mail:  markrutzick@rutzick.com

2.      Title 33 U.S.C. § 1344 evidences Congress' deep interest in avoiding needless and burdensome USACE regulation of economic activity, and Plaintiffs' economic interests are fully consistent with, and neither "marginally related to" nor "inconsistent with," the expressed congressional intentions in the statute ...................................................................35

3.      Treated wood producers have a congruence of interest with the treated wood users who are directly regulated by 33 U.S.C. § 1344, and their interest in statutory enforcement will advance, rather than hinder, the operation of a statute ...........................................................36

C.      Plaintiffs's APA rulemaking claims (1, 2 and 3) do not have to meet any prudential standing requirement outside the APA, but in event Plaintiffs have shown they have prudential standing under the CWA .....................................................................................................38

D.      Western Wood has Article III and prudential standing to state a claim under the RFA .......40

Conclusion ...................................................................................................................................41

Mark C. Rutzick, Inc.
12402 Myra Virginia Ct
Oak Hill, Virginia 20171
Phone/Fax:  703-870-7347  ●  E-mail:  markrutzick@rutzick.com

**Table of Authorities**

<u>**Cases**</u>

*Abigail Alliance for Better Access to Developmental Drugs v. Eschenbach,* 469 F.3d 129 (D.C. Cir. 2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26
*\*Amgen, Inc. v. Smith,* 357 F.3d 103 (D.C.Cir. 2004). . . . . . . . . . . . . . . . . . . . . . . . . 3, 30, 33, 35
*Animal Legal Def. Fund, Inc. v. Glickman,* 154 F.3d 426 (D.C. Cir. 1998), *cert. denied sub nom. Nat'l Ass'n for Biomedical Research v. Animal Legal Def. Fund, Inc.,* 526 U.S. 1064 (1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23
*\*Bennett v. Spear,* 520 U.S. 154 (1997) . . . . . . . . . . . . . . . . . . . . 3, 21, 22, 31, 32, 33,34, 35, 36
*Capital Legal Found. v. Commodity Credit Corp.,* 711 F.2d 253 (D.C. Cir. 1983). . . . . . . . . . . 39
*Clarke v. Securities Industry Ass'n,* 479 U.S. 388 (1987). . . . . . . . . . . . . . . . . . . . . 28, 30, 32, 34
*Club Italia Soccer & Sports Org., Inc. v. Charter Tp. of Shelby, Mich.,* 470 F.3d 286 (6th Cir. 2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26
*Cons. Industry Ass'n of Sonoma Cty. v. City of Petaluma,* 522 F.2d 897 (9th Cir. 1975). . . . . . 26
*Control Data Corp. v. Baldrige,* 655 F.2d 283 (D.C. Cir.), *cert. denied,* 454 U.S. 881 (1981). . 30
*Ctr. for Biological Diversity v. U.S. Dep't of the Interior,* 563 F.3d 466 (D.C. Cir. 2009). . . . . 24
*Cty. of Delaware, Pa. v. Dep't of Transp.,* 554 F.3d 143 (D.C. Cir. 2009). . . . . . . . . . . . . 27, 28
*Dismas Charities, Inc. v. U.S. Dept. of Justice,* 401 F.3d 666 (6th Cir. 2005). . . . . . . . . . . . . . 38
*Ethyl Corp. v. Envtl. Prot. Agency,* 306 F.3d 1144 (D.C. Cir. 2002). . . . . . . . . . . . . . . . . . . . . . 37
*\*FAIC Securities, Inc. v. U.S.,* 768 F.2d 352 (D.C. Cir. 1985). . . . . . . . . . . . . . . . . . . . . . . 4, 37
*Fl. Audubon Soc'y v. Bentsen,* 94 F.3d 658 (D.C. Cir.1996). . . . . . . . . . . . . . . . . . . . . . . . . . . . 28
*Grocery Mfrs. Ass'n v. Envtl. Prot. Agency,* 693 F.3d 169 (D.C. Cir. 2012), *cert. denied* 133 S. Ct. 2880 (2013). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20
*Hazardous Waste Treatment Council v Envtl. Prot. Agency,* 861 F.2d 277 (D.C. Cir. 1988), *cert. denied,* 490 U.S. 1106 (1989). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34
*Hazardous Waste Treatment Ass'n v. Envtl. Prot. Agency,* 885 F.2d 918 (D.C. Cir. 1989). . . . 34
*Holistic Candlers and Consumers Ass'n v. Food & Drug Admin.,* 664 F.3d 940 (D.C. Cir. 2012) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21
*\*Honeywell Intern. Inc. v. Envtl. Prot. Agency,* 374 F.3d 1363 (D.C. Cir. 2004), *amended on other grounds,* 393 F.3d 1315 (D.C. Cir. 2005). . . . . . . . . . . . . . . . . . . . 2, 3, 22, 23, 30, 33
*\*Inter. Broth. of Teamsters v. U.S. Dept. of Transp.,* 724 F.3d 206 (D. C. Cir. 2013), *cert. denied sum nom. Owner-Operator Indep. Drivers Ass'n, Inc. v. Dep't of Transp.,* 2014 WL 102990 (U.S. Jan 13, 2014). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 21, 22
*Lepelletier v. Fed. Dep. Ins. Corp.,* 164 F.3d 37 (D.C. Cir. 1999). . . . . . . . . . . . . . . . . . . . . . . . 37
*Liquid Carbonic Industries Corp. v. Fed. Energy Reg. Comm*., 29 F.3d 697 (D.C. Cir. 1994) . 28
*Mass. v. Envtl. Prot. Agency,* 549 U.S. 497 (2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27
*\*Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak,* 132 S.Ct. 2199 (2012). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 29, 30, 33, 34, 36
*Mendoza v. Solis,* 924 F. Supp. 2d 307 (D. D.C. 2013). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39
*Mtn. States Legal Found. v. Glickman,* 92 F.3d 1228 (D.C. Cir. 1996). . . . . . . . . . . . . . . . . . . . 31
*\*Nat'l Ass'n of Home Builders v. U. S. Army Corps of Eng'rs,* 417 F.3d 1272 (D.C. Cir. 2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 14, 15, 18, 27, 33, 35, 37, 38
*Nat'l Ass'n of Home Builders v. U.S. Army Corps of Eng'rs,* 539 F.Supp.2d 331 (D.D.C. 2008)29
*Nat'l Automatic Laundry & Cleaning Council v. Shultz,* 443 F.2d 689 (D.C.Cir.1971). . . . . . . 26
*Nat'l Cottonseed Prod. Ass'n v. Brock,* 825 F.2d 482 (D.C. Cir. 1987). . . . . . . . . . . . . . . . . . . . 37
*\*Nat'l Credit Union Admin. v. First Nat'l Bank & Trust Co.,* 522 U.S. 479 (1998). . . . . . . 2, 21
*Nat'l Min. Ass'n v. Slater,* 167 F.Supp.2d 265 (D.D.C. 2001). . . . . . . . . . . . . . . . . . . . . . . . . . . 22
*Neighborhood Assistance Corp. of Am. v. Cons. Prot. Bur.,* 907 F.Supp.2d 112 (D.D.C. 2012). 26
*Sackett v. E.P.A.,* 132 S.Ct. 1367 (2012). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12
*Scheduled Airlines Traffic Offices, Inc. v. Dep't of Def.,* 87 F.3d 1356 (D.C. Cir. 1996). . . . . . 39
*Sherley v. Sebelius,* 610 F.3d 69 (D.C. Cir. 2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21, 24, 25

*Solid Waste Agency of N. Cook County v. U.S. Army Corps of Eng'rs*, 531 U.S. 159 (2001). . .  12
*\*Sugar Cane Growers Co-op. of Fl. v. Veneman*, 289 F.3d 89 (D.C. Cir. 2002).. . . . . . . . . . .  27
*Summers v. Earth Island Inst.*, 555 U.S. 488 (2009). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  20
*Town of Stratford, Conn, v. Fed. Av. Admin.*, 285 F.3d 84 (D.C. Cir. 2002). . . . . . . . . . . . . . .  32
*U.S. v. Thorson*, 219 F.R.D. 623 (W.D. Wis. 2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  12
*Vill. of Arlington Heights v. Metro. Hous. Dev.*, 429 U.S. 252 (1977). . . . . . . . . . . . . . . . . . .  26
*Wabash Valley Power Ass'n, Inc. v. Fed. Energy Reg. Comm.*, 268 F.3d 1105 (D.C. Cir. 2001).23
*Wilderness Soc'y v. Griles*, 824 F.2d 4 (D.C. Cir. 1987). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  39

## Statutes

5 U.S.C. § 553(b). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  40
5 U.S.C. § 553(c). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  40
5 U.S.C. § 553(d). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  40
5 U.S.C. §603. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  18
5 U.S.C. §604. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  18
16 U.S.C. §1536. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31, 32
33 U.S.C. § 1311. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  12
*\*33 U.S.C. § 1344.. . . . . . . . . . . . . . . . . . . . . . . .  1, 2, 4, 12, 13, 29, 34, 35, 36, 37, 38
33 U.S.C. §1344(a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  36
33 U.S.C. §1344(e). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 19, 36
APA, 5 U.S.C. §706. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  16
Administrative Procedure Act (APA), 5 U.S.C. §553. . . . . . . . . . . . . . . . . . . . . . .  4, 38, 39
Endangered Species Act (ESA), 16 U.S.C. §§ 1531 et seq. . . . . . . . . . . . . . . . . . . . . . . . . . .  6
Regulatory Flexibility Act, 5, U.S.C. §§ 601 et seq. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  1

## Other Authorities

33 C.F.R. § 328.3(a)(3) (1999). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  12
33 C.F.R. §330.4(a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  13
33 C.F.R. §330.4(e)(1). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  13
33 C.F.R. 323.2(f). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  12
33 C.F.R. 323.3(c). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  12
Fed.R.Civ.P. 12(b)(1). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16, 20
Fed.R.Civ.P. 12(b)(6).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16, 17

\* indicates authorities chiefly relied on

## Introduction and Summary of Argument

Plaintiffs are *a*) Western Wood Structures, Inc. (Western Wood), a treated wood design and construction company that is directly regulated by defendant U.S. Army Corps of Engineers (USACE); *b*) three treated wood producers; and *c*) five trade associations of businesses in the treated wood industry throughout the United States.  They are challenging two "Regional Conditions" – one for Oregon and one for Alaska – attached by USACE regional offices to the agency's Clean Water Act (CWA) nationwide general permits issued in 2012.  These Regional Conditions severely disadvantage treated wood in the outdoor and aquatic building materials marketplace in Oregon and Alaska by excluding treated wood from the expedited general permitting procedures that are available for the competing steel, plastic, concrete and untreated wood materials.  Plaintiffs also challenge USACE operating procedures that similarly disadvantage treated wood against its marketplace competitors in Oregon.  Plaintiffs' have asserted 11 claims alleging that these decisions were made without required notice and comment rulemaking procedures or a regulatory flexibility analysis, are arbitrary and capricious, and violate mandates in the Endangered Species Act.

Defendants now seek dismissal of all or parts of the complaint on three grounds:  1) Defendants contend Plaintiffs have failed to allege the required causation and redressibility elements for Article III standing because a building material purchaser's choice to buy a competing product available under the nationwide general permit, rather than seeking an individual permit from USACE for treated wood, is an independent decision by a third party that is not "caused" by the challenged USACE decisions; 2) Plaintiffs lack prudential standing for seven of their claims because, according to Defendants, the Plaintiffs are neither regulated nor protected by the Clean Water Act (ignoring Western Wood's allegations that it is a regulated party); and 3) Plaintiffs fail to state a claim under the Regulatory Flexibility Act, 5, U.S.C. §§ 601 *et seq*. because, according to Defendants, none of the Plaintiffs is directly regulated by USACE (again ignoring Western Wood's allegations that it is directly regulated by USACE).

Page 1 -       **PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**

The motion should be denied because Plaintiffs have alleged in specific detail the elements of injury, causation and redressability required for Article III standing, they meet every prudential standing requirement for their claims, and their RFA claims are legally sufficient.

Plaintiffs' standing allegations. Western Wood designs and installs treated wood bridges and other outdoor structures for its customers in and over USACE-regulated waters in Oregon, Alaska and elsewhere. Western Wood's installation and construction of these structures constitutes a "discharge" under the Clean Water Act that requires a permit issued by USACE. As a result, and central to the standing issues raised in this motion, Western Wood is directly regulated by the USACE, and has lost at least three contracts since 2012 due to the USACE Regional Conditions challenged in this case. The other three individual plaintiffs are treated wood manufacturers who also allege specific details of business they have lost since 2012 due to the USACE Regional Conditions and procedures the plaintiffs are challenging in this case. In addition, plaintiff Western Wood Preservers Institute (WWPI) has alleged financial loss the organization itself has suffered, and continues to face, in a program it administers for its members, who have reduced their payments for the program due to a reduction in their treated wood sales caused by the Regional Conditions and procedures challenged in this case.

1. Article III Standing. Plaintiffs have Article III standing under the "competitor standing doctrine" frequently applied by the Supreme Court and the D.C. Circuit, which grants standing to a marketplace competitor to challenge government action "relaxing statutory restrictions on the activities of" the plaintiff's competitors. *Nat'l Credit Union Admin. v. First Nat'l Bank & Trust Co.*, 522 U.S. 479, 488 (1998). "[I]t is well established that parties suffer cognizable injury under Article III when an agency lifts regulatory restrictions on their competitors or otherwise allows increased competition." *Honeywell Intern. Inc. v. Envtl. Prot. Agency*, 374 F.3d 1363 (D.C. Cir. 2004), *amended on other grounds*, 393 F.3d 1315 (D.C. Cir. 2005). "The causation and redressability requirements of Article III standing are easily satisfied [when an agency lifts regulatory restrictions

Page 2 -      **PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**

Mark C. Rutzick, Inc.
12402 Myra Virginia Ct
Oak Hill, Virginia 20171
Phone/Fax:  703-870-7347  ●  E-mail:  markrutzick@rutzick.com

on the plaintiff's competitors] because, absent the [regulatory decision], members of these groups would not be subject to increased competition. " *Inter. Broth. of Teamsters v. U.S. Dept. of Transp.*, 724 F.3d 206, 211-12 (D. C. Cir. 2013), *cert. denied sum nom. Owner-Operator Indep. Drivers Ass'n, Inc. v. Dep't of Transp.*, 2014 WL 102990 (U.S. Jan 13, 2014).  The Supreme Court has rejected the "independent third party" causation argument offered by Defendants here because it "wrongly equates injury 'fairly traceable' to the defendant with injury as to which the defendant's actions are the very last step in the chain of causation." *Bennett v. Spear*, 520 U.S. 154, 168 (1997).

 2. <u>Prudential Standing.</u>  Western Wood, as a party directly regulated by USACE under the CWA statute that authorizes the challenged Regional Conditions, has unchallengeable prudential standing under Supreme Court and D.C. Circuit precedent.  Defendants do not claim otherwise; they simply failed to address Western Wood's prudential standing.

 All the treated wood producing plaintiffs also have prudential standing for the challenged claims.  Prudential standing is not limited to parties who are themselves "regulated" or "protected" by a statute, as Defendants contend, because "[c]ongruence of interests, rather than identity of interests, is the benchmark [for prudential standing]." *Amgen, Inc. v. Smith*, 357 F.3d 103, 109 (D.C.Cir. 2004).  "The [zone of interest] test forecloses suit only when a plaintiff's interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit." *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 132 S.Ct. 2199, 2211 (2012).  "If there is reason to believe that a party's interest in statutory enforcement will advance, rather than hinder, the operation of a statute, the court can reasonably assume that Congress intended to permit the suit." *Honeywell Intern. Inc.*, 374 F.3d at 1370.

 Prudential standing is determined not from the broad overall purpose of a legislative enactment, but from the specific purpose of the particular statutory section that gives rise to the plaintiffs' claims. *Bennett*, 520 U.S. at 175-76.  The Clean Water Act statute at issue in this case,

Page 3 -  **PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**

33 U.S.C. § 1344, makes protection of economic activity its primary goal – it exempts some economic sectors altogether from environmental regulation, and authorizes general and individual permits to help facilitate the non-exempt sectors.  Plaintiffs' economic concerns are entirely congruent with the evident congressional motivation for that statutory provision. Plaintiffs also have prudential standing here because their economic interest in challenging biased and unfair regulatory enactments is in line with that of the purchasers of their products, like Western Wood, who are directly regulated by the CWA.  The D.C. Circuit has held several times that unregulated vendors have congruent interests with their regulated vendees that allows the vendors to represent vendees. *See. e.g., FAIC Securities, Inc. v. U.S.*, 768 F.2d 352, 357 (D.C. Cir. 1985).

While Defendants seem to contend Plaintiffs' Claims 1, 2 and 3 alleging that Defendants violated the rulemaking requirements of the Administrative Procedure Act (APA), 5 U.S.C. §553, must meet a zone of interests test defined by a statute other than the APA, Defendants do not identify how the proper zone of interests should be determined, and do not claim it is the CWA.  *See* Defendants' Brief (Def. Br.) at 27-28. Even if an additional zone of interests test were required, Plaintiffs' prudential standing for their CWA claims would extend to their APA rulemaking claims.

3. Sufficiency of RFA Claims.  Western Wood, as a small business directly regulated by USACE, has standing and legal right to challenge USACE's failure to prepare a regulatory flexibility statement for the Regional Conditions and local operating procedures, since those statements must examine the impact of the proposed decisions on directly regulated small businesses like Western Wood.  Defendant again overlook Western Wood's status as a regulated party, and do not explain why Western Wood's regulated status is not sufficient to state a claim under the RFA.

**Statement of Facts Alleged in the Complaint**

A.     **Treated Wood**

Treated wood is manufactured by pressure injection of a chemical preservative into raw wood, a process which greatly extends the useful life of wood products for decades by resisting

damage from termites and decay fungi, especially in outdoor or aquatic areas where exposure to water is extensive.  For well over a century, treated wood has been widely used throughout the United States in exterior applications such as bridges, docks, utility poles, railroad cross ties, decks, fences, retaining walls, pilings, signposts, permanent foundations and general construction lumber.  Complaint, ECF 1, ¶15 (all subsequent paragraph references are to the Complaint).

In response to environmental concerns, in recent years the treated wood industry has developed new treating materials with substantially reduced potential impacts on surrounding land and water.  The principal treating materials in use today in the United States include alkaline copper quaternary (ACQ), ammoniacal copper zinc arsenate (ACZA), copper azole (CA-B & CA-C), chromated copper arsenate (CCA), DCOI/imidacloprid/stabilizer (EL2), propiconazole tebuconazole imidacloprid (PTI), copper naphthenate, creosote, pentachlorophenol (Penta), micronized copper azole (MCA) and micronized copper quaternary (MCQ).  Most treated wood products used in the United States are produced in western and southern states, and are distributed and resold in all 50 states and many foreign countries.  ¶15.

Treated wood producers purchase untreated logs and lumber, and apply a selected treating material to the untreated product under very high pressure in an enclosed cylindrical treating container called a "retort."  Treated wood producers then sell their treated products to retailers (*e.g.,* Home Depot and Lowes), to distributors, and also directly to end-users such as builders, construction companies, landowners, land managers and public agencies.  Thus, in the stream of commerce, the treated wood producers sell their products to end-users who are directly regulated by the USACE decisions challenged in this case, such as Plaintiff Western Wood.

Plaintiff WWPI, a trade association representing western treated wood producers and related businesses, has worked with the USACE and Defendant National Marine Fisheries Service (NMFS) for almost two decades to develop environmentally sustainable standards for the use of treated wood in aquatic environments that can support fish and wildlife species of concern to federal wildlife

Page 5 -      **PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**

Mark C. Rutzick, Inc.
12402 Myra Virginia Ct
Oak Hill, Virginia 20171
Phone/Fax:  703-870-7347  ●  E-mail:  markrutzick@rutzick.com

management agencies, including species protected under the Endangered Species Act (ESA), 16 U.S.C. §§ 1531 *et seq.*  WWPI wrote, published and has revised, with plaintiff Southern Pressure Treating Association (SPTA) and other industry groups, a set of *Best Management Practices For the Use of Treated Wood in Aquatic and Wetland Environments* that has been endorsed and recommended by USACE and NMFS.  ¶¶ 8, 9.  Treated wood is not the only building material available for use in aquatic environments.  Treated wood competes in the market place against plastics, steel, concrete and untreated wood.  ¶¶ 7, 10, 25.  The competing products also present a range of environmental concerns.  *Id.*

In 2009 NMFS, at the urging of WWPI, completed a rigorous review of treated wood use in aquatic environments, and adopted a set of agency guidelines entitled "*The Use of Treated Wood Products in Aquatic Environments:  Guidelines to West Coast NOAA Fisheries Staff for Endangered Species Act and Essential Fish Habitat Consultations in the Alaska, Northwest and Southwest Regions*" (NMFS Guidelines).  ¶ 25.  The NMFS Guidelines recognize that many uses of treated wood in and over aquatic environments pose no detectable threat of harm to federally protected species and other aquatic resources, and recommend a site-specific review of the effects of treated wood only for projects that involve installation in water of the equivalent of more than 50 treated wood pilings.  The NMFS Guidelines represent the best scientific information currently available on the impacts of treated wood in aquatic environments.  ¶ 76.

**B.    The Plaintiffs**.

    **1.  The four individual company plaintiffs.**

Plaintiff Western Wood, based near Portland, OR, is a small business as defined by the Small Business Administration (SBA) that has been in operation since 1969.  Western Wood designs, sells and installs engineered wood systems using treated wood products purchased from producers. Western Wood has designed, supplied or installed more than 5,000 timber bridges in 45 states and many countries around the world, virtually all made with treated wood.  Western Wood has installed

**PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**

over 100 bridges for the U.S. Forest Service in Oregon and Alaska, including a recently-completed 280 foot span bridge in the Chugach National Forest in Alaska.  ¶10.

Western Wood annually receives and performs over 70 contracts for design and construction of treated wood projects, and typically 15-20 of these contracts per year – hundreds in total over the years the company has been in business – require Western Wood to perform the installation of the structure.  Most of these structures are installed out of doors, and many of these structures are in or over USACE-regulated waters.  Western Wood cannot install these structures without a USACE permit under the Clean Water Act.  Thus, Western Wood is directly regulated by the USACE, and is directly affected by the Regional Conditions challenged in this case.  ¶10.

Western Wood has found that its customers, particularly including the U.S. Forest Service, are increasingly reluctant or unwilling to specify treated wood in their contracts due to the need for individualized ESA consultation to obtain a USACE permit to use treated wood for a project.  The Forest Service is increasingly requiring that its projects be built with untreated wood or steel, reducing the business opportunities for Western Wood and diminishing its present and future business.  Recently the State of Oregon invited bids for projects specifying no treated wood, and informed Western Wood that the USACE has prohibited use of treated wood.  ¶ 10. On one recent job the Oregon Department of State Lands instructed Western Wood to remove treated wood from a project and to replace it with plastic.  On another occasion, a Portland-area parks and recreation district told Western Wood that it had been instructed not to use treated wood for a project, and it had therefore decided to build a steel bridge instead, precluding Western Wood from bidding on the project. Western Wood believes the USACE Regional Conditions excluding treated wood from the standard CWA general permits is the principal cause of all these decisions.  Western Wood also expects future loss of business due to the challenged Oregon and Alaska permit conditions.  ¶ 10.

The other three individual company plaintiffs are pressure-treated wood manufacturers:

a. Plaintiff Permapost Products, Inc. (Permapost), based in Hillsboro, OR, is an SBA-defined

Page 7 -      **PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**

Mark C. Rutzick, Inc.
12402 Myra Virginia Ct
Oak Hill, Virginia 20171
Phone/Fax:  703-870-7347  ●  E-mail:  markrutzick@rutzick.com

small business which produces and fabricates pressured-treated wood products for sale to commercial and industrial customers in Oregon and Alaska, and elsewhere.  ¶ 4.  Permapost manufactures pressure-treated forest products for highway and pedestrian bridges, retaining walls, picnic tables and shelters, lighting standards, and marinas, which are used for park management, recreation, wildlife management, docks and piers.  Permapost's customers are commonly required to obtain permits from the USACE to install treated-wood materials in and over aquatic environments in Oregon and Alaska.  Since adoption of the USACE Regional Conditions for Oregon and Alaska challenged in this case, Permapost has lost sales to customers in Oregon and Alaska due to the inability of end-users in those two states to install treated wood products under a Clean Water Act general permit, which has had the effect of forcing end-users to select construction materials other than treated wood.  In July 2013, after Permapost submitted a contract bid to provide treated wood to construct five bridges on Forest Service land, a Forest Service engineer instructed Permapost to resubmit the bid without treated wood based on the USACE treated wood restrictions challenged in this case.   The decisions challenged in this case have caused financial loss to Permapost and threaten further financial loss to the company.  ¶ 4.

b.  J. H. Baxter & Co. (Baxter), which is based in San Mateo, CA, and also operates manufacturing facilities in Oregon, is an SBA-defined small business, and a Woman-Owned Business Enterprise certified by the California Public Utilities Commission and the State of Oregon, which has been in business since 1896.  Baxter produces bulkheads, decks, docks, marinas, pilings, piers, wharfs and bridges using a wide variety of oil-borne and water-borne treating products.  Many public and private ports on the West Coast use its products.  Baxter sells to wholesale customers in Oregon and Alaska, and also sells directly to end-users in Oregon.  Many of the projects that involve the use of its treated wood products require CWA permits from the USACE.  Baxter's customers and end-users have reported increasing reluctance by federal regulatory authorities in Oregon to approve the use of treated wood in aquatic applications, and since the USACE Oregon and Alaska Regional

Page 8 -       **PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**

Mark C. Rutzick, Inc.
12402 Myra Virginia Ct
Oak Hill, Virginia 20171
Phone/Fax:  703-870-7347   ●   E-mail:  markrutzick@rutzick.com

Conditions took effect in 2012, Baxter has lost business from customers and end-users who are unable to use treated wood in or over water due to the exclusion of these products from the USACE's CWA general permits.  Baxter is threatened with additional future business losses as a result of the USACE decisions challenged in this case.  ¶ 6.

c.  Conrad Forest Products, Inc. (Conrad), based in the small town of North Bend, OR, on Oregon's Pacific Coast, is an SBA-defined small business which operates manufacturing facilities in North Bend, OR, Rainier, OR and Arbuckle, CA.  Conrad has been engaged since 1979 in the business of producing pressure-treated preserved wood products that are used in bridges, docks, retaining walls, pedestrian boardwalks and habitat improvement projects.  A USACE permit under the Clean Water Act must be obtained before these structures can be installed in aquatic environments.  Conrad has supplied products used in the construction of hundreds of bridges and other structures in Alaska and Oregon.  Conrad has observed that its customers are increasingly reluctant to specify treated wood in their contracts due to the increased regulatory burden imposed by federal agencies.  While the U.S. Forest Service has traditionally had a strong preference for the use of treated wood in outdoor structures rather than competing steel structures, recently Conrad has been advised by Forest Service engineering staff in Oregon that they are no longer allowed to specify treated wood in their outdoor structures.  The reason given is that the use of treated wood requires a special ESA consultation with NMFS, and the Forest Service does not have the staff or funds to prepare for and conduct such consultations.  The need for this extended permitting process results from the decisions challenged in this case.  In place of treated wood, the Forest Service is increasingly requiring that its projects be built with untreated wood, which has a much shorter useful and requires far more frequent replacement and maintenance, or with steel, a product that Conrad does not produce, reducing the business opportunities for Conrad, causing financial loss and threatening further financial loss.  ¶ 7.

Page 9 -       **PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**

**2. The five association plaintiffs.**

a.  Plaintiff WWPI, based in Vancouver, WA, is a non-profit trade organization representing 25 manufacturers of pressure-treated wood products in western North America, as well as suppliers, affiliates and related businesses.  Many of its members operate in Oregon or Alaska, or sell treated wood to customers or end-users in Oregon or Alaska, including plaintiffs Western Wood, Permapost, Conrad and Baxter, as well as Allweather Wood LLC, Washougal, WA; Exterior Wood, Inc., Washougal, WA; McFarland Cascade, a Stella-Jones Company, Eugene, OR and Sheridan, OR; Superior Wood Treating, Sumner, WA; Bridgewell Resources, LLC , Tigard, OR and Western Wood Preserving Co., Sumner, WA.  As explained above, WWPI addresses regulatory matters affecting its members, including environmental issues at the federal and state level.  ¶ 8.  The companies named above have lost business, and fear additional future losses, resulting from the decisions challenged in this case.

WWPI itself has also been directly injured by the challenged decisions.  As part of developing best management practices (BMPs) for its members, WWPI created a revenue-generating endeavor called the "BMP Mark Program."  ¶ 9.  The BMP Mark Program is a fee-based license agreement ($300 per year renewed annually) between a member wood-preserving company and WWPI.  Participation in the BMP Mark Program allows companies to use the BMP trademark for the purpose of marketing their products and certifying they comply with the requirements of the BMPs as confirmed by an independent WWPI-approved third party inspection agency.  Any qualifying third party inspection agency that wishes to provide quality assurance and inspection services is also required to enter into an agreement with WWPI for an annual fee of $1,000.  In addition, the agency is required to pay WWPI an inspection volume fee of $0.02 per lineal foot of piling or round stock, $0.50 per thousand board feet of sawn material, and $0.50 per thousand square feet of plywood produced by all participating treating companies.  Currently two inspection agencies and seven WWPI member treating companies participate in the BMP Mark Program.  Thus, WWPI

receives income from every unit of treated wood sold by one of its members who participates in the BMP Mark Program. The BMP Mark Program currently generates $5,000-$7,000 dollars of revenue per year for WWPI with the potential to significantly increase in the future if more companies choose to join the program.   The decisions challenged in this case have caused and threaten the loss of sales of treated wood by the WWPI members who participate in the BMP Mark Program that is resulting in, and is threatening to cause, direct financial loss to WWPI.  ¶ 9.

b. The Treated Wood Council (TWC), based in the District of Columbia, represents over 440 companies and organizations throughout the United States, including plaintiffs Baxter and Conrad, that produce pressure-treated wood products, manufacture wood preservatives, harvest and saw wood or serve the treated wood industry.  The TWC monitors and responds to legislation and regulatory activities related to the treated wood industry, and advocates for environmentally sound standards for treated wood manufacture and use. ¶ 5.

c. SPTA, based in Pineville, LA, is a trade association representing treated wood producers and related businesses in the eastern half of the United States. Its members manufacture pressure treated wood poles and wood cross arms, timber piles, timbers and various other pressure treated industrial wood products for America's energy, construction and transportation infrastructure. ¶ 12.

d. The Railway Tie Association, based in Fayetteville, GA, promotes the economical and environmentally sound use of treated wood crossties for North American railroads.  ¶ 11.

e. The Creosote Council (CC), headquartered in Valencia PA, represents the regulatory and legislative interests of companies that produce and/or use creosote, a wood preservative used on railroad ties, marine and foundation piling, structural sawn wood timbers, posts, wood utility poles, and other industrial wood products.  ¶ 13.

**C.** **Clean Water Act permitting**.

**1.** **Statutory prohibitions and permits.**

"The Clean Water Act prohibits, among other things, the discharge of any pollutant by any

Mark C. Rutzick, Inc.
12402 Myra Virginia Ct
Oak Hill, Virginia 20171
Phone/Fax:  703-870-7347  ●  E-mail:  markrutzick@rutzick.com

person, ... without a permit, into ... the waters of the United States ....” *Sackett v. E.P.A.*, 132 S.Ct. 1367, 1369-70 (2012) (internal quotations omitted), *citing* 33 U.S.C. § 1311.  USACE regulatory authority under 33 U.S.C. § 1311 extends broadly not only to oceans and navigable rivers but also to “intrastate lakes, rivers, streams (including intermittent streams), mudflats, sandflats, wetlands, sloughs, prairie potholes, wet meadows, playa lakes, or natural ponds, the use, degradation or destruction of which could affect interstate or foreign commerce ....” *Solid Waste Agency of N. Cook County v. U.S. Army Corps of Eng’rs*, 531 U.S. 159, 163 (2001), *quoting* 33 C.F.R. § 328.3(a)(3) (1999).  USACE broadly interprets the term “discharge” to mean, among other things, “the building of any structure” in USACE-regulated waters.  33 C.F.R. 323.2(f).  The placement of a piling into regulated waters can constitute a discharge.  33 C.F.R. 323.3(c).  A prohibited discharge leads to “a compliance order or ... a civil enforcement action.”  *Sackett*, 132 S. Ct. at 1370.  A contractor performing work for a property owner in USACE-regulated waters is a “person” subject to the regulatory provisions of the CWA.  *See, e.g.*, *U.S. v. Thorson*, 219 F.R.D. 623 (W.D. Wis. 2003) (enforcement action against excavation contractor).  Thus, plaintiff Western Wood, which constructs and installs treated wood bridges and other structures under contracts with land owners and managers, is directly subject to USACE regulation.

Title 33 U.S.C. §1344, known as section 404 of the CWA, contains two separate measures that allow discharges otherwise prohibited by §1311:

First, §1344(f) provides broad exemptions from the §1311 discharge prohibition for various categories of economic activity where “the discharge of dredged or fill material ... is not prohibited by or otherwise subject to regulation under this section.”  *Id*.  The exempted categories of economic activity include “normal farming, silviculture [*i.e.*, forest management], and ranching activities,” §1344(f)(1)(A); “maintenance ... of ... dikes, dams, levees, groins, riprap, breakwaters, causeways, and bridge abutments or approaches, and transportation structures,” §1344(f)(1)(B); “construction or maintenance of farm or stock ponds or irrigation ditches, or the maintenance of drainage ditches,”

Page 12 -      **PLAINTIFFS’ OPPOSITION TO DEFENDANTS’ MOTION TO DISMISS**

Mark C. Rutzick, Inc.
12402 Myra Virginia Ct
Oak Hill, Virginia 20171
Phone/Fax:  703-870-7347  ●  E-mail:  markrutzick@rutzick.com

§1344(f)(1)(C); "temporary sedimentation basins on a construction site," §1344(f)(1)(D); and "construction or maintenance of farm roads or forest roads, or temporary roads for moving mining equipment," §1344(f)(1)(E).  Thus, discharges in connection with these broad categories of economic activity can not be prohibited or controlled under the Clean Water Act.

Secondly, §1344 also authorizes the Secretary of the Army to issue permits "for the discharge of dredged or fill material into the navigable waters" that is not otherwise exempt from regulation under §1344(f).  In addition to individual permits that may be granted, 33 U.S.C. §1344(e) allows the Secretary of the Army to issue "general permits on a State, regional, or nationwide basis" for up to five years upon a finding that the permitted activities "will cause only minimal adverse environmental effects." USACE has adopted regulations allowing USACE divisions to modify such nationwide permits on a geographical basis through "regional conditions," 33 C.F.R. §330.4(e)(1), which are legally binding on permittees, who "must satisfy all ... conditions" on a nationwide permit in order to rely on the permit.  33 C.F.R. §330.4(a).   These provisions authorize the permits Western Wood must obtain to install treated wood structures in and over waters regulated by USACE.

"Thus a party desiring to discharge fill or dredged material into our nation's navigable waters may do so in either of two ways. ... If the proposed discharge activity is covered by a general permit, the party may proceed without obtaining an individual permit or, in some cases, even without giving the Corps notice of the discharge.  ...  On the other hand, if the proposed discharge is not covered by a general permit, the party must secure an individual permit before undertaking the discharge." *Nat'l Ass'n of Home Builders v. U. S. Army Corps of Eng'rs,* 417 F.3d 1272, 1275-76 (D.C. Cir. 2005) (citation and quotation omitted).

**2.     The permitting decisions challenged in this case.**

a. On February 21, 2012, USACE published its 2012-17 nationwide permits in the Federal Register, following publication of a proposed rule and consideration of public comments under the APA.  77 Fed. Reg. 10184.  On March 16, 2012, the Commander of the USACE Northwest Division

Page 13 -     **PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**

approved a regional condition to the nationwide permits for the Portland District prohibiting "wood products treated with biologically harmful leachable chemical components ... to be placed over or come in contact with waters or wetlands."  ¶¶23-24.  USACE never made a finding that this ban on treated wood is necessary to achieve the "minimal adverse environmental effects" standard in the CWA. In fact the Commander contemporaneously approved regional conditions for the Seattle and Walla Walla Districts – which jointly regulate some of the same waters as the Portland District (*e.g.*, the Columbia and Snake Rivers) – that allow the use of treated wood in those waters, finding that treated wood in those waters <u>meets</u> the "minimal adverse environmental effects" limitation.  Thus, USACE has created an irrational situation where treated wood may be used under a general permit on the Washington side of the Columbia River, and on the Idaho side of the Snake River, but not on the Oregon side of either water body.   USACE has never acknowledged or explained its contradictory findings.  ¶¶61-69.

b.  On March 19, 2012 the Commander of the USACE Pacific Ocean Division approved a regional condition for the Alaska District prohibiting all use of Penta, and prohibiting all fresh water use of creosote.  ¶24.

Thus, in Oregon and Alaska any private citizen or government agency wishing to take advantage of the nationwide general permits may freely use plastic, steel, concrete or untreated products to build bridges, docks and other structures in or over USACE-regulated waters, but <u>can not use</u> the nationwide general permits to build such a structure with any treated wood product (in Oregon), or any treated wood product with Penta or, in fresh water, creosote (in Alaska) .

Because of the regulatory exclusion in the two Regional Conditions, treated wood can be used only if the potential user petitions USACE for an individual permit, triggering a lengthy and expensive individual permitting process.  "The Corps' individual permit process is, by contrast [to the general permits], a longer, more comprehensive procedure." *Nat'l Ass'n of Home Builders,* 417 F.3d at 1275 (citation and quotation omitted).   USACE admits that the average processing time for

an individual permit is seven months, 77 Fed. Reg. at 10628, while the minimal paperwork required to rely on the nationwide permit for competing materials takes only one month to process. *Id*. Obtaining an individual permit for treated wood requires USACE to complete an individual ESA consultation with NMFS. If the purchaser is a federal agency (*e.g.*, Forest Service), the agency must also participate in the ESA consultation. These differing regulatory rules give plastic, steel, concrete and untreated wood an enormous market advantage over treated wood in Oregon and Alaska.

**D.      Standard Local Operating Procedures for Endangered Species.**

USACE's Portland District has also developed sets of "Standard Local Operating Procedures for Endangered Species" (SLOPES) for recurring activities within that district (encompassing the state of Oregon). Between 2001 and 2008 USACE issued three sets of SLOPES procedures, following ESA consultation with NMFS, which did not limit use of treated wood. ¶ 28. On November 2, 2011, USACE requested consultation with NMFS on a new set of SLOPES Procedures (called SLOPES IV) for new recreational boat docks and for maintenance, rehabilitation, replacement or removal of existing in-water or over-water structures in Oregon, including the south shore of the Columbia River and its tributaries. ¶ 29. On April 5, 2012 NMFS issued a biological opinion concluding that the SLOPES IV Procedures are not likely to jeopardize the continued existence of endangered and threatened species (SLOPES IV Biological Opinion). *Id*.

The SLOPES IV Procedures includes among its "proposed design criteria" a total prohibition on the use of treated wood in or over waters and wetlands subject to USACE jurisdiction. ¶ 31. As a condition of the NMFS biological opinion, NMFS required that USACE must apply the proposed design criteria to "each individual project." Thus, under the SLOPES IV Procedures as enforced through the SLOPES IV Biological Opinion, USACE and NMFS now ban treated wood from new recreational boat docks and maintenance, repair or replacement of all existing in-water or over-water structures in Oregon. Any proposed use of treated wood for these structures would require USACE to initiate and complete a separate ESA consultation. ¶¶ 29-31.

Page 15 -      **PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**

E.      **Prior litigation.**

In July 2012, four months after the challenged Regional Conditions were approved, the five associational plaintiffs in this case filed a legal challenge to the Regional Conditions and the SLOPES IV procedures.  *Western Wood Preservers Inst. v. McHugh*, No. 12-1253-ESH (D.D.C. 2012).  Their complaint alleged 12 claims:  three claims alleging violations of APA rulemaking requirements in the adoption of the Regional Conditions; one claim alleging a related violation of Clean Water Act rulemaking requirements in the same decisions; two claims alleging violations of the rational decisionmaking requirements of the APA, 5 U.S.C. §706; two claims alleging violations of the National Environmental Policy Act (NEPA), §§4321 *et seq*.; two claims alleging violations of the RFA; and two claims under the ESA – one claim alleging USACE violated the ESA by failing to consult with wildlife agencies on the Regional Conditions; and one claim alleging USACE and NMFS violated the ESA by failing to "use the best scientific and commercial data available" in making the challenged decisions.

Defendants moved to dismiss the complaint under Fed.R.Civ.P. 12(b)(1) (lack of jurisdiction) (alleging lack of injury in fact, lack of causation and lack of prudential standing as to some claims) and 12(b)(6) (failure to state a claim for some claims).  The Court granted both motions in part:

a.  The Court dismissed 10 of the claims under Fed.R.Civ.P. 12(b)(1) "without prejudice" for failing to allege a constitutionally sufficient injury in fact I) due to Plaintiffs' failure to identify specific named members of the associations who had suffered injury in fact, and thus their failure to allege associational standing on behalf of their members, and ii) due to the insufficiency of the associations' alleged environmental, informational and procedural injury on their own behalf, independent of their members.  Memorandum Opinion (Feb. 27, 2013) (Feb. Mem. Op.) at 5-12.

b.  The Court dismissed the two NEPA claims with prejudice under Fed.R.Civ.P. 12(b)(6) for failure to state a claim, finding that the associations lack prudential standing to sue under that statute.  Feb. Mem. Op. 12-15.

Page 16 -      **PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**

c. The Court dismissed the two RFA claims with prejudice under Fed.R.Civ.P. 12(b)(6) for failure to state a claim because the association members are not "regulated" by USACE and therefore the RFA does not require consideration of rulemaking impacts upon them.  Feb. Mem. Op. at 15-17.

d. The Court dismissed Claim 10 against NMFS (but not USACE) with prejudice under Fed.R.Civ.P. 12(b)(6) for failure to state a claim. Feb. Mem. Op. 18-20.

The plaintiffs moved for reconsideration of some aspects of the ruling, and in response the Court changed its dismissal of Claim 10 against NMFS to "without prejudice."  Order (July 22, 2013).  In addition, the Court deferred a ruling on whether the addition of Western Wood as a plaintiff would make the RFA claims legally sufficient, because the Court denied leave to file an amended complaint that would have added Western Wood as a plaintiff:  "If plaintiffs re-file their complaint with additional plaintiffs, the Court can consider whether those plaintiffs may bring a claim under the RFA at that time."  Memorandum Opinion (July 22, 2013) (July Mem. Op.) at 6.

**F.    The complaint filed in this case**.

The complaint, ECF 1, responds to all the Court's rulings in *Western Wood Preservers Inst.*:

1. Four individual companies who are members of one or more of the associational plaintiffs have been added as plaintiffs in the case.  They have made detailed specific allegations of "concrete and particularized" and "actual or imminent" injury in fact to themselves, which is sufficient to establish not only their own standing under Article III, but also the standing of the associations to represent their members.  ¶¶ 4, 6, 7, 10.  Plaintiff WWPI has also identified six additional non-plaintiff members who have suffered injury in fact from the challenged agency decisions.  ¶ 9.  Notably, Defendants do not challenge the adequacy of the companies' injury allegations.

2. The associational plaintiffs are no longer claiming environmental, informational or (with the exception of WWPI) procedural injury to themselves – grounds the Court found insufficiently pleaded in *Western Wood Preservers Inst.*  Feb. Mem. Op. at 7-12.  However, Plaintiff WWPI has now alleged a direct economic injury to itself from the challenged decisions – not alleged in *Western*

*Wood Preservers Inst.* – explaining how the decisions have reduced, and threaten to further reduce, a stream of revenue WWPI receives from its BMP Mark Program based on sales of treated wood products by the companies that participate in the program.  ¶ 9.  While Defendants have challenged the injury alleged to support standing for the associations, Def. Br. at 23-26, Defendants do not address, and appear to have overlooked, WWPI's allegations of economic injury.  ¶¶ 8-9.

3.  Plaintiffs have not asserted the NEPA claims that were dismissed with prejudice in *Western Wood Preservers Inst.*

4.  As invited by the Court in its July Memorandum Opinion, Plaintiffs have repleaded their RFA claims based on the status of Western Wood as an entity that is directly regulated by USACE.  ¶¶ 57-59, 88-89.  Also, Plaintiffs now base their RFA claim solely on 5 U.S.C. §604, for which there is express statutory authorization for judicial review, and do not assert a claim under 5 U.S.C. §603, where no such express authorization is provided.  *See* Feb. Mem. Op. at 16.

5.  In response to the Court's comment that the basis for the ESA claim against NMFS was "murky at best," July Mem. Op. at 9, Plaintiffs have divided their former six paragraph ESA claim against all the defendants into two separate claims, and now present a total of 12 new paragraphs of allegations in the two claims.  Claim 9 alleges an ESA violation by USACE, ¶¶ 75-79, and Claim 10 alleges an ESA violation by NMFS.  ¶¶ 80-87.[1]

Plaintiffs assert 11 claims for relief in this case:

Claims 1, 2 and 3 allege the Regional Conditions were adopted in violation of APA rulemaking requirements.  These claims are based on *Nat'l Ass'n of Home Builders,* 417 F.3d at 1284, which held that the USACE's nationwide general permits (NWPs) are an APA rule requiring compliance with rulemaking procedures.  *Id*. ("Each NWP easily fits within the APA's definition of

---

[1]For these reasons, Defendants' assertion that except for adding four plaintiffs and dropping the NEPA claims, the complaint in this case is "identical" to the dismissed complaint in *Western Wood Preservers Inst.*, Def. Br. at 2, does not accurately reflect the changes in the new complaint.

'rule.'").  The NWPs are issued under the same statutory authority as the regional conditions, 33 U.S.C. §1344(e), and share all the same legal characteristics as the regional conditions.

Claim 4 alleges the Regional Conditions were adopted in violation of a related CWA rulemaking requirement.  Claims 7 and 8 alleges the Regional Conditions were adopted in violation of the rational decisionmaking requirements of the APA.  Claims 6 and 11 alleges RFA violations by USACE in adopting the Regional Conditions and the SLOPES IV Procedures.

Claim 5 alleges USACE violated the ESA by failing to consult with wildlife agencies on the Regional Conditions.  Claim 9 alleges USACE violated the ESA by failing to "use the best scientific and commercial data available" in the SLOPES IV Procedures.  Claim 10 alleges NMFS violated the ESA by failing to "use the best scientific and commercial data available" in the SLOPES IV Biological Opinion.

For convenience, the table set forth below compares the claims asserted in the Second Amended Complaint in *Western Wood Preservers Inst.* and the claims asserted in this case:

| Comparison of Claims:  *Western Wood Preservers Inst. v. McHugh* and this case | | |
|---|---|---|
| **Claim Number in Second Amended Complaint in *Western Wood Preservers Inst.*** | **Legal Basis of Claim** | **Claim Number in This Case** |
| 1 | APA - rulemaking | 1 |
| 2 | APA - rulemaking | 2 |
| 3 | APA - rulemaking | 3 |
| 4 | CWA - rulemaking | 4 |
| 5 | NEPA | – |
| 6 | ESA - failure to consult | 5 |
| 7 | RFA | 6 |
| 8 | APA rational decisionmaking | 7 |
| 9 | APA rational decisionmaking | 8 |

Page 19 -      **PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**

| Comparison of Claims: *Western Wood Preservers Inst. v. McHugh* and this case | | |
|---|---|---|
| 10 | ESA - failure to use best available scientific data | 9 & 10 |
| 11 | NEPA | – |
| 12 | RFA | 11 |

## Argument

## I. THE COMPETITOR STANDING DOCTRINE PROVIDES ARTICLE III STANDING FOR ALL THE CLAIMS IN THIS CASE.

Defendants have moved to dismiss the case for lack of jurisdiction under Fed.R.Civ.P. 12(b)(1), challenging plaintiffs' Article III standing for all of their claims.  Def. Br. 1, 13-26.

### A. Article III standing requirements.

To establish constitutional standing for injunctive relief, "a plaintiff must show that he is under threat of suffering injury in fact that is concrete and particularized; the threat must be actual and imminent, not conjectural or hypothetical; it must be fairly traceable to the challenged action of the defendant; and it must be likely that a favorable judicial decision will prevent or redress the injury."  *Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009) (citation and quotation omitted). However, a "person who has been accorded a procedural right to protect his concrete interests can assert that right without meeting all the normal standards for redressability and immediacy."  *Lujan*, 504 U.S. at 573 n.7 (1992).  " [I]f ... even one of the petitioners has Article III standing, we will then have established our jurisdiction to consider the merits of the [claims]."  *Grocery Mfrs. Ass'n v. Envtl. Prot. Agency*, 693 F.3d 169, 175 (D.C. Cir. 2012), *cert. den*, 133 S. Ct. 2880 (2013).

### B. At the pleading stage, Plaintiffs have only a "relatively modest" and "not onerous" burden to allege general facts that "embrace those specific facts that are necessary to support the claim," and the Court must assume those facts to be true and "draw all inferences in favor of the nonmoving party."

"[O]n a motion to dismiss we presume that general allegations embrace those specific facts that are necessary to support the claim."  *Lujan*, 504 U.S. at 561 (quotation and alterations omitted).

Page 20 -       **PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**

A plaintiff's pleading burden at the motion to dismiss stage "is relatively modest." *Bennett*, 520 U.S. at 171. "In analyzing whether [a plaintiff] has standing at the dismissal stage ... we must assume that [the plaintiff] states a valid legal claim and must accept the factual allegations in the complaint as true." *Holistic Candlers and Consumers Ass'n v. Food & Drug Admin.*, 664 F.3d 940, 943 (D.C. Cir. 2012) (citations and quotations omitted). The court must "draw all inferences in favor of the nonmoving party." *Sherley v. Sebelius*, 610 F.3d 69, 71 (D.C. Cir. 2010) (citation, quotation and brackets omitted).

**C.**    **Defendants' Article III causation/redressability argument ignores, and is contrary to, the well-established doctrine of "competitor standing" recognized by the Supreme Court and the D.C. Circuit.**

Defendants' Article III arguments all rest on a single argument:  that the actual and threatened financial losses experienced by the individual company plaintiffs have not been "caused" by the challenged Alaska and Oregon Regional Conditions and SLOPES IV Protocol, and therefore the necessary "causation" element of standing is missing.  Def. Br. at 14-22.  Defendants contend there is no Article III causation (or redressability) in this case because the plaintiffs' financial losses resulted from independent decisions by third party customers who choose an alternative building material in order to rely on the CWA general permits, instead of choosing treated wood and having to complete the costly and time-consuming individual permitting procedures and ESA consultations that are necessary in the absence of a CWA general permit.  *Id.*

Defendants' argument is defeated by the well-established "competitor standing doctrine," *see, e.g., Inter. Broth. of Teamsters*, 724 F.3d at 211-12, which the Supreme Court and the D.C. Circuit have repeatedly approved.  Defendants' motion completely ignores the competitor standing doctrine.

1.  In five separate cases, the Supreme Court has upheld the standing of a marketplace competitor to challenge government action "relaxing statutory restrictions on the activities of" the plaintiff's competitors.  *Nat'l Credit Union Admin.*, 522 U.S. at 488.

Further, in *Bennett*, 520 U.S. 154, an environmental case, the Supreme Court broadly rejected

Page 21 -    **PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**

Mark C. Rutzick, Inc.
12402 Myra Virginia Ct
Oak Hill, Virginia 20171
Phone/Fax:  703-870-7347  ●  E-mail:  markrutzick@rutzick.com

the causation argument made by the government here – that Article III standing is lacking where a government decision starts a chain of events leading to the plaintiffs' financial loss, but the final action imposing the loss on the plaintiff is ultimately made by a third party not before the court:

> This [argument] wrongly equates injury "fairly traceable" to the defendant with injury as to which the defendant's actions are the very last step in the chain of causation. While, as we have said, it does not suffice if the injury complained of is the result of the independent action of some third party not before the court, ... that does not exclude injury produced by determinative or coercive effect upon the action of someone else.

*Id*. at 168-69 (citations, quotations and brackets omitted). "It is immaterial whether the intermediary that directly causes the injury is a public entity or a private one." *Nat'l Min. Ass'n v. Slater*, 167 F.Supp.2d 265, 277 (D.D.C. 2001).

2. The D.C. Circuit's decisions on competitor standing decisively establish that the Plaintiffs have standing in this case.  The most recent decision is *Inter. Broth. of Teamsters*, 724 F.3d 206, where a trade association of American trucking companies and a labor union of truck drivers challenged a decision by the Transportation Department to adopt a pilot program removing legal disabilities that had disfavored Mexican trucking companies, thus putting the Mexican trucks on an equal regulatory plane with American trucks.  Rejecting the government's standing argument similar to the one presented here, the court easily found that the trade association and labor union had alleged a competitive injury, causation and redressability that conferred standing under Article III:

> Here, both the Drivers Association and the Teamsters have suffered an injury in fact under the doctrine of competitor standing. The competitor standing doctrine recognizes that economic actors suffer an injury in fact when agencies lift regulatory restrictions on their competitors or otherwise allow increased competition against them. ... Because the pilot program allows Mexico-domiciled trucks to compete with members of both these groups, the Drivers Association and the Teamsters have suffered an injury in fact. The causation and redressability requirements of Article III standing are easily satisfied because, absent the pilot program, members of these groups would not be subject to increased competition from Mexico-domiciled trucks operating throughout the United States.

*Id*. at 211-12 (citation and quotations omitted).  In *Honeywell Intern. Inc.*, 374 F.3d 1363, the court also rejected a similar causation argument where the petitioner challenged an EPA decision allowing

Page 22 -     **PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**

sale of a new hydrofluorocarbon product to compete with petitioner's hydrochlorofluorocarbon product.  EPA's challenge to the causation element of the petitioner's standing was summarily rejected by the appellate court:

> Honeywell satisfies the traceability requirement because the rule legalizes the entry of a product into a market in which Honeywell competes .... EPA maintains that Honeywell cannot demonstrate that it would benefit from a decision listing [the new products] as unacceptable because doing so would require speculation about the purchasing decisions of third parties not before the court. There is not much to this chain-of-speculation objection; it is well established that parties suffer cognizable injury under Article III when an agency lifts regulatory restrictions on their competitors or otherwise allows increased competition.

*Id*. at 1369 (citations, quotations and brackets omitted).  The present case involves an even clearer injury caused by the USACE decisions:  treated wood's competitors in the marketplace were all given greatly advantaged status through access to the general permits, while purchasers wishing to use treated wood are required to complete a burdensome individual permit process.

In *Wabash Valley Power Ass'n, Inc. v. Fed. Energy Reg. Comm*., 268 F.3d 1105 (D.C. Cir. 2001), a power company sought to challenge a merger of two other companies, fearing the merged company might compete more effectively against it.  The government challenged the causation element of standing, arguing, as it does here, that any harm to the plaintiff would result from the independent action of a third party (there, the merged utility), rather than from government action.  The D.C. Circuit easily rejected the argument, holding that even if it is the merged company that outcompetes the plaintiff, the plaintiff's "competitive injury is fairly traceable to FERC's decision to approve the merger."  *Id*. at 1113.  Similarly, Plaintiffs' injury here is easily traceable to the USACE decisions challenged in this case.

The *en banc* D.C. Circuit court has stated: "Supreme Court precedent establishes that the causation requirement for constitutional standing is met when a plaintiff demonstrates that the challenged agency action authorizes the conduct that allegedly caused the plaintiff's injuries, if that conduct would allegedly be illegal otherwise."  *Animal Legal Def. Fund, Inc. v. Glickman*, 154 F.3d

Page 23 -    **PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**

426, 440 (D.C. Cir. 1998), *cert. denied sub nom. Nat'l Ass'n for Biomedical Research v. Animal Legal Def. Fund, Inc.,* 526 U.S. 1064 (1999).  In *Sherley*, 610 F.3d 69, 73-74, the Court explained the breadth of the competitor standing doctrine, and broadly applied the doctrine to litigants merely competing for government grants.

Here, there is no doubt USACE "authorized the conduct" that has caused Plaintiffs' injuries. The USACE general permits as issued for the nation allow all building materials, including treated wood, to be used for aquatic construction with no further regulatory approval by USACE.  The Regional Conditions for Alaska and Oregon and the SLOPES IV Procedures drastically, and unfairly, changed the marketplace in those states by excluding treated wood from the general permits – singling out treated wood for highly disadvantaged status.   The challenged decisions are the cause of this highly disadvantaged status, even if builders, owners and contractors inflict the ultimate harm on the treated wood producers by choosing alternative materials through a series of separate independent decisions.  Under the competitor standing doctrine, Plaintiffs have standing to seek to overturn the regulatory decisions imposing this severe disadvantage on the treated wood industry in Oregon and Alaska.

Ignoring competitor standing, Defendants instead rely on *Ctr. for Biological Diversity v. U.S. Dep't of the Interior*, 563 F.3d 466, 478 (D.C. Cir. 2009), Def. Br. at 16, yet that case did not involve competitor standing, and has no similarity to this one.  In that case environmental plaintiffs claimed an arctic oil and gas leasing program might cause climate change that could injure them; the court rejected standing because the plaintiffs could not show that there was any causative relationship between the oil and gas leasing program and any climate change that could injure them.  *Id.*

Defendants also cite *Nat'l Wrestling Coaches Ass'n v. U.S. Dep't of Educ.*, 366 F.3d 930, 938 (D.C. Cir. 2004), but that case also does not involve competitor standing, and addresses a factual situation far removed from the marketplace context of this case.  In that case the coaches sought to challenge a Department of Education interpretative rule aimed at spurring women's intercollegiate

opportunities, but which the coaches feared might instead lead college athletic directors to reduce men's intercollegiate wrestling.  The Court denied standing because "a plaintiff's standing fails where it is purely speculative that a requested change in government policy will alter the behavior of regulated third parties that are the direct cause of the plaintiff's injuries." *Id*. at 938.  But here, there is nothing "purely speculative" about the marketplace response to the competitive disadvantage the challenged rules have imposed on the treated wood industry; the complaint provides precise, specific examples from each of the four individual company plaintiffs of land owners and managers avoiding treated wood, and choosing competitive materials, precisely because of the unfair regulatory burden imposed on treated wood by the challenged USACE decisions.  See ¶¶ 4, 6, 7, 10.  The competitor standing doctrine recognizes that marketplace responses to regulatory burdens are not "purely speculative," because an increase in marketplace competition "will almost certainly cause an injury in fact," *Sherley*, 610 F.3d at 73, unlike decisions of college athletic departments.

The competitor standing doctrine provides Article III standing for all of the claims in this case, since all the claims seek to remedy the unfair marketplace burden placed on treated wood by the challenged USACE decisions.  Competitor standing covers both the procedural claims and the substantive claims, as all the claims seek to undo the marketplace bias imposed by USACE.

**D.**   **WWPI has organizational standing to challenge the USACE decisions, apart from standing to represent its members, based on the economic harm that has occurred and is threatened to WWPI's income generated by the BMP Mark Program.**

Defendants argue that none of the association plaintiffs has Article III standing independent of the standing of their members.  Def. Br. at 23-26.  Yet they merely challenge the associations' environmental and informational injury, which the associational plaintiffs do not allege in this case, and their procedural injury, which only WWPI alleges – and it appears Defendants overlooked WWPI's new allegations of economic harm to itself which are tied to its procedural injury.  *Compare* ¶ 9 *with* Def. Br. at 24 ("the trade associations' claims with respect to their organizational standing have not changed from the *Western Wood Preservers* case other than to identify individual member

Mark C. Rutzick, Inc.
12402 Myra Virginia Ct
Oak Hill, Virginia 20171
Phone/Fax:  703-870-7347  ●  E-mail:  markrutzick@rutzick.com

companies who allegedly suffered injury."). In *Western Wood Preservers Inst.*, none of the associations alleged economic injury.[2]

WWPI alleges that the challenged USACE decisions have caused direct economic injury to itself from the loss of revenue to its proprietary BMP Mark Program, and have threatened even greater economic loss to WWPI. ¶ 9. The economic injury threatened to WWPI is sufficient to give WWPI Article III standing independent of the allegations of its members. "Economic injury can satisfy the 'injury in fact' requirement. ... even when the economic injury is slight." *Neighborhood Assistance Corp. of Am. v. Cons. Prot. Bur.*, 907 F.Supp.2d 112, 121 (D.D.C. 2012), *citing Nat'l Automatic Laundry & Cleaning Council v. Shultz*, 443 F.2d 689, 693 (D.C.Cir.1971). Economic injury to a non-profit organization (such as WWPI) is sufficient to give the organization Article III standing. *Club Italia Soccer & Sports Org., Inc. v. Charter Tp. of Shelby, Mich.*, 470 F.3d 286, 295 (6th Cir. 2006), *citing Vill. of Arlington Heights v. Metro. Hous. Dev.*, 429 U.S. 252, 262 (1977). Loss of revenue to a trade association is an injury that establishes Article III standing. *Cons. Industry Ass'n of Sonoma Cty. v. City of Petaluma*, 522 F.2d 897, 903 (9th Cir. 1975) ("The Association alleges it has suffered in its own right monetary damages due to lost revenues. Sonoma County builders contribute dues to the Association in a sum proportionate to the amount of business the builders do in the area. Thus, in a very real sense a restriction on building in Petaluma causes economic injury to the Association."). The actual and threatened decline in revenues to WWPI are caused by the USACE decisions challenged in this case, and are redressable by the Court. WWPI has Article III standing on its own behalf. WWPI's economic injury underlies its standing to allege procedural injuries resulting from Defendants' violations of various rulemaking requirements.

---

[2]Defendants do not dispute that WWPI meets the representational standing requirements that "the interests it seeks to protect are germane to the organization's purpose; and ... neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Abigail Alliance for Better Access to Developmental Drugs v. Eschenbach*, 469 F.3d 129, 133 (D.C. Cir. 2006).

Page 26 -      **PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**

E.   **Plaintiffs need not show that the absence of notice and comment injured them by altering the result of the rulemaking proceeding, and Plaintiffs have alleged that the Regional Conditions are causing them harm.**

As the Court stated in *Western Wood Preservers Inst.*, "[a] plaintiff may establish standing based on a procedural injury only if (1) the government violated a procedural right that was designed to protect their threatened concrete interest, and (2) the violation in fact resulted in injury to that concrete, particularized interest." Feb. Mem. Op. at 11, *citing Ctr. for Law & Educ. v. Dep't of Educ.*, 396 F.3d 1152, 1157 (D.C. Cir. 2005). Plaintiffs have met both requirements: they allege, and will establish based on *Nat'l Ass'n of Home Builders,* 417 F.3d 1272, that USACE unlawfully denied the public, including Plaintiffs, any opportunity to participate in an APA rulemaking proceeding on the challenged Regional Conditions, and Plaintiffs have alleged in detail how the resulting Regional Conditions are inflicting economic injury on the Plaintiffs.

However, Defendants urge that Plaintiffs must prove the Regional Conditions would have been different if notice and comment had been provided. Def. Br. at 25-26. There is no such requirement for Article III standing. As the Court held in *Ctr. for Law & Educ.*, 396 F.3d at 1160, "Appellants need not demonstrate that, but for the procedural defect, the final outcome of the rulemaking process would have been different .... [T]h[e] Court assumes the causal relationship between the procedural defect and the final agency action." *Id*. (footnote omitted). "When a litigant is vested with a procedural right, that litigant has standing if there is <u>some possibility</u> that the requested relief will prompt the injury-causing party to reconsider the decision that allegedly harmed the litigant." *Mass. v. Envtl. Prot. Agency*, 549 U.S. 497, 518 (2007) (underlining added). "A litigant 'who alleges a deprivation of a procedural protection to which he is entitled never has to prove that if he had received the procedure the substantive result would have been altered." *Cty. of Delaware, Pa. v. Dep't of Transp.*, 554 F.3d 143, 147 (D.C. Cir. 2009), *quoting Sugar Cane Growers Co-op. of Fl. v. Veneman*, 289 F.3d 89, 94-95 (D.C. Cir. 2002).

In *Cty. of Delaware*, 554 F.3d 143, the Court identified the very limited causation showing

Page 27 -      **PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**

required for a procedural injury to provide Article III standing:  "In order to establish causation sufficient for standing, a plaintiff asserting procedural injuries must demonstrate that there is a 'substantial probability that the substantive agency action that disregarded a procedural requirement created a demonstrable risk ... of injury to the particularized interests of the plaintiff.'" *Id.* at 148, *quoting Fl. Audubon Soc'y v. Bentsen*, 94 F.3d 658, 669 (D.C. Cir.1996) (*en banc*).  Thus, it is the "substantive agency action" rather than the "disregarded ... procedural requirement" that must create a risk of actual injury.  Here, Plaintiffs have alleged in detail how the "substantive agency action" (adoption of the Regional Conditions) that was taken without the required notice and comment has not merely "created a demonstrable risk ... of injury" but has in fact caused and threatened economic injury to them.  That causation is more than sufficient for Article III standing.

## II.    PLAINTIFFS HAVE PRUDENTIAL STANDING.

Defendants do not seek dismissal of Claims 5, 8, 9 and 10 for any reason other than lack of Article III causation and redressability.  Def. Br. at 26.  As to Claims 1-4, 6-7 and 11, Defendants assert Plaintiffs' lack prudential standing because their claims are not in the appropriate "zone of interests."  All these arguments fail.

### A.    Plaintiff Western Wood, a party directly regulated by USACE, has prudential standing to challenge the Regional Conditions and SLOPES IV Procedures.

As explained above, Plaintiff Western Wood, which has constructed and installed hundreds of treated wood structures in and over USACE-regulated waters, is directly regulated by the specific regulatory actions the plaintiffs are challenging in this case – the two Regional Conditions and the SLOPES IV Procedures.  ¶ 10.  A party directly regulated by a federal regulatory agency always has prudential standing to challenge regulatory action by that agency.  *Clarke v. Securities Industry Ass'n*, 479 U.S. 388, 399 (1987) (zone of interests test only applies "[i]n cases where the plaintiff is <u>not itself</u> the subject of the contested regulatory action." (underlining added)).  "Parties regulated by a statute ... fall within its 'zone of interest.'"  *Liquid Carbonic Industries Corp. v. Fed. Energy*

*Reg. Comm.*, 29 F.3d 697, 704 (D.C. Cir. 1994).

In *Nat'l Ass'n of Home Builders v. U.S. Army Corps of Eng'rs*, 539 F.Supp.2d 331 (D.D.C. 2008), the Court found prudential standing for a directly regulated party in a comparable setting. In that case the NAHB, representing builders and owners directly regulated by USACE, challenged a nationwide general permit applicable to non-tidal upland ditches, alleging that the permit exceeded the agency's statutory authority. The Court held that the association's members had prudential standing for their claim: "The plaintiff's members are among those individuals whose activities are regulated by the CWA, and more specifically by NWPs, and therefore, the court easily concludes that the plaintiff has demonstrated prudential standing." *Id.* at 342.

Western Wood is a regulated party, and therefore has prudential standing to assert the claims in this case. Defendants did not address Western Wood's prudential standing in their motion, and therefore have waived any opposition to Western Wood's prudential standing.

**B.**     **All the Plaintiffs have prudential standing for their CWA claims because economic interests were Congress' primary concern in 33 U.S.C. § 1344, and Plaintiffs' interests are congruent with those of the parties regulated by that statute.**

**1.**     **Supreme Court and D.C. Circuit expansion of prudential standing over three decades.**

The Supreme Court's most recent holding on prudential standing emphasizes the breadth of the zone of interest test under current Supreme Court direction: "The [zone of interest] test forecloses suit only when a plaintiff's interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit." *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians*, 132 S.Ct. at 2211. The Supreme Court noted four aspects of the prudential standing doctrine that favor a broad application: "The prudential standing test ...is not meant to be especially demanding. ... We apply the test in keeping with Congress's evident intent when enacting the APA to make agency action presumptively reviewable. ... We do not require any indication of congressional purpose to benefit the would-be plaintiff. ... And we have always conspicuously included the word 'arguably' in the test to indicate

Mark C. Rutzick, Inc.
12402 Myra Virginia Ct
Oak Hill, Virginia 20171
Phone/Fax:  703-870-7347  ●  E-mail:  markrutzick@rutzick.com

that the benefit of any doubt goes to the plaintiff." *Id.* (citations and quotations omitted).

a.   **Congruence of interest with Congress' objectives in a statute, rather than status as a party that is "regulated or protected," determines the zone of interests.**

Under Supreme Court direction, the zone of interests allowing prudential standing has expanded steadily over the past 30 years.  Originally, the zone of interests was understood only to include interests "intended by Congress to be <u>protected</u> or <u>regulated</u> by the statute under which suit is brought." *See Control Data Corp. v. Baldrige*, 655 F.2d 283, 294-95 (D.C. Cir.), *cert. denied*, 454 U.S. 881 (1981) (underlining added).  However, in *Clarke*, 479 U.S. at 400 n. 15, the Supreme Court repudiated the *Control Data Corp* decision as "inconsistent with our understanding of the 'zone of interest' test, as now formulated," emphasizing that "there need be no indication of congressional purpose to benefit the would-be plaintiff" for an interest to gain prudential standing. *Id*. at 399-400.

More recent D.C. Circuit cases have emphasized that it is "beside the point whether a putative plaintiff's objectives are the same as those intended by Congress," because "[c]ongruence of interests, rather than identity of interests, is the benchmark." *Amgen, Inc.*, 357 F.3d at 109. In *Amgen, Inc.*, the plaintiff alleged it was regulated under the Medicare Act, but the Court expressly held that because "Amgen's interests are congruent with interests underlying the Medicare Act [we] do not reach the question whether it is a regulated party."  Congruence means "a party need not share Congress' motives in enacting a statute to be a suitable challenger to enforce it ....  If there is reason to believe that a party's interest in statutory enforcement will advance, rather than hinder, the operation of a statute, the court can reasonably assume that Congress intended to permit the suit." *Honeywell Intern. Inc.*, 374 F.3d at 1370.

b.   **Prudential standing under environmental laws is not confined to the "pure of heart" seeking to expand environmental protection, but must be determined from the specific statute giving rise to a plaintiffs' claims and will include economic interests where the specific statutory section at issue indicates congressional interest in economic impacts.**

In the past two decades courts have also rejected the doctrine that only the "pure of heart," those seeking to expand environmental protection, may sue under the environmental laws, while

Mark C. Rutzick, Inc.
12402 Myra Virginia Ct
Oak Hill, Virginia 20171
Phone/Fax:  703-870-7347  ●  E-mail:  markrutzick@rutzick.com

business interests seeking to limit the reach of those laws are frozen out of court.  In *Mtn. States Legal Found. v. Glickman*, 92 F.3d 1228 (D.C. Cir. 1996), the Court found that economic injury to timber companies was within the zone of interests of the ESA, which has as its principal purpose the protection and recovery of endangered and threatened species.  One year later, in *Bennett*, 520 U.S. 154, a unanimous Supreme Court decisively rejected the "pure of heart" standing doctrine in another ESA case.  The Supreme Court made it clear that the zone of interests for prudential standing is not limited to those favoring the overall policy objective of a statute.  "Whether a plaintiff's interest is 'arguably ... protected ... by the statute' within the meaning of the zone-of-interests test is to be determined not by reference to the overall purpose of the Act in question (here, species preservation)." *Id*. at 175.  Rather, the zone of interests is determined "by reference to the particular provision of law upon which the plaintiff relies." *Id*. at 176.  In unusually harsh language, the court scolded the Ninth Circuit for misapplying Supreme Court precedents:  "It is difficult to understand how the Ninth Circuit could have failed to see this from our cases." *Id*.

In *Bennett*, the Court set out to determine if a claim of economic injury to two Oregon irrigation districts, challenging the alleged failure of the U.S. Fish and Wildlife Service to base a biological opinion on a water management plan on "the best scientific and commercial data available," § 1536(a)(2), was arguably within the zone of interests of 16 U.S.C. §1536.  Nothing in that statute expresses any congressional concern over the economic impacts of species protection in the preparation of a biological opinion, which is scientific in nature, has as its sole objective to avoid jeopardizing the existence of protected species, and does not allow economic impacts to influence the conclusion of the opinion. *Id*.

Nonetheless, the Supreme Court found that economic interests are within the zone of interests under that section of the ESA:

> The obvious purpose of the requirement that each agency "use the best scientific and commercial data available" is to ensure that the ESA not be implemented haphazardly, on the basis of speculation or surmise. While this no doubt serves to

Mark C. Rutzick, Inc.
12402 Myra Virginia Ct
Oak Hill, Virginia 20171
Phone/Fax:  703-870-7347  ●  E-mail:  markrutzick@rutzick.com

> advance the ESA's overall goal of species preservation, <u>we think it readily apparent that another objective (if not indeed the primary one) is to avoid needless economic dislocation produced by agency officials zealously but unintelligently pursuing their environmental objectives</u>. ... We believe the "best scientific and commercial data" provision is ... intended, at least in part, to prevent uneconomic (because erroneous) jeopardy determinations. Petitioners' claim that they are victims of such a mistake is plainly within the zone of interests that the provision protects.

*1.Id*. at 176-77 (underlining added). Thus, the Court found that economic interests have prudential standing under ESA even though there was no explicit congressional focus on economics; a mere inference was sufficient. In this case, as will be seen, far more than an inference is available to show that Congress considered economic effects central to the CWA statute at issue here.

In *Town of Stratford, Conn, v. Fed. Av. Admin.*, 285 F.3d 84, 88 (D.C. Cir. 2002), the Court highlighted the two guiding principles in *Bennett*:

> [T]he Supreme Court ... recognized that the Endangered Species Act did allow a petitioner with only economic interests to challenge an action of the Fish and Wildlife Service. That was because <u>the specific section of the statute upon which the petitioners (irrigation districts and ranchers) relied was drafted at least in part to avoid needless economic dislocation.</u>

*Id*. at 88 (underlining added). The D.C. Circuit recognized that under *Bennett* the zone of interests is not based on "the general aims of a statute," but on "the specific section of the statute upon which the [plaintiffs] relied," *id*., and an inferred legislative purpose to "avoid needless economic dislocation" is sufficient to include economic interests within a statute's zone of interests.

**c.**   **Defendants rely on outdated doctrines that have been rejected by the Supreme Court and the D.C. Circuit, and cite 1980's precedents that employed the subsequently-rejected doctrines.**

Defendants' prudential standing argument (Def. Br. 26-32) relies on doctrines that have been rejected in the past quarter century by the Supreme Court and the D.C. Circuit, and ignores the intervening expansion of the zone of interests test.

a. Defendants argue that prudential standing is lacking because the Plaintiffs are neither "regulated" nor "protected" by the CWA, Def. Br. at 28, 29, but this argument overlooks five factors: I) the Supreme Court repudiated that limited view of prudential standing in *Clarke*, 479 U.S. at 400

Mark C. Rutzick, Inc.
12402 Myra Virginia Ct
Oak Hill, Virginia 20171
Phone/Fax:  703-870-7347  ●  E-mail:  markrutzick@rutzick.com

n. 15; ii) prudential standing has expanded so that "[c]ongruence of interests, rather than identity of interests, is the benchmark." *Amgen, Inc.*, 357 F.3d at 109; iii) "a plaintiff can be within the zone of interests of a statute even in the absence of an indication of congressional purpose to benefit the would-be plaintiff," *Mova Pharmaceutical Corp.*, 140 F.3d at 1075; iv)"[i]f there is reason to believe that a party's interest in statutory enforcement will advance, rather than hinder, the operation of a statute, the court can reasonably assume that Congress intended to permit the suit," *Honeywell Intern. Inc.*, 374 F.3d at 1370; and v) the zone of interests "forecloses suit only when a plaintiff's interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit." *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians*, 132 S.Ct. at 2211.

b.  Similarly outdated, and wrong, is Defendants' argument that Plaintiffs lack prudential standing because Plaintiffs do not claim the violations they allege caused "any reduction in environmental quality."  Def. Br. at 29.  *Bennett*, 520 U.S. at 177, made it clear in 1997 that the zone of interests for an environmental statute is not limited to those challenging a "reduction in environmental quality."  "[P]arties motivated by purely commercial interests routinely satisfy the zone of interests test." *Nat'l Ass'n of Home Builders,* 417 F.3d at 1287.

c.  Defendants' argument that "[t]here can be no reasonable argument that in enacting the CWA Congress intended would-be sellers of treated wood to be the beneficiaries," Def. Br. at 29, has not been relevant to prudential standing for a quarter century since "a plaintiff can be within the zone of interests of a statute even in the absence of an indication of congressional purpose to benefit the would-be plaintiff." *Mova Pharmaceutical Corp.*, 140 F.3d at 1075; *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians*, 132 S.Ct. at 2211.

d.  Defendants' assertion that "[t]he purpose of the CWA is to 'restore and maintain the chemical, physical, and biological integrity of the Nation's waters,'" Def. Br. at 29, has not been part of the prudential standing test since 1997 when *Bennett* rejected the "overall purpose of the Act in

**PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**

Mark C. Rutzick, Inc.
12402 Myra Virginia Ct
Oak Hill, Virginia 20171
Phone/Fax:  703-870-7347   ●   E-mail:  markrutzick@rutzick.com

question" as relevant to prudential standing.

e. Defendants commit the same error again in arguing that the Plaintiffs are not within the CWA zone of interests because the CWA was not enacted "to benefit would-be sellers of treated wood." Def. Br. at 29. This argument is misplaced in two respects: 1) the overall purpose for which Congress enacts a law is not the measure by which a statutory zone of interests is determined, *Bennett*, and 2) a party need not be an intended beneficiary of a statute to fall within its zone of interests. *Clarke*, 479 U.S. at 399-400.

Conspicuously, Defendants do not cite any recent prudential standing decision, including the Supreme Court's 2012 review of the doctrine in *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians*, 132 S.Ct. at 2211, although the D.C. Circuit alone has decided over 20 prudential standing cases since 2010. Instead, Defendants principally rely on two dated precedents from the 1980's, *Hazardous Waste Treatment Council v Envtl. Prot. Agency*, 861 F.2d 277, 282-85 (D.C. Cir. 1988) ("*HWTC II*"), *cert. denied*, 490 U.S. 1106 (1989), and *Hazardous Waste Treatment Ass'n v. Envtl. Prot. Agency*, 885 F.2d 918 (D.C. Cir. 1989) ("*HWTC III*"), *see* Def. Br. at 29-31, which predate all the changes described above in prudential standing doctrine over the past quarter century, and in addition are based on a different environmental statute (the Resource Conservation and Recovery Act), which can shed no light on Congress' intention in enacting 33 U.S.C. § 1344 in the CWA, the required focus of prudential standing under *Bennett*.

a. Both of the *HWTC* decisions employ the one-sided "pure of heart" zone of interest approach rejected in *Bennett*. In one case the appellate court denied prudential standing to waste treatment firms because winning the case "might benefit [their profits] . . . but harm the environment" and in the other because "[t]he watchword of [the plaintiffs] must be, in short, that treatment is good and more treatment is better – whether the effect on health and the environment is good, bad, or indifferent." *see* Def. Br. at 30-31 (quoting cases). Perhaps that was good law in 1989, but more than 15 years has passed since *Bennett* made it clear that seeking to earn a profit does

Mark C. Rutzick, Inc.
12402 Myra Virginia Ct
Oak Hill, Virginia 20171
Phone/Fax: 703-870-7347 ● E-mail: markrutzick@rutzick.com

not disqualify a party from suing under an environmental statute, and the zone of interests is not limited to those seeking to expand environmental protection. "[T]he fact that [a plaintiff]'s motives were commercial is not disqualifying." *Amgen, Inc.*, 357 F.3d at 110.

b. *HTWC III*, 885 F.2d at 922, explicitly adopts the "regulate or protect" limitation to prudential standing that ignores the later "congruence of interests" test in *Amgen, Inc.*, 357 F.3d at 109, and *Nat'l Ass'n of Home Builders*, 417 F.3d at 1287. *See* 885 F.2d at 922 ("As a general matter, there are two types of parties with the right incentives to police an agency's enforcement of the laws it administers. First, those whom the agency <u>regulates</u> have the incentive to guard against any administrative attempt to impose a greater burden than that contemplated by Congress. Second, those whom the agency was supposed to <u>protect</u> have the incentive to ensure that the agency protects them to the full extent intended by Congress.") (underlining added).

*HWTC II*, 861 F.2d at 283, likewise uses a narrow prudential standing test that is out of line with the current jurisprudence, rejecting prudential standing because "in the absence of either some explicit evidence of an intent to benefit such firms, or some reason to believe that such firms would be unusually suitable champions of Congress's ultimate goals, no one would suppose them to have standing to attack regulatory laxity." Neither an "intent to benefit" standard nor an "unusually suitable champions" standard has been part of the prudential standing test for more than 20 years.

2.   **Title 33 U.S.C. § 1344 evidences Congress' deep interest in avoiding needless and burdensome USACE regulation of economic activity, and Plaintiffs' economic interests are fully consistent with, and neither "marginally related to" nor "inconsistent with," the expressed congressional intentions in the statute**.

Under *Bennett*, the proper focus for the zone of interests issue for Plaintiffs' CWA claims in this case is 33 U.S.C. §1344, the specific statute upon which the CWA claims rest. The congressional focus on economics in this statute is far clearer than the inferential showing that was sufficient in *Bennett*. This statute is <u>principally</u> focused on <u>reducing</u> the economic impacts of clean water regulation. The statute exempts major sectors of the economy (farming, forestry and ranching)

Mark C. Rutzick, Inc.
12402 Myra Virginia Ct
Oak Hill, Virginia 20171
Phone/Fax:  703-870-7347  ●  E-mail:  markrutzick@rutzick.com

altogether from CWA regulation, and exempts major categories of construction and maintenance-related activity (some involving the use of treated wood) in other sectors of the economy.  §1344(f). For the economic sectors that remain subject to CWA regulation, the other major thrust of this section, in §1344(a)-(e), is to create a permitting regime to allow those economic sectors to continue to operate.  Preserving economic opportunity is, in reality, the central focus of 33 U.S.C. §1344. Congress also showed its concern for public participation in USACE regulatory decisions by specifying that all discharge permits, including the general permits authorized under 33 U.S.C. §1344(e), require "notice and opportunity for public hearings," 33 U.S.C. §1344(a).  Thus, it is more than "arguable" that economic interests were a central part of Congress' concern in the CWA permitting statute.

Nothing in 33 U.S.C. §1344 suggests that a treated wood producer's challenge to an unjustifiably broad government limitation on the use of treated wood is "so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit."  *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 132 S.Ct. at 2211.  Notably, Defendants can only cite a single out-of-circuit district court case to support their prudential standing argument under 33 U.S.C. §1344, *Borough of Carlstadt v. U. S. Army Corps of Eng'rs*, 2006 WL 305314 at * 8 (D.N.J. Feb. 8, 2006), but that case actually supports Plaintiffs here in that the Court recognized that 33 U.S.C. §1344 takes economic impacts into account, *id*. which should support prudential standing under *Bennett*, and the Court found an absence of prudential standing without reference to *Bennett* or the many other prudential standing cases cited above.

**3.      Treated wood producers have a congruence of interest with the treated wood users who are directly regulated by 33 U.S.C. § 1344, and their interest in statutory enforcement will advance, rather than hinder, the operation of a statute.**

A series of D.C. Circuit cases has recognized that the seller of a product has a congruence of interest with the purchaser of the product, such that the seller can represent the interest of the

Mark C. Rutzick, Inc.
12402 Myra Virginia Ct
Oak Hill, Virginia 20171
Phone/Fax:  703-870-7347  ●  E-mail:  markrutzick@rutzick.com

buyer in litigation where the buyer is regulated by the defendant federal agency even if the seller is not.  This doctrine of *jus tertii* demonstrates a congruence between treated wood producers and their buyers (like Plaintiff Western Wood), who are regulated by USACE, which is sufficient to show that the treated wood producers are within the zone of interests of 33 U.S.C. §1344 in this case.  *FAIC Securities, Inc.*, 768 F.2d at 357 (because court finds vendor has *jus tertii* standing for potential customers' claims, "[w]e need not decide whether" vendor has prudential standing for his own claims).

In *FAIC Securities*, 768 F.2d at 354, the Court held that whether or not the seller was within the statutory zone of interest, the seller had prudential standing to represent the interests of his potential customers, who were unquestionably within the statutory zone of interests.   The Court explained that the sellers and the buyers of the product at issue "are so mutually interdependent ... that they are, to choose an apt analogy, two sides of the same coin."  *Id*. at 359.

*FAIC Securities* was followed two years later in *Nat'l Cottonseed Prod. Ass'n v. Brock*, 825 F.2d 482 (D.C. Cir. 1987), where the Court again applied the "two sides of the same coin" metaphor to allow a seller of a product to represent the interest of the purchasers of that product.  *Id*. at 491-92 (citations, quotations and footnotes omitted); *see Ethyl Corp. v. Envtl. Prot. Agency*, 306 F.3d 1144, 1148 (D.C. Cir. 2002) (again using "two sides of the same coin" metaphor); *Lepelletier v. Fed. Dep. Ins. Corp.*, 164 F.3d 37 (D.C. Cir. 1999),

In this case, there can be no question that the potential purchasers of treated wood – the homeowners, homebuilders, municipalities and other construction sponsors who purchase treated wood – are within the zone of interests of the CWA.  *Nat'l Ass'n of Home Builders*, 539 F.Supp.2d at 342 (homebuilders are regulated by CWA and have prudential standing to challenge CWA rules).  The treated wood producers – including Plaintiffs Permapost, Baxter and Conrad – who sell the products the home builders purchase and install have a congruence of interest with the purchasers under 33 U.S.C. § 1344, which supports prudential standing in this case.

Page 37 -      **PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**

Defendants recognize that the vendor-vendee relationship can create prudential standing, Def. Br. at 30 n. 9, but cite *HWTC II* to distinguish the above-cited cases. Yet *HWTC II* held the vendor-vendee relationship in that particular case did not create prudential standing because the plaintiff "wants to increase the regulatory burden on others." *Id*. at 285. That is not the case here. The Plaintiffs in this case are not seeking to increase the regulatory burden on producers of competing steel, plastic, cement and untreated wood products – instead, they are seeking to reduce the regulatory burden on themselves and their purchasers, in order to bring regulation of treated wood into parity with its competitors. *HWTC II* does not address that situation, nor diminish the authorities supporting vendor-vendee prudential standing in this situation.

**C.   Plaintiffs's APA rulemaking claims (1, 2 and 3) do not have to meet any prudential standing requirement outside the APA, but in event Plaintiffs have shown they have prudential standing under the CWA.**

Claims 1, 2 and 3 allege USACE violated the rulemaking requirements of the APA, § 553(b), (c) and (d), respectively, by adopting the Regional Conditions without notice, opportunity for comment or a delayed starting date. In *Nat'l Ass'n of Home Builders,* 417 F.3d 1272, the D.C. Circuit held that the USACE general permits are an APA rule requiring § 553 rulemaking procedures. Despite Defendants' footnote foray into the merits of these claims, Def. Br. at 21, n. 4, there is no legal distinction between the Regional Conditions imposed on the general permits and the general permits themselves, and Plaintiffs are confident of prevailing on the merits of these claims. As shown above, Plaintiffs have alleged the injury in fact, causation and redressability required for Article III standing to present these rulemaking claims.

Defendants insist more is required. Def. Br. 26-27. They contend the APA rulemaking claims must meet an additional "zone of interests" test defined by some authority beyond the APA rulemaking provisions. In *Dismas Charities, Inc. v. U.S. Dept. of Justice,* 401 F.3d 666, 676-77 (6th Cir. 2005), the Court rejected this argument, finding that even though plaintiff did not have prudential standing to present a substantive challenge to a decision under a federal prison statute, the

Mark C. Rutzick, Inc.
12402 Myra Virginia Ct
Oak Hill, Virginia 20171
Phone/Fax:  703-870-7347  ●  E-mail:  markrutzick@rutzick.com

plaintiff nonetheless had prudential standing to challenge the agency's failure under 5 U.S.C. § 553 to make the decision with notice and comment rulemaking, because plaintiff is "arguably within the zone of interests protected by the notice and comment rulemaking requirements of the APA."

Arguing to the contrary, Defendants rely on *Capital Legal Found. v. Commodity Credit Corp.*, 711 F.2d 253 (D.C. Cir. 1983), *see* Def. Br. at 27, but the case does not require a zone of interests test for APA rulemaking claims. In that case, a watch-dog group with no personal stake in Polish financing decisions challenged an agency plan to forgive Polish debt. The Court rejected the argument that the group's loss of opportunity to comment on the proposed agency rule is by itself a sufficient injury for Article III standing. *Id*. at 260. The Court required that the group must allege a cognizable Article III injury in fact in addition to the loss of comment opportunity. *Id*. at 258. Plaintiffs have done that in this case.

In the only other case cited by Defendants in the relevant section of their brief, *Wilderness Soc'y v. Griles*, 824 F.2d 4, 19 (D.C. Cir. 1987), *see* Def. Br. at 27, the Court stated the holding in *Capital Legal Found.* was "mere assertion of procedural flaw in agency action [is] unjusticiable absent allegation of personal injury stemming from that flaw." *Id*. at 19 (underlining added). Similarly, in *Wilderness Soc'y*, the Court denied Article III standing, and did not find any prudential zone of interest deficiency. *Id*. at 13-16. Here, Plaintiffs have alleged personal economic harm constituting Article III injury, and *Capital Legal Found.* imposes no additional standing requirement on them.[3]

---

[3]*Scheduled Airlines Traffic Offices, Inc. v. Dep't of Def.*, 87 F.3d 1356, 1359 (D.C. Cir. 1996), also cited in this section of Defendants' Brief, at 28, does not involve an APA rulemaking claim, and offers no support for Defendants' argument that APA rulemaking claims have a zone of interest outside the APA. In *Mendoza v. Solis*, 924 F. Supp. 2d 307, 320 (D. D.C. 2013) , the Court did apply a prudential standing test under the Immigration and Naturalization Act to claims alleging APA rulemaking violations, *id*. at 320-21, but the Court did not offer a reason for applying that analysis, or cite any authority requiring it to do so, so the case provides no persuasive support for any argument the Defendants make here.

Page 39 -        **PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**

Mark C. Rutzick, Inc.
12402 Myra Virginia Ct
Oak Hill, Virginia 20171
Phone/Fax:  703-870-7347  ●  E-mail:  markrutzick@rutzick.com

In *Western Wood Preservers Inst.*, the Court rejected Defendants' argument that Plaintiffs' APA rulemaking claims require them to be within the zone of interests of the CWA:  "it does not appear that plaintiffs' claims arise under the CWA. Instead, the claims challenged by defendant arise directly under the APA and allege violations of its rulemaking provisions." Feb. Mem. Op. at 15 n. 2.  While Defendants assert they "disagree" with this conclusion, Def. Br. at 28, n. 8, Defendants do not contend that the CWA defines the zone of interests for Plaintiffs' APA rulemaking claims. "Claims 3, 4, and 7 [but not Claims 1 and 2] require looking outside the APA to the CWA to determine what 'zone of interests' are to be protected or regulated by that statute."  Def. Br. at 27-28. Defendants never describe what statute should define the zone of interests for Claims 1 and 2.

Plaintiffs can not explain why Defendants separated Claim 3, alleging a rulemaking violation under 5 U.S.C. § 553(d), from Claim 1, alleging a violation under 5 U.S.C. § 553(b) and Claim 2, alleging a violation under 5 U.S.C. § 553(c).  Nor can Plaintiff explain why Defendants put the APA rulemaking violation in Claim 3 in the same category as Claims 4 and 7, which arise under the CWA – but conceded prudential standing for Claim 8, which also arises under the CWA.  In any event, since Defendants do not claim the CWA defines the zone of interests for the first two APA rulemaking claims, there is no logical basis on which they could view the third rulemaking claim any differently than the first two.

No case cited by Defendants holds that a party asserting an APA rulemaking claim – as presented in Plaintiffs' Claims 1, 2 and 3 – must establish prudential standing based on the zone of interests of some other statute.  In any event, here Plaintiffs have established their prudential standing under the CWA, as demonstrated above.

**D.    Western Wood has Article III and prudential standing to state a claim under the RFA.**

Finally, Defendants argue Plaintiffs lack prudential standing under the RFA, and fail to state a claim under that statute, because none of the Plaintiffs are "directly regulated" by USACE.  Def. Br. at 31, 32-33.  However, Defendants have once again failed to acknowledge or respond to Plaintiff

Mark C. Rutzick, Inc.
12402 Myra Virginia Ct
Oak Hill, Virginia 20171
Phone/Fax:  703-870-7347  ●  E-mail:  markrutzick@rutzick.com

Western Wood's allegations that it <u>is directly regulated</u> by the very section of the CWA that is central to this case. ¶ 10.  The Court had recognized in *Western Wood Preservers Inst.* that Western Wood's allegations (in the amended complaint Plaintiffs were not allowed to file) presented a different issue from what the Court had previously decided, meriting further consideration by the Court:

> Plaintiffs seek reconsideration of the Court's dismissal of claims 7 and 12 under the RFA ...for failure to state a claim under Rule 12(b)(6), arguing that the addition of new plaintiff Western Wood Structures, Inc. remedies the previous pleading deficiencies. ...
> ...Because the Court has denied plaintiffs' request for leave to amend their complaint, it need not rule on any arguments that relate to new additions in the amended complaint. <u>If plaintiffs re-file their complaint with additional plaintiffs, the Court can consider whether those plaintiffs may bring a claim under the RFA at that time</u>.

July Mem. Op. at 6.  Yet here Defendants failed to address Western Wood's right to assert the RFA claims, waiving any objection they may have to the legal sufficiency of the RFA claims insofar as they are asserted on behalf of Western Wood.  *Baier v. Rohr-Mont Motors, Inc.*, 2013 WL 2384269 *4 (N.D.Ill. 2013) (argument not raised in opening brief in support of motion to dismiss is deemed waived); *Eisenberg v. Shendell & Associates, P.A.*; 2011 WL 1233253 *4 n. 7 (S.D. Fla.2011) (same).

## Conclusion

The motion to dismiss should be denied.

Dated this 25th day of February, 2014.

By: _____/s/ Mark C. Rutzick_____

Mark C. Rutzick, D.C. Bar No. 979547
markrutzick@rutzick.com
Mark C. Rutzick, Inc.
12402 Myra Virginia Ct.
Oak Hill, VA 20171
Telephone/Facsimile: (703) 870-7347
Attorney for Plaintiffs

Page 41 -    **PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**