# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____
                                        )
PERMAPOST PRODUCTS, INC., *et al.*,      )
                                        )
            Plaintiffs,                  )
                                        )
            v.                           ) Civil Case No. 1:13-cv-01736 (ESH)
                                        )
THE HONORABLE JOHN M. McHUGH, *et al.,*  )
                                        )
            Defendants.                  )
_____)


## REPLY MEMORANDUM IN SUPPORT OF UNITED STATES'
## MOTION TO DISMISS PLAINTIFFS' COMPLAINT

Defendants, the Honorable John M. McHugh (Secretary of the Army), U.S. Army Corps of Engineers ("Corps"), National Marine Fisheries Service ("NMFS"), and Penny S. Pritzker (Secretary of Commerce) (collectively "United States") have moved to dismiss Plaintiffs' Complaint, ECF No. 1, under Federal Rules of Civil Procedure 12(b)(1) for lack and jurisdiction and 12(b)(6) for failure to state a claim.  *See* United States' Motion to Dismiss Plaintiffs' Complaint, ECF No. 18, and Memorandum in Support of United States' Motion to Dismiss Plaintiffs' Complaint, ECF No. 18-1 ("U.S. Mem.").  Specifically, the Court should dismiss all of Plaintiffs' claims under Rule 12(b)(1) for failure to demonstrate the requisite causation and redressability for Article III standing.  Alternatively, the Court should dismiss Claims 1-4, 6, 7, and 11 under the Clean Water Act ("CWA"), Administrative Procedure Act ("APA"), or Regulatory Flexibility Act ("RFA") for lack of prudential standing.  Finally, Plaintiffs have failed to state a claim in Claims 6 and 11 under the RFA and the Court therefore should dismiss those Claims under Rule 12(b)(6).

The critical point supporting these grounds for dismissal is the complete lack of allegations showing that any Plaintiff is a party directly regulated by the agency actions at issue. Despite Plaintiffs' creative legal drafting in their Complaint and Opposition to Defendants' Motion to Dismiss, ECF No. 19 ("Pls' Opp'n"), Plaintiffs have failed to provide a single allegation to support the critical inference they need this Court to draw to allow their Complaint to survive:  that any Plaintiff is a party who has been or will be directly regulated by the Regional Conditions, or by subsequent agency actions under the "Standard Local Operating Procedures for Endangered Species" ("SLOPES IV Procedures") or Biological Opinion.

Although Plaintiffs are correct in their legal conclusion that a CWA permit must be obtained under Section 404, 33 U.S.C. § 1344, before treated wood structures are placed in

jurisdictional waters of the United States, Plaintiffs are incorrect in making the unsupported

factual leap that these permits are obtained by any Plaintiff, including by Western Wood

Structures, Inc.  Plaintiffs have provided *no* allegations in either their Complaint or Opposition to

support that Western Wood Structures or any other Plaintiff has had to avail itself or will have to

avail itself of a CWA nationwide permit ("NWP") to sell or install these treated wood structures

for Plaintiffs' customers.  Plaintiffs also provide *no* allegations that Western Wood Structures or

any other Plaintiff itself has been forced or will be forced to obtain a CWA individual permit for

installation of these treated wood structures in waters of the United States.  Quite simply, there

are *no* allegations that *any* Plaintiff is a CWA permittee for these projects in Alaska and Oregon.

As explained in the United States' Memorandum, this fact is fatal to Plaintiffs' claims and, as

explained below, nothing in Plaintiffs' Opposition has revived Plaintiffs' Complaint.

## ARGUMENT

### I.    NO PLAINTIFF HAS ARTICLE III STANDING.

#### A.    Plaintiffs' Pleading Burden At This Stage Under The Motion To Dismiss Standards In Rules 12(b)(1) And (6) Is Higher Than Plaintiffs Imply.

The standards of review for motions to dismiss under Rule 12(b)(1) for lack of

jurisdiction and under Rule 12(b)(6) for failure to state a claim deserve clarification.  Although

Plaintiffs correctly note that their pleading burden at the motion to dismiss stage is "relatively

modest," Plfs' Opp'n at 21 (quoting *Bennett v. Spear*, 520 U.S. 154, 171 (1997)), that burden is

more nuanced than they suggest.  "Despite the favorable inferences a plaintiff generally receives

on a motion to dismiss under Rule 12(b)(1), 'it is to be presumed that a cause lies outside the

federal court's limited jurisdiction unless the plaintiff establishes by a preponderance of the

evidence that the Court possesses jurisdiction.'"  *Nat'l Tobacco Co. v. District of Columbia*, 11-

cv-388(RLW), 2011 WL 4442771, at *4 (D.D.C. Sept. 14, 2011) (quoting *Ramer v. United*

*States*, 620 F .Supp. 2d 90, 95-96 (D.D.C. 2009)).  Thus, although the "complaint is to be construed liberally, the Court need not accept factual inferences drawn by plaintiffs if those inferences are not supported by facts alleged in the complaint, nor must the Court accept plaintiffs' legal conclusions."  *Speelman v. United States*, 461 F.Supp.2d  71, 73 (D.D.C. 2006).

As to the standard for a Rule 12(b)(6) motion to dismiss for failure to state a claim, the Supreme Court in *Bell Atlantic Corporation v. Twombly*, 550 U.S. 544 (2007), and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), addressed the intersection of the notice pleading requirements under Federal Rule of Civil Procedure 8(a)(2) and the failure to state a claim under Rule 12(b)(6).  Although "the pleading standard Rule 8 announces does not require detailed factual allegations . . . it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Iqbal*, 556 U.S. at 678 (citations and internal quotation marks omitted).  Indeed, although there is no "probability requirement at the pleading stage," *Twombly*, 550 U.S. at 556, "something beyond . . . mere possibility . . . must be alleged[.]"  *Id.* at 557-58.  Thus, the factual allegations in the complaint "must be enough to raise a right to relief above the speculative level," *id.* at 555, and must be sufficient "to state a claim to relief that is plausible on its face."  *Id.* at 570.  As with a Rule 12(b)(1) motion to dismiss, the Court considering a Rule 12(b)(6) motion "need not accept inferences drawn by plaintiffs if such inferences are unsupported by the facts set out in the complaint."  *Kowal v. MCI Commc'ns, Corp.*, 16 F.3d 1271, 1276 (D.C. Cir. 1994).

These standards are particularly important here where there are factual inferences Plaintiffs expect this Court to draw, but that are completely devoid of any factual support. Specifically, the critical "fact" Plaintiffs want this Court to accept is that they – or more particularly one Plaintiff, Western Wood Structures – is a party that is directly "regulated" by the agency actions under attack.  As discussed below, however, there are no such "facts" here and

the Court therefore need not accept Plaintiffs' conclusory, unadorned allegations that Western

Wood Structures is a permittee who is directly regulated by the Regional Conditions, or by

agency actions under the SLOPES IV Procedures and Biological Opinion.

> **B.**     **No Factual Allegations Support That Western Wood Structures Or Any Other Plaintiff Itself Has Used Or Will Use A CWA Permit.**

As the United States explained in its Memorandum, the four new individual companies

who have been added to this lawsuit do not save Plaintiffs from their deficiencies in standing.

U.S. Mem. at 13-21.  These four new companies are Permapost Products, Inc.; J.H. Baxter &

Co.; Conrad Forest Products, Inc.; and Western Wood Structures, Inc. – none of whom is alleged

in the Complaint to be an actual permittee for installation of treated wood projects in Alaska and

Oregon.  Also, none of the remaining five trade associations is alleged to be a permittee.  The

reason this permittee status (or lack therefore) is important is because when an agency action

imposes regulatory restrictions or actions on third parties rather than the parties before the Court,

"it becomes substantially more difficult" for Plaintiffs to establish standing.  U.S. Mem. at 15

(quoting *Nat'l Wrestling Coaches Ass'n v. U.S. Dep't of Educ.*, 366 F.3d 930, 938 (D.C. Cir.

2004) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 562 (1992)).

Trying to avoid this more difficult burden, Plaintiffs claim that one party – Western

Wood Structures – is "directly regulated" by the Corps because it cannot "install these [treated

wood] structures without a [Corps] permit under the [CWA]."  Pls' Opp'n at 7; *see* Compl. ¶ 10

("A USACE permit under the Clean Water Act must be obtained before these in or over water

structures can be built.").  That single, carefully crafted allegation is the sole basis for Plaintiffs'

justification for the individual companies' Article III standing and, consequently, for the five

trade associations' associational standing to sue on their members' behalves.  Specifically,

relying on Western Wood Structures' alleged would-be permittee status, Plaintiffs claim that the

doctrine of "competitor standing" applies to save them from dismissal.  For the reasons discussed below, however, *see infra* Section I.C., that doctrine does not apply where, as here, there is no direct regulation of a plaintiff.

Plaintiffs' inference that Western Wood Structures is a would-be permittee is based on the carefully crafted language Plaintiffs use to claim that Western Wood Structures is "directly regulated" by the challenged agency actions or, more specifically, by the Regional Conditions. Plaintiffs *never* say that Western Wood Structures itself has used an NWP to install its treated wood structures in waters of the United States in Alaska and Oregon.  They also *never* say that Western Wood Structures itself has been or will be required to obtain a CWA Section 404 individual permit for any such installation.  Instead, Plaintiffs say that a permit must be obtained and that these structures cannot be installed without a CWA permit.  Although Plaintiffs are correct that an NWP or an individual permit under CWA Section 404 is required if these structures are being installed in jurisdictional waters of the United States, *see* U.S. Mem. at 4-6, that fact alone is not enough.  The critical fact is what party is obtaining that permit and, consequently, what party either must comply with the terms of the Regional Conditions if an NWP is to be used, or apply for an individual permit.  Importantly, Plaintiffs never say that this party is Western Wood Structures.  Saying that a permit must be obtained or used is different than saying that Western Wood Structures itself must obtain or use a permit.

Western Wood Structures allegedly "receives and performs over 70 contracts for design and construction of treated wood projects, and typically 15-20 of these contracts per year – hundreds in total over the years the company has been in business – require Western Wood to perform the installation of the structure."  Pls' Opp'n at 7; *see* Compl. ¶ 10.  Yet out of these hundreds of contracts, Western Wood Structures has not provided a single example to show that

it (rather than the party with whom the company contracted) was responsible for complying with or seeking authorization under an NWP, or for seeking an individual permit.  For instance, Plaintiffs claim that Western Wood Structures has projects with the U.S. Forest Service.  Pls' Opp'n at 7.  Yet, the Forest Service, according to Plaintiffs, is the party who determines the requirements for the project.  *Id.* ("The Forest Service is increasingly requiring that its projects be built with untreated wood or steel[.]").  As the party in charge of installing the project, the Forest Service determines whether an NWP or an individual permit must be sought and applies for such permit.  The Forest Service therefore is the permittee and Western Wood Structures provides no example out of its numerous contracts to show that it, rather than the Forest Service, is the permittee.

In fact the one allegation that Western Wood Structures provides – the recent completion of a "280 foot span bridge in the Chugach National Forest in Alaska," Pls' Opp'n at 7 (citing Compl. ¶ 10) – actually undercuts Western Wood Structures' alleged permittee status.   Indeed, the documents for that project show that the Forest Service was the permittee who was seeking authorization under an NWP.  *See* Exhibit 1 (attached hereto).  Moreover, the NWP authorization was not for the installation of the treated wood bridge; rather, the authorization, which was under NWP 33 (Temporary Construction Access and Dewatering), was for the Forest Service's "use of jersey barriers, positioned in flowing water to deflect current and allow crane access to place the pedestrian bridge."  *See* Exhibit 1, March 26, 2011 letter  at 1.  Based on information provided by the Forest Service (not by Western Wood Structures), the Corps verified the use of jersey barriers in waters of the United States under NWP 33.  The wood bridge itself, however – which Western Wood Structures claims to have installed – did not require CWA authorization under an NWP or an individual permit because the bridge itself was located above the "ordinary high

water mark" or "OHW line" and therefore was not subject to the Corps' CWA jurisdiction.  *See* Exhibit 1, Memorandum for Record at 1.  Thus, the one example that Western Wood Structures provides, is neither an example of a treated wood project that required a CWA permit, nor an example of Western Wood Structures itself being a permittee.

There also are no allegations that these hundreds of projects for which Western Wood Structures has or had contracts are projects that qualified for authorization under an NWP. NWPs are conditioned or restricted based on concerns for the aquatic environment or other public interest factors.  33 C.F.R. § 330.1(d).  For example, "[w]here appropriate and necessary, certain NWPs have acreage, linear foot, or cubic yard limits, or combinations of those limits, to ensure that authorized activities result in minimal individual and cumulative adverse effects on the aquatic environment."  77 Fed. Reg. 10,184, 10,186 (Feb. 21, 2012).  Plaintiffs *never* allege that the projects for which Western Wood Structures or any other individual company had contracts would meet these acreage, linear foot, or cubic yard limitations so as to qualify for NWP authorization.  This fact is important because if Plaintiffs are claiming that the challenged agency actions have deprived Plaintiffs of the streamlined processes under NWP authorization, then they need to provide more than mere speculation that their projects or installations actually qualified for NWP authorization in the first place.

Overall, Plaintiffs do not allege that Western Wood Structures itself is or was a permittee under an NWP for the installation of treated wood projects in Alaska or Oregon.  Nor do Plaintiffs allege that Western Wood Structures itself will now be required to obtain an individual permit for such installations.  Instead, the Complaint alleges that other permittees – such as the Forest Service – received authorization under NWPs and may now be required to obtain individual permits if those permittees choose to continue to use treated wood for their projects.

Plaintiffs further do not allege that any of the projects for which they had contracts with permittees actually qualified for NWP authorization instead of requiring an individual permit. There simply are no allegations – including reference to any specific permit authorizations – to support Plaintiffs' inference that Western Wood Structures was a permittee. Western Wood Structures therefore is not directly regulated by the Regional Condition, or by the agency actions that would occur under the SLOPES IV Procedures or Biological Opinion.

### C.   The "Competitor Standing" Doctrine Does Not Apply Here To Confer Standing On Any Of The Four Individual Companies.

Plaintiffs' claim to Article III standing relies entirely on the doctrine of "competitor standing." Pls' Opp'n at 21-25. Plaintiffs' reliance on this doctrine, however, is fatally flawed because that the cases establishing this doctrine involved parties or competitors who were directly regulated by the challenged agency action. That doctrine does not apply, however, to a situation where, as here, none of the Plaintiffs or their competitors faces such direct regulation by the Regional Conditions, SLOPES IV Procedures, or Biological Opinion.

For example, Plaintiffs rely on *International Brotherhood of Teamsters v. United States Department of Transportation*, 724 F.3d 206 (D.C. Cir. 2013), *cert denied, Owner Operator Independent Drivers Association v. Department of Transportation*, 134 S.Ct. 922 (2014). Pls' Opp'n at  22. There, the agency action lifted a prior ban on Mexican-domiciled trucking companies operating trucks in the United States and allowed such trucks to operate if they complied with certain federal safety standards. Two associations representing American-domiciled truck drivers challenged the agency action. 724 F.3d at 211. The Mexican truck drivers in that case were directly regulated by the agency action that lifted the ban, and the American truck drivers were the direct competitors who were faced with losing business. The agency action at issue effectively allowed increased competition between American and Mexican

8

truck drivers.  *Id.* at 211-12.  Thus, under the doctrine of "competitor standing" the associations representing the American truck drivers had sufficient causation and redressability for Article III standing because had the agency not lifted the prior ban, "members of these groups would not be subject to increased competition."  *Id.* at 212.

The "competitor standing" doctrine makes sense in a situation like that in *International Brotherhood of Teamsters* where the competing parties are directly regulated by the agency action.  Plaintiffs' application of "competitor standing," however, would unreasonably stretch that doctrine beyond parties who are directly regulated.  For example, under Plaintiffs' application of this doctrine, American gas companies who supplied American truck companies also could have had standing to sue in *International Brotherhood of Teamsters* because they could have claim that they too would lose business if the American trucking companies had fewer routes in the United States.  If "competitor standing" extended that far down the chain, it is hard to see where the competition would cease to be sufficient for standing.  For instance, under such an extended application of this doctrine here, the companies who supply the chemicals used to treat the wood could claim that they are harmed by the Regional Conditions, SLOPES IV Procedures, and Biological Opinion because they compete against companies who supply chemicals to manufacturers that produce treated wood alternatives.

Such an attenuated application of the competitor standing doctrine is not supported by the reasoning in *International Brotherhood* or related authority.  Under the law of this Circuit, the court may apply the "'competitor standing' doctrine only when a plaintiff is a "*direct* and *current* competitor whose bottom line may be adversely affected by the challenged government action."  *New World Radio, Inc. v. FCC*, 294 F.3d 164, 170 (D.C. Cir. 2002) (emphasis in original).  In simple terms, competitor standing applies where the plaintiff is a competitor who is directly

regulated by the challenged agency action and the plaintiff's competitors are also directly regulated or have had regulatory burdens relaxed.  Here, however, like the petitioners in *New World*, Plaintiffs' causation argument is based on a "chain of events" that "depends on the independent actions of third parties."  294 F.3d at 172 (citation and internal quotation marks omitted).  This fact, just as in *New World*, distinguishes this "case from the garden variety competitor standing cases which require a court to simply acknowledge a chain of causation firmly rooted in the basic law of economics."  *Id.* (citation and internal quotation marks omitted).  Plaintiffs here are not direct competitors of the parties who are directly regulated by the agency actions at issue; rather, they are suppliers of those parties.  Thus, the competitor standing doctrine does not apply here and, even if it did, this case is more akin to the situation in *New World* where the court petitioners lacked of causation for Article III standing.  *Id.*

Further, Plaintiffs' reliance on *Bennett v. Spear*, 520 U.S. 154 (1997), is misplaced. Contrary to Plaintiffs' argument, *Bennett* did not reject the notion that "Article III standing is lacking where a government decision starts a chain of events leading to the plaintiffs' financial loss, but the final action imposing the loss on the plaintiff is ultimately made by a third party not before the court."  Pls' Opp'n at 22.  In fact, the Supreme Court specifically stated that "[w]hile *it does not suffice if the injury complained of is the result of the independent action of some third party not before the court* . . . that does not exclude injury produced by determinative or coercive effect upon the action of someone else."  *Bennett*, 520 U.S. at 169 (citations and internal quotation marks omitted) (emphasis added).  Thus, the Supreme Court specifically recognized the argument that the United States makes here – that Plaintiffs' claimed injury is the result of independent actions of third parties not before this Court, which is insufficient for causation and redressability under Article III standing.

In *Bennett*, the Fish and Wildlife Service issued a biological opinion under ESA Section 7 ESA, 16 U.S.C. § 1536, finding that operation of the Klamath Irrigation Project would jeopardize two endangered species. *Id.* at 158.  One reasonable and prudent alternative under the biological opinion to avoid that jeopardy was the maintenance of minimum water levels on the lake and reservoir. *Id.* at 159.  Two irrigation districts and two ranch operators in that district whose irrigation water levels would be reduced filed suit, claiming that their injury for Article III purposes was the reduction of the quantity of water available. *Id.*  Thus, unlike here, the *Bennett* petitioners were directly regulated, *i.e.*, directly impacted, by the agency action at issue.

The government in *Bennett*, however, claimed that the petitioners' injuries were not caused by the biological opinion and would not be redressed by a favorable ruling. *Id.* at 169. The basis for the agency's argument was that the Bureau of Reclamation retained "ultimate responsibility for determining whether and how a proposed action shall go forward" following the issuance of a Biological Opinion. *Id.*  Thus, according to the Fish and Wildlife Service, whether petitioners would suffer a decrease in irrigation water would depend on an independent decision by the Bureau of Reclamation. *Id.*  The Supreme Court disagreed, explaining that this rationale "wrongly equate[d] injury 'fairly traceable' to the defendant with injury as to which the defendant's actions are the very last step in the chain of causation." *Id.* at 168-69.

In short, *Bennett* supports the proposition that a biological opinion may form the basis of an alleged injury, for purposes of establishing Article III standing, suffered by a party who is directly regulated by the agency action that is considered in the biological opinion.  That is not the situation here, where the challenged agency actions are the first step – not the last – in a speculative chain of decisions made by third party permittees that must occur before there is any alleged injury to Plaintiffs.  For example, a permittee must determine first whether its proposed

project would qualify for NWP authorization, *i.e.*, whether the project meets any applicable acreage, linear feet, or cubic yard requirements.  If so, then the permittee must determine, based on financial and other business considerations, whether it wants to use alternatives to treated wood so as to still qualify for NWP authorization.  That determination would be based on various undetermined financial and business decisions that could lead a permittee to choose another alternative over treated wood so the permittee can proceed under an NWP rather than an individual permit.  *If* all of the permittee's independent decisions about the project lead it to select a project that can proceed under an NWP, only then *may* Plaintiffs suffer some injury. Unlike the direct injury from agency action at issue in *Bennett*, however, that would-be injury is the result of several intervening and independent choices made by permittees.  Such an injury would be far removed from the challenged agency actions and part of an attenuated chain that is insufficient for causation.

Equally unpersuasive is Plaintiffs' reliance on *Honeywell International, Inc. v. Environmental Protection Agency*, 374 F.3d 1363 (D.C. Cir. 2004).  *See* Pls' Opp'n at 22-23. Again, the petitioners in *Honeywell* – unlike Plaintiffs here – were directly regulated by the challenged agency action.  The Environmental Protection Agency ("EPA") had previously designated a particular substitute for ozone-depleting substances that was made by Honeywell, which was the only substitute on the market.  EPA subsequently issued another rule authorizing two other substitutes that were not made by Honeywell, subject to certain limits and conditions. 374 F.3d at 1365.  As to Honeywell's Article III standing, the D.C. Circuit found that causation was satisfied "because the rule legalizes the entry of a product into a market in which Honeywell competes – the market for approved substitutes for [ozone-depleting substances]."  *Id.* at 1369. The court rejected EPA's argument that the chain of causation was based on the purchasing

decisions of third party manufacturers not before the court and, thus, was too speculative.  *Id.*
"[I]t is well established that parties suffer cognizable injury under Article III when an agency
lifts regulatory restrictions on their competitors or otherwise allows increased competition."  *Id.*
(citations and internal quotation marks omitted).  That is not the situation here.

Not only are Plaintiffs and their competitors not directly regulated by the agency actions
here, but the Corps also has not lifted any direct regulatory restrictions on treated wood
alternatives.  Before issuance of the Regional Conditions, the Corps District Engineers in Alaska
and Oregon retained authority to determine that any project seeking authorization under an NWP
would cause more than "minimal adverse effects."  76 Fed. Reg. 9174, 9175 (Feb. 6, 2011).
Thus, even though the use of treated wood projects in waters of the United States was not
specifically excluded from the NWPs, District Engineers in Alaska and Oregon retained case-by-
case authority to determine that such use would cause more than minimal adverse effects for a
project and, thus, that an individual permit would be required.

Moreover, unlike the situation in *Honeywell* where Honeywell literally had the exclusive
corner on the market for ozone-depleting substitutes prior to EPA's new rule, Plaintiffs here did
not have the exclusive corner for projects (like bridges) installed by permittees in waters of the
United States.  Plaintiffs shared, and still share that market, with treated wood alternatives.
Plaintiffs have not been eliminated from that market.  After issuance of the Regional Conditions
in Alaska and Oregon, a permittee is *not prohibited* from using treated wood in its projects; the
permittee simply cannot use an NWP and must seek an individual permit instead.  Also contrary
to the situation in *Honeywell*, there is nothing to support that Plaintiffs' market share will be
reduced.  As discussed above, Plaintiffs have provided no examples supporting that Plaintiffs'
treated wood structures actually are or were being used by permittees for projects authorized

under an NWP rather than an under individual permit. Thus, there are no allegations that the agency actions will reduce Plaintiffs' market share by allowing treated wood alternatives, but not treated wood, to be used under NWPs.

In summary, there is no factual support for the inference Plaintiffs want this Court to draw – that Western Wood Structures is a party directly regulated by the agency actions at issue. Consequently, there is nothing to support application of the garden variety "competitor standing" cases on which Plaintiffs rely.   The doctrine of competitor standing simply does not apply in this situation and, even if it did, Plaintiffs' alleged competitive injuries are too far removed from the challenged agency actions.

**D.    There Are No Allegations Showing A Causal Connection Between The Alleged Disregard For Agency Procedure And Plaintiffs' Particular Injuries.**

The United States argued that Plaintiffs' alleged procedural injuries in Claims 1-6 and 11 failed to establish a causal connection between Plaintiffs' injuries and the alleged disregard for certain APA, CWA, and RFA procedures.  U.S. Mem at 19-22.  Plaintiffs' response misses the mark.  Pls' Opp'n at 27-28.  The United States' argument is *not* that "Plaintiffs must prove the Regional Conditions would have been different if notice and comment had been provided."  *Id.* at 27.  Instead, the United States' argument simply is that there is a difference between the alleged "procedural right" that has been violated, and the plaintiff's "concrete interest" at stake in a procedural rights case.  U.S. Mem. at 20 (quoting *Ctr. for Law & Educ. v. Dep't of Educ.*, 396 F.3d 1152, 1159 (D.C. Cir. 2005)).  In other words, the mere existence of the procedural right is not the same as Plaintiffs' concrete interest.

Plaintiffs fail to recognize the importance of this distinction and claim that there is a "very limited causation showing required for a procedural injury to provide Article III standing." Pls' Opp'n at 27-28.  Ironically, the case on which Plaintiffs rely does not support this "very

limited causation showing."  *Id.* at 27 (quoting *Florida Audubon Soc'y v. Bentsen*, 94 F.3d 658, 669 (D.C. Cir. 1996)).  In *Florida Audubon Society*, the D.C. Circuit stated that a procedural rights plaintiff "must demonstrate that there is a *substantial probability* that the substantive agency action that disregarded a procedural requirement created a *demonstrable risk* . . . of injury to the particularized interests of the plaintiffs."  94 F.3d at 669 (emphasis added); Pls' Opp'n at 28 (quoting same).  Under this case law, Plaintiffs must still demonstrate a "causal connection between the government action that supposedly required the disregarded procedure and *some reasonably increased risk of injury* to [the plaintiff's] particularized interest."  U.S. Mem. at 20 (quoting *Fla. Audubon Soc'y*, 94 F.3d at 664) (emphasis added).

For the same reasons discussed above, Plaintiffs have failed to make this required showing of a "causal link" between the alleged disregard for APA, CWA, and RFA procedures and a demonstrable risk of injury to their particularized interests.  Again, Plaintiffs have done nothing more than draw their own "factual inferences" that are not actually "supported by facts alleged in the complaint."  *Speelman*, 461 F.Supp.2d at 73.  Specifically, there are *no* facts in the Complaint that the hundreds of contracts Western Wood Structures allegedly has with permittees for installation of treated wood structures were authorized under NWPs as opposed to individual permits.  Thus, Plaintiffs have failed to show that they had any "reasonably increased risk of injury," *Fla. Audubon Soc'y*, 94 F.3d at 664, from the alleged failure of the United States to follow certain statutory and regulatory procedures for the Regional Conditions.

### E.  The Five Trade Associations Do Not Have Associational Or Organizational Standing.

The United States' Memorandum explained that without standing by any of the four individual companies, none of the five trade associations has associational standing to sue on those companies' behalves.  *See* U.S. Mem. at 22-23.  The only argument Plaintiffs' make to

dispute that point is their "competitor standing" argument that, as discussed above, does not apply here.  Thus, the five trade associations have no associational standing.

As to the trade associations' organizational standing, Plaintiffs' only retort is to rely on alleged economic harms suffered by Western Wood Preservers Institute ("WWPI") (one of the Plaintiffs in the original plaintiffs in the *Western Wood Preservers Institute, et al. v. McHugh, et al.* case.  925 F.Supp.2d 63 (D.D.C. 2013) ("*WWPI*"); *see* Pls' Opp'n at 25-26.  In *WWPI*, the Court found that WWPI failed to establish any environmental or procedural injury.  925 F.Supp.2d at 70-71; *see* U.S. Mem. at 24-25.  In an attempt to get around those infirmities, Plaintiffs argue here that WWPI has "economic harm to itself which are tied to its procedural injury."  Pls' Opp'n at 25.  Specifically, WWPI claims that it has suffered losses in revenue from "its proprietary BMP Mark Program."  *Id.* at 26.  This program allegedly allows member companies to use a trademark developed by WWPI to certify that the companies' treated wood complies with certain "best management practices" or "BMPs."  Compl. ¶ 9; Pls' Opp'n at 10.  WWPI charges an annual fee for use of this BMP certification.  Pls' Opp'n at 10.  WWPI further claims that "third party inspection agenc[ies]" who provide quality assurance also must pay an annual fee to WWPI, as well as per/volume inspection fee.  *Id.*  WWPI claims that the challenged agency actions "have caused and threaten the loss of sales."  *Id.* at 11.

WWPI's logic seems to be that because of the challenged agency actions, the WWPI member companies will be unable to sell treated wood to permittees who are using NWPs and therefore will not seek BMP certifications under WWPI's program.  They also seem to claim that the third party inspection agencies will have less volume of treated wood to inspect, thereby resulting in financial losses to WWPI's BMP Mark Program.  The lack of causation and redressability for these alleged injuries, however, is equally if not more speculative than that for

the four individual companies' discussed above.  Out of the $5,000-$7,000 annual revenue that

WWPI alleges it receives from its BMP Mark Program, Compl. ¶ 9, WWPI makes no allegations

that any of this revenue comes from treated wood sold by its member companies to would-be

permittees constructing projects authorized under NWPs.  Even if WWPI provided such

allegations and supporting facts, they nonetheless would be insufficient to show causation:  the

certifications sought by member companies and the inspections done by third party agencies are

dependent on the decisions of third party permittees who ultimately decide whether or not to use

treated wood.  WWPI and Plaintiffs therefore have failed to show that any of the five

organizations have organizational or associational standing.

## II.    PLAINTIFFS LACK PRUDENTIAL STANDING FOR CLAIMS 1-4, 6, 7, AND 11 BECAUSE THEIR INTERESTS FALL OUTSIDE THE "ZONE OF INTERESTS" OF THE CWA AND RFA.

### A.    The "Zone Of Interests" Test Applies Because No Plaintiffs Is A Regulated Party.

As with Article III standing, Plaintiffs wager their entire prudential standing argument on

their unsupported allegation that Western Wood Structures is "directly regulated by the specific

regulatory actions" at issue.  Pls' Opp'n at 28.  On that basis, Plaintiffs claim that the "zone of

interests test" does not apply.  *Id.*  As discussed above, however, Western Wood Structures is *not*

a permittee and, thus, is not regulated by the Regional Conditions.  *See supra* Section I.B.

Moreover, because *no* Plaintiff is a regulated party, the "zone of interests" test indeed does

apply, as discussed more fully below.  Finally, Plaintiffs' perplexing claim that the United States

has waived any opposition to Western Wood Structure's prudential standing is incorrect.  Pls'

Opp'n at 29.  The United States argued that *all* Plaintiffs lacked prudential standing.  U.S. Mem.

at 26-32.  In opposition, Plaintiffs have hinged their entire prudential standing argument on

WWPI's unsupported status as a regulated party.  The United States has not waived any right to respond to that argument.

### B.      There Is No Precedent Conferring Universal Prudential Standing On Any Party Who Claims To Have Been Deprived Of APA Procedures.

Claims 1-3 are based *solely* on the Corps' alleged violations of APA procedures in issuing the Regional Conditions.[1]  As the United States succinctly explained, procedural claims based solely on the APA are still subject to the "zone of interests" test.  U.S. Mem. at 26-27.  No matter how broad Plaintiffs' claim this "zone of interests" test to be, they cite no case law supporting that any unregulated party (such as Plaintiffs here) can assert some generalized complaint that an agency failed to follow the APA's procedural requirements.  If that were the case, an automobile manufacturer could challenge the Regional Conditions here claiming it is "aggrieved" within the meaning of APA Section 702 because the automobile manufacturer has a generalized interest in ensuring that government agencies follow APA procedures.  APA Section 702's language allowing suits by those parties "adversely affected or aggrieved," 5 U.S.C. § 702, is not meant to be that broad – a principle the D.C. Circuit emphasized in *Capital Legal Foundation,* 711 F.2d at 260; *see* U.S. Mem. at 27.

Thus, as to Claims 1 through 3, which are based solely on the APA, Plaintiffs have no universal right to sue to enforce a procedural right unless they fall within the "zone of interests to be protected or regulated by the statute that he says was violated."  *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 132 S.Ct. 2199, 2210 (2012) (citations and internal quotation marks omitted).  Here, Plaintiffs' do not fall within the zone of interests because their

---

[1] The United States' brief overlooked that Claim 3 was based solely on the APA and, instead, mistakenly associated that Claim with Claims 4 and 7, which are based jointly on certain APA and CWA procedures.  U.S. Mem. at 26-27.  The discussion in the United States' Memorandum regarding the principle from *Capital Legal Foundation v. Commodity Credit Corp*., 711 F.2d 253 (D.C. Cir. 1983) applies equally to Claim 3 in addition to Claims 1 and 2.  U.S. Mem. at 27.

alleged injuries have no demonstrable link to projects authorized under NWPs and, thereby, to the Regional Conditions that define the situations in which those NWPs can be used or to the SLOPES IV Procedures and Biological Opinion that would apply to those projects.[2]

**C.      Plaintiffs' Interests Are Not Among Those Regulated Or Protected By the Statutory Provision Plaintiffs Claim The United States Has Violated.**

Plaintiffs devote a significant portion of their brief to their view of the historical broadening of the "zone of interests" test, arguing that the United States has relied on outdated doctrines that have been rejected by the Supreme Court.  Pls' Opp'n at 29-35.  Yet despite all their rhetoric, Plaintiffs fail to recognize that the cases on which they rely actually support the United States' argument and make the same points as the cases on which the United States relies.

Supreme Court precedent dictates that the Court's analysis of prudential standing starts with the well-established principle that the interest a plaintiff "asserts must be arguably within the zone of interests to be *protected or regulated* by the statute that he says was violated." *Patchak*, 132 S.Ct. at 2210 (emphasis added) (citation and internal quotation marks omitted); *Mendoza*, 924 F.Supp.2d at 320 (citing *Patchak*).  This is the current law of the land and Plaintiffs' could not be more wrong in asserting that the "protected or regulated" component of that analysis is no longer valid.  *See* Pls' Opp'n at 30 (claiming that the original zone of interests

---

[2] The United States should clarify that in analyzing procedural claims under the APA, Courts will look to the substantive statute that a plaintiff alleges was violated to determine the "zone of interests" to be protected.  *See Patchak*, 132 S.Ct. at 2210-11 (looking to Section 465 of the Indian Reorganization Act to determine whether the interest plaintiff asserted was "arguably within the zone of interests to be *protected or regulated by the statute that he says was violated*.") (emphasis added) (citation omitted); *Mendoza v. Solis*, 924 F. Supp. 2d 307, 320-21 (D.C.Cir. 2013) ("In order to delineate the zone of interests, a court must look to the Act itself and to its legislative history.") (citation and internal quotation marks omitted).  Thus, for all of Plaintiffs' claims where the United States has challenged prudential standing (Claims 1-4, 6, 7, and 11), the Court must look outside the APA to the associated substantive statute (the CWA or RFA) to determine the "zone of interests."  The United States' Memorandum mistakenly asserted that the Court need only look to the zone of interests under the CWA for Claims 3, 4, and 7.  U.S. Mem. at 27.

test looking at the interests to be protected or regulated by the statute is no longer valid). Plaintiffs' analysis of the zone of interests test incorrectly argues that a "congruence of interests" analysis has supplanted the "regulated or protected" analysis. *Id.* What Plaintiffs fail to understand, however, is that the "congruence of interests" analysis, *Amgen, Inc. v. Smith*, 357 F.3d 103, 109 (D.C. Cir. 2004), which effectively is the same as determining whether a plaintiffs' interests are "marginally related to or inconsistent with the purposes implicit in the statute," *Mendoza*, 924 F.Supp.2d at 321, is part and parcel of determining whether a plaintiff's interests are "protected or regulated" by the statute at issue. Thus, as the Supreme Court instructs, the analysis must start with determining what interests are "protected or regulated by the statute" that Plaintiffs claim was violated, which in this case for Claims 1-4 and 7, is the CWA.

The specific CWA provision at issue in Claims 1-4 and 7 is Section 404(e), which authorizes the Corps to issue general permits "for any category of activities involving discharges of dredged or fill material," as long as "the activities in such category are similar in nature, will cause only minimal adverse environmental effects when performed separately, and will have only minimal cumulative adverse effect on the environment." 33 U.S.C. § 1344(e)(1).[3] Although the issuance of NWPs under Section 404(e) is intended to "regulate with little, if any, delay or paperwork certain activities having minimal impacts[,]" 33 C.F.R. § 330.1(b), the overriding Congressional concern was that the general categories of activities that are authorized under an NWP have only "minimal adverse effects" on the environment when performed both individually and cumulatively.

---

[3] Plaintiffs do not specifically allege that the Corps violated CWA Section 404(e); however, Plaintiffs' allegations that the Corps' issuance of Regional Conditions violates the APA and the Corps' regulations necessarily implicates the organic statutory provision from which the Corps derives its authority to issue NWPs and associated Regional Conditions.

This overriding concern in Section 404(e), when coupled with the CWA's general purpose to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters, 33 U.S.C. § 1251(a), shows that the CWA is very clear about the "interests to be protected or regulated." *See Patchak*, 132 S.Ct. at 2210 (quotation omitted).  Specifically, the relevant interests are to allow general permits to streamline the permitting process *so long as* they are protective of the nation's waters and the categories of activities under those permits will cause no more than minimal adverse effects.[4]

Once the statutory interests are determined, the next step is to determine whether Plaintiffs' interests are "so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit."  *Patchak*, 132 S.Ct. at 2210 (citation and internal quotation marks omitted); *Honeywell*, 374 F.3d at 1370 (quoting *Clarke v. Sec. Indus. Ass'n*, 479 U.S. 388, 399 (1987)).  Here, although this test "is not meant to be especially demanding," Plaintiffs have failed to meet it.  *Clarke*, 479 U.S. at 399.

First, Plaintiffs reliance on a separate subsection of CWA Section 404 to argue that the CWA is "principally focused on reducing the economic impacts of clean water regulation," Pls' Opp'n at 35-36, is not only irrelevant, but also wrong.  The specific forestry, farming, and ranching activities that Plaintiffs cite, Pls' Opp'n at 12-13, 35-35, and that are exempted under Section 404(f) from permitting requirements have nothing to do with Congress' intent in Section 404(e) to authorize the Corps to issue general permits for similar categories of activities that will have only minimal adverse effects on the environment.  Moreover, the "principle" focus of the CWA statute as a whole, as noted above, is pollution reduction – not reducing economic impacts

---

[4] The Corps' regulations also emphasize that activities under NWPs can have no more than minimal adverse effects.  *See* U.S. Mem. at 5 (citing 33 C.F.R § 330.1(d), § 330.2(c), § 330.5(c)(1)(i).

of that pollution reduction as Plaintiffs urge.  Quite simply, the exemptions under 404(f) are irrelevant to the Corps' issuance of NWPs, the Regional Conditions, and the SLOPES IV Procedures and have no bearing on the interests that CWA Section 404(e) is designed to protect or regulate.

Second, Plaintiffs' argument that it does not need to have "pure of heart" interests, *i.e.*, interests unmotivated by economic concerns, misses a critical distinction in the D.C. Circuit precedent, which supports that prudential standing is defeated where the plaintiff relies on purely economic interests that are inconsistent with a statute's environmentally protective purposes. U.S. Mem. at 29.  The D.C. Circuit in *Honeywell* explained that there is a difference between the line of cases where a company "sues to enforce a 'statutory demarcation,' such as an entry restriction," and the line of cases where a company challenges "allegedly too-weak pollution regulations" on the ground that "stronger regulations would lead to increased demand for their products."  374 F.3d at 1370.  The former situation (cases involving a "statutory demarcation") was representative of the situation in *Honeywell*, where Honeywell was challenging EPA's allowance of another competitor into the market.  In that situation, one competitor was suing to enforce a statutory provision that involved a "demarcation" or a restriction on a competitor's entry into the market.  *Id.*  In such cases, a competitor's product "is either permitted to compete in the market . . . or not."  *Id*.  "Irrespective of whether the statutory scheme contemplates that competitive interests will advance statutory goals . . . when a competitor sues to enforce a 'statutory demarcation,' such as an entry restriction," the plaintiff's competitive interests will align with those of the statute "because the potentially limitless incentives of competitors are channeled by the terms of the statute into suits of a limited nature brought to enforce the statutory demarcation."  *Id.* at 1370-71 (internal quotation marks and citations omitted).

That type of "statutory demarcation" issue is distinct from the second type of scenario that *Honeywell* recognized and which was presented in *Hazardous Waste Treatment Council v. Environmental Protection Agency*, 861 F.2d 277 (D.C. Cir. 1988) (per curiam) ("*HWTC II*") and *Hazardous Waste Treatment Council v. Environmental Protection Agency*, 885 F.2d 918 (D.C. Cir. 1989) ("*HWTC IV*").  *See Honeywell*, 374 F.3d at 1370.  In the *HWTC* line of cases, manufacturers challenged lax environmental standards, claiming there would be less demand for their product.  *Id.*  In those cases, the D.C. Circuit found that the manufacturers did not have prudential standing because there was "insufficient alignment between the manufacturers' commercial interests and the environmental purposes of the statute."  *Id.*  As the *Honeywell* court explained, cases involving a "statutory demarcation" issue "are less subject to manipulation than the open-ended emissions standards in *HWTC II & IV* . . .  because they constrain[] competitors to a limited role in guarding a congressionally drawn boundary."  *Id.* at 1371 (quoting *First Nat'l Bank and Trust Co. v. Nat'l Credit Union Admin.*, 988 F.2d 1272, 1278 (D.C. Cir. 1993)).

Plaintiffs' challenge presents a situation mirroring the second type of situation presented by the *HWTC II & IV* line of cases.  Where the manufacturers in *HWTC II & IV* claimed that the agency's standard were too weak and decreased the demand for the manufacturers' product, Plaintiffs here claim the Regional Conditions and SLOPES IV Procedures are too strict and decrease demand for their product.  Each situation is a different side of the same coin and one where the commercial interests of the plaintiffs do not align sufficiently with the environmental purposes of the statute.  Thus, Plaintiffs are wrong that such a "pure of heart" doctrine has been rejected.  Pls' Opp'n at 30-31.

Plaintiffs also rely on *Bennett* to support their prudential standing.  The Supreme Court's holding in *Bennett*, however, concerning the expansion of the applicable zone of interests for

certain ESA claims was based on the specific language of the ESA's citizen-suit provision, 16 U.S.C. Sec. 1540(g), which authorizes "any person" to bring enumerated types of ESA claims. 520 U.S. 164 n. 2.  Contrary to Plaintiffs' suggestion, *see* Pls' Opp'n at 36-37, the holding in *Bennett* does not extend to other applications of the prudential standing doctrine outside the context of the ESA citizen-suit provision.  Thus, *Bennett* does not preclude the application of the "zone of interests" test for prudential standing for Plaintiffs' non-ESA claims.

Finally, Plaintiffs' reliance on the doctrine of *jus tertii* is misplaced.  Pls' Opp'n at 36-37. As an initial matter, there are no allegations in Plaintiffs' Complaint that they are asserting the rights of third parties, *i.e.*, the permittees to whom Plaintiffs sell their treated wood products. Indeed, all of Plaintiffs allegations are geared toward Plaintiffs' own injuries and interests and not those of third parties.  Further, cases such as *FAIC Securities v. United States*, 768 F.2d 352 (D.C. 1985), on which Plaintiffs rely involved parties who were directly regulated by the agency action at issue.  In *FAIC* for example, the agencies issued a regulation that changed the federal insurance coverage for depositors and required aggregation of all deposits made by deposit brokers.  *Id.* at 356.  A deposit broker and trade association representing deposit brokers challenged the regulation, claiming that it would "eliminate the deposit brokerage industry, thus causing them direct economic injury, and depriving their customers of the benefits of placing deposits through a broker."  *Id.*  The court, finding that the field of *jus tertii* was "confused," found that the petitioners had standing based on the vendor-vendee relationship.  *Id.* at 360-61.

Contrary to the situation in *FAIC* where the vendor was the regulated party and was asserting the rights of the vendees who were impacted by that regulation, Plaintiffs here, again, are not the regulated party.  None of the cases on which Plaintiff relies for the *jus tertii* doctrine involve a situation like here where the party asserting the rights of a third party is *not* the

24

regulated party.

For these reasons, Plaintiffs' failure to establish any party's status as a directly regulated

party delivers a fatal blow to Plaintiffs' claim of prudential standing.[5]

## CONCLUSION

For the foregoing reasons and those in the United States' Memorandum, the United States

respectfully requests that the Court dismiss Plaintiffs' Complaint.

Respectfully submitted,

ROBERT G. DREHER
Acting Assistant Attorney General
Environment & Natural Resources Division

/s/ Michele L. Walter
MICHELE L. WALTER, DC Bar # 487329
Trial Attorney
Environmental Defense Section
U.S. Department of Justice
601 D St., NW, Suite 8000
Washington, D.C. 20004
Telephone: 202.514.2795
Facsimile:  202.514.8865
michele.walter@usdoj.gov

/s/ Mark Arthur Brown
MARK ARTHUR BROWN
DC Bar # 470050
Senior Trial Attorney
Wildlife and Marine Resources Section
U.S. Department of Justice
P.O. Box 7611
Washington, D.C. 20044 7611
Telephone: (202) 305 0204

---

[5] Plaintiffs' only argument to support maintaining its claims under the RFA is that Western Wood Structures is directly regulated by the agency actions and, thus, is a small business who has prudential standing to challenge the Corps' compliance with the RFA requirements.  Plfs' Opp'n at 40-41.  The discussion above, however, demonstrates that Western Wood Structures is not a party who is "directly regulated" by the agency actions at issue.  Consequently, Western Wood Structures' interests do not fall within the zone of interests protected by the RFA.  U.S. Mem. at 31-32.  Prudential standing therefore is lacking for the RFA claims.

Facsimile: (202) 305 0275
Email:  mark.brown@usdoj.gov

*Counsel for Defendants*

DATED:  March 12, 2014

**<u>CERTIFICATE OF SERVICE</u>**

The undersigned hereby certifies that on March 12, 2014, a copy of the foregoing was

served on the counsel of record who are registered with the Court's ECF system:


_____/s/ Michele L. Walter_____
MICHELE L. WALTER