# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **PERMAPOST PRODUCTS, INC.,** *et al.*, | |
| *Plaintiffs*, | |
| v. | **Civil Action No. 13-1736 (ESH)** |
| **JOHN M. McHUGH, Secretary** of the Army, *et al.*, | |
| *Defendant.* | |

## MEMORANDUM OPINION AND ORDER

Plaintiffs Permapost Products, Inc., Treated Wood Council, J.H. Baxter & Co., Conrad Forest Products, Inc., Western Wood Preservers Institute, Western Wood Structures, Inc., Railway Tie Association, Southern Pressure Treaters' Association, and Creosote Council ("plaintiffs") have sued John M. McHugh in his official capacity as the Secretary of the Army, the United States Army Corps of Engineers ("Corps"), Penny S. Pritzker in her official capacity as Secretary of Commerce, and the National Marine Fisheries Service ("NMFS"). Plaintiffs challenge defendants' approval of two regional conditions to nationwide permits under the Clean Water Act, as well as the issuance of certain operating procedures for activities that are regulated by that Act. Before the Court is defendants' motion to dismiss plaintiffs' complaint under Fed. R. Civ. P. 12(b)(1) and (b)(6). (Feb. 10, 2014 [Dkt. No. 18-1] ("Mot.").)[1] For the foregoing reasons, the Court will grant defendants' motion in part.

---

[1] Also before the Court is plaintiffs' motion for leave to file a surreply. (March 19, 2014 [Dkt. No. 22].) Although it is questionable whether defendants' reply brief raised issues that would justify a surreply in this case, *see Banner Health v. Sebelius*, 905 F. Supp. 2d 174, 187-88 (D.D.C. 2012), the Court will grant plaintiffs' motion and consider their additional arguments.

**FACTUAL BACKGROUND**

**I.     REGIONAL CONDITIONS**

The Clean Water Act, 33 U.S.C. § 1251 *et seq*. ("CWA"), prohibits, *inter alia*, the discharge of dredged or fill materials into navigable waters unless authorized by an individual or general "section 404" permit issued by the Army Corps of Engineers. *See id.* §§ 1311(a), 1344(a), (e). The issuance of an individual section 404 permit requires a case-by-case analysis. *See id.* § 1344(a). In contrast, general permits may be issued on a state, regional, or nationwide basis for categories of activities that "will cause only minimal adverse environmental effects when performed separately, and will have only minimal cumulative adverse effect on the environment." *Id.* § 1344(e)(1); 33 C.F.R. § 322.2(f)(1). Any party may engage in an activity within the scope of a general permit. Nationwide general permits may be conditioned or restricted by District and Division Engineers within the Corps, resulting in what are known as regional conditions. 33 C.F.R. § 330.1(d).

On February 16, 2011, the Corps proposed to re-issue forty-eight existing nationwide permits and two new nationwide permits for the five-year period from 2012 through 2017. (*See* Mot. at 7 (citing Proposal To Reissue and Modify Nationwide Permits, 76 Fed. Reg. 9174-01, 9175 (Feb. 16, 2011)); Complaint, Nov. 4, 2013 [Dkt. No. 1] ("Compl.") ¶ 19.) Two district offices of the Corps then announced proposed regional conditions for those nationwide permits: (1) on February 25, 2011, the Portland District proposed a regional condition that would prohibit nationwide permittees from using "wood products treated with biologically harmful leachable chemical components," including various wood preservatives, "to come in contact with waters or wetlands" in the State of Oregon (Compl. ¶ 20); and (2) on March 4, 2011, the Alaska District proposed a regional condition that would prohibit nationwide permittees from using products

treated with creosote and pentachlorophenol in certain waters in Alaska (*id.* ¶ 21) (collectively, the "Regional Conditions"). The nationwide permits were published on February 21, 2012. (*Id.* ¶ 22 (citing Reissuance of Nationwide Permits, 77 Fed. Reg. 10184-01 (Feb. 21, 2012)).) The Oregon Regional Condition was approved on March 16, 2012 (*id.* ¶ 23), and the Alaska Regional Condition was approved on March 19, 2012 (*id.* ¶ 24).

Plaintiffs allege that the Regional Conditions were issued in violation of the Administrative Procedure Act, 5 U.S.C. § 500 *et seq.* ("APA") (Claims 1-3, 7-8), Corps regulations (Claim 4), the ESA (Claim 5), and the Regulatory Flexibility Act, 6 U.S.C. § 601 *et seq.* ("RFA") (Claim 6). (Compl. ¶¶ 34-74.)

## II.    SLOPES PROCEDURES

The Endangered Species Act, 16 U.S.C. §§ 1531-1544 ("ESA"), provides certain protections for species listed as "threatened" or "endangered." *Id.* § 1533(a). As relevant to this case, the Act provides that federal agencies must ensure that any proposed agency action will not "jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of [that species's critical habitat]." *Id.* § 1536(a)(2). The determination of what constitutes a "critical habitat" is to be made by the Secretary of the Interior or the Secretary of Commerce, who have delegated that responsibility to the U.S. Fish and Wildlife Service ("FWS") and the NMFS, respectively. *Id.* § 1532(15). Thus, federal agencies must consult with the FWS or NMFS whenever an agency action "may affect" an endangered or threatened species. 50 C.F.R. § 402.14(a). Formal consultation with those entities results in their issuance of a "biological opinion," assessing whether the species or its habitat is likely to be jeopardized, and if so, identifying any "reasonable and prudent alternatives" that may exist to avoid that jeopardy. *Id.* § 402.14(h)(3). Of particular importance

to this case, consultation is required when a party seeks an individual section 404 permit from the Corps, but is *not* necessarily required when a party operates pursuant to a nationwide permit. (Compl. ¶ 32.)

In order to streamline its ESA consultation process, the Corps has adopted several Standard Local Operating Procedures for Endangered Species, known as "SLOPES" procedures, that set out design criteria for categories of recurring activities. The Corps then consults with the NMFS to receive a biological opinion on whether the use of those design criteria would jeopardize the existence or critical habitats of any threatened or endangered species. (Compl. ¶¶ 26-28.) If the NMFS agrees that a set of SLOPES procedures complies with the ESA, then the Corps may issue individual section 404 permits for any proposed project that complies with those design criteria without seeking further consultation from the NMFS.

On November 2, 2011, the Corps consulted with NMFS on a new set of procedures, known as SLOPES IV, which addressed construction or maintenance of certain in-water and over-water structures in Oregon. (Compl. ¶¶ 29-30.) One of the design criteria in SLOPES IV provided that treated wood could not be used as part of an in-water or over-water structure in Oregon. (*Id.* ¶ 30.) On April 5, 2012, the NMFS issued a Biological Opinion that those design criteria would not jeopardize any endangered or threatened species or their critical habitats, and therefore, projects that satisfy those design criteria would comply with the ESA and not require individual consultation. (*Id.* ¶ 29.) If, however, a proposed project did not comply with the design criteria in the SLOPES IV procedures, that would not prevent the issuance of a permit for that project: the Corps would simply need to request additional consultation from the NMFS. (*See id.* ¶ 32.)

Plaintiffs allege that the SLOPES IV procedures were issued in violation of mandatory procedural requirements in the APA and the ESA (Claims 9 and 10) and the RFA (Claim 11). (Compl. ¶¶ 75-89.)

### III.   *WESTERN WOOD*

In July 2012, the five associational plaintiffs in this case sued three of the four defendants who are the subject of this suit, raising substantially the same claims against the Regional Conditions and SLOPES IV Biological Opinion as are raised here.  *W. Wood Preservers Inst. v. McHugh* (*Western Wood I*), 925 F. Supp. 2d 63, 67-69 (D.D.C. 2013).  Defendants moved to dismiss plaintiffs' complaint for lack of standing under Fed. R. Civ. P. 12(b)(1) and for failure to state a claim under Rule 12(b)(6).  This Court granted that motion.  *See id.* at 77.  With respect to standing, the Court first found that the plaintiffs could not establish associational standing because they had not identified a single member firm that had suffered the alleged economic harm.  *Id.* at 69-70.  Furthermore, the associations themselves had not sufficiently alleged any environmental or procedural harm.  *Id.* at 70-73.  Additionally, the Court concluded that the associational plaintiffs had failed to state a claim under the RFA and ESA.  *Id.* at 75-77.

Plaintiffs filed a motion for leave to file an amended complaint or, in the alternative, for reconsideration.  *See W. Wood Preservers Inst. v. McHugh* (*Western Wood II*), 292 F.R.D. 145, 146 (D.D.C. 2013).  The Court granted plaintiffs' motion for reconsideration in part, agreeing that plaintiffs had stated a claim under the ESA.  *Id.* at 149-50.  However, the Court did not reconsider the issue of plaintiffs' standing, and the case remained dismissed without prejudice.  *Id.* at 147-49.

In an effort to correct the jurisdictional inadequacies found by the Court in *Western Wood*, the associational plaintiffs are now joined by four member-companies that either

manufacture pressure-treated wood (Permapost, Baxter, and Conrad) or design, sell, and install engineered wood systems that utilize treated wood products (Western Wood Structures). (Compl. ¶¶ 4, 6-7, 10.)

## ANALYSIS

Defendants have again filed a motion to dismiss plaintiffs' complaint, arguing that plaintiffs lack Article III standing to bring any of their claims and that they lack prudential standing to bring certain of their claims.

## I.    ARTICLE III STANDING

To establish constitutional standing, plaintiffs must demonstrate (1) that they have suffered an injury-in-fact, (2) that the injury is fairly traceable to the defendant's challenged conduct, and (3) that the injury is likely to be redressed by a favorable decision. *See NB ex rel. Peacock v. Dist. of Columbia*, 682 F.3d 77, 81 (D.C. Cir. 2012) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992)).

Plaintiffs bear the burden of establishing each element of standing. *Lujan*, 504 U.S. at 561. However, on a motion to dismiss, the Court "'must accept as true all material allegations of the complaint, and must construe the complaint in favor of the complaining party.'" *Ord v. Dist. of Columbia*, 587 F.3d 1136, 1140 (D.C. Cir. 2009) (quoting *Warth v. Seldin*, 422 U.S. 490, 501 (1975)). For each claim, if at least one plaintiff can demonstrate Article III standing, the Court "need not consider the standing of the other plaintiffs to raise that claim." *Mountain States Legal Found. v. Glickman*, 92 F.3d 1228, 1232 (D.C. Cir. 1996); *accord Grocery Mfrs. Ass'n v. EPA*, 693 F.3d 169, 175 (D.C. Cir. 2012).

When a "plaintiff is himself an object of the action" at issue, "there is ordinarily little question that the action . . . has caused him injury, and that a judgment preventing . . . the action

will redress it." *Lujan*, 504 U.S. at 561-62.  As defendants correctly note (Reply at 4-8),

plaintiffs do not allege in their complaint that they are directly regulated by either the Regional

Conditions or the SLOPES IV procedures.  Three of the company-plaintiffs merely sell treated

wood to customers who then use the wood in projects requiring section 404 permits.  (Compl. ¶¶

4, 6-7.)  And while Western Wood Structures designs and installs treated wood systems that,

when constructed in or over waters of the United States, require section 404 permits (*id.* ¶ 10),

plaintiffs provide no evidence, in their complaint or otherwise, that Western Wood Structures is

or ever has been responsible for obtaining those permits.  Instead, it is plaintiffs' *clients* who

engage in the section 404 processes to obtain the requisite permits.  And, thus, it is those clients

– not Western Wood Structures – who are directly regulated by the Regional Conditions and

SLOPES IV procedures.

   The company-plaintiffs do allege, however, that they are economically harmed by the

challenged actions because many of their customers in Oregon and Alaska would have preferred

to use treated wood for their construction projects "but were forced to use alternative materials to

take advantage of the nationwide general permits and the NMFS SLOPES IV biological

opinion."  (Compl. ¶ 33; *see also id.* ¶¶ 4, 6-7, 10.)  Because the company-plaintiffs' "asserted

injury is based on governmental regulation of a third party, proof of standing may be

problematic."  *Gilardi v. U.S. Dep't of Health & Human Servs.*, 733 F.3d 1208, 1228 (D.C. Cir.

2013).  This is so "because the necessary elements of causation and redressability in such a case

rest on the independent choices of the regulated third party."  *Id.*  Thus, it "becomes the burden

of the plaintiff to adduce facts showing that those choices have been or will be made in such

manner as to produce causation and permit redressability of injury."  *Lujan*, 504 U.S. at 562.

Defendants do not at this point challenge whether the company-plaintiffs' alleged injuries satisfy the injury-in-fact requirement of Article III standing. They instead argue that plaintiffs' injuries are not traceable to the Corps or NMFS and cannot be redressed by the Court. (Mot. at 13 & n.3.) Defendants' primary argument is that the company-plaintiffs' alleged injuries result from the business decisions of third parties – their potential customers – and therefore are not a direct consequence of the challenged actions. The Court disagrees.

Although it is true that a plaintiff's injury may not be premised on the independent actions of a third party, it is wrong to equate "injury 'fairly traceable' to the defendant with injury as to which the defendant's actions are the very last step in the chain of causation." *Bennett v. Spear*, 520 U.S. 154, 168-69 (1997). Rather, it is sufficient if the challenged agency action has a "determinative or coercive effect upon the action of someone else," and that action injures the plaintiff. *Id.* at 169.

In keeping with that rule, the D.C. Circuit has long recognized – and recently reaffirmed – the doctrine of competitor standing, whereby a party suffers a cognizable injury under Article III when an agency "'lift[s] regulatory restrictions on their competitors or otherwise allow[s] increased competition against them.'" *Int'l Bhd. of Teamsters v. U.S. Dep't of Transp.*, 724 F.3d 211-12 (D.C. Cir. 2013) (quoting *Sherley v. Sebelius*, 610 F.3d 69, 72 (D.C.Cir.2010)); *accord Mendoza v. Perez*, 2014 WL 2619844, *4 (D.C. Cir. June 13, 2014). Although the competitor standing doctrine typically arises in the context of establishing a constitutionally adequate injury-in-fact, it also serves as a tacit acknowledgement that agency action benefiting a plaintiff's competitor can have a direct effect on the plaintiff itself. Thus, the D.C. Circuit has found all three elements of standing to be met by plaintiffs where an agency has approved a merger of two of plaintiffs' competitors, *see Wabash Valley Power Ass'n v. FERC*, 268 F.3d 1105, 1113 (D.C.

Cir. 2001), approved the entry of competitor product into the market, *see Honeywell Int'l Inc. v. EPA*, 374 F.3d 1363, 1369 (D.C. Cir. 2004), and otherwise passed rules that led to an increased number of market participants. *Mendoza*, 2014 WL 2619844, at *4-5.

This Circuit also found standing in a case that is similar to this one – *Tozzi v. U.S. Dep't of Health & Human Servs.*, 271 F.3d 301 (D.C. Cir. 2001). There, the Department of Health and Human Services listed dioxin – a byproduct of the incineration of PVC plastic – as a known carcinogen. *Id.* at 306. Plaintiff, a manufacturer of medical products containing PVC plastic, challenged that classification. The Court there had "little doubt that the [challenged agency action] will represent a 'substantial factor' in the decisions of state and local agencies to regulate products containing dioxin or of healthcare companies to reduce or end purchases of PVC plastics," thereby causing injury to the plaintiff. *Id.* at 309.[2] The same rationale applies here. As a result of the challenged agency action, plaintiffs' customers are more likely to select materials other than treated wood for their projects so as to take advantage of the nationwide section 404 permits and to thereby forgo the lengthy and complicated process of obtaining an individualized permit for each project they undertake. (*See* Compl. ¶ 33.)

The D.C. Circuit has previously acknowledged the "direct and immediate" impact that such a shift in the CWA permitting process can have for the "day-to-day business" of regulated entities. *Nat'l Ass'n of Home Builders v. U.S. Army Corps of Eng'rs.*, 417 F.3d 1272, 1280 (D.C. Cir. 2005). Specifically:

> If the appellants' planned activities do not meet the applicable NWP's [nationwide permit] conditions and thresholds, they have two options. They can either put their projects on hold and run the Corps' individual-permit gauntlet or modify the projects to meet the conditions. Either way, through increased delay

---

[2] *See also Ams. for Safe Access v. Drug Enforcement Admin.*, 706 F.3d 438, 448 (D.C. Cir. 2013) (disabled veteran had standing to challenge the U.S. Drug Enforcement Administration's listing of marijuana as a Schedule I narcotic because that listing was the only express justification provided by the Department of Veterans Affairs for its policy against completing state medical marijuana forms).

> or project modification, the NWPs directly affect the investment and project development choices of those whose activities are subject to the CWA. Indeed, the Corps itself appreciated that its permits would influence project design. "Many project proponents," it noted, "will design their projects to comply with the [new regulation] so that they can qualify for an NWP and receive authorization more quickly than they could through the standard permit process."

*Id.* In other words, both this Circuit and the Corps itself have previously acknowledged that the issuance of nationwide section 404 permits has a "determinative effect" on the actions of regulated entities seeking to qualify for those permits. In this case, that means plaintiffs' customers will opt to use materials other than treated wood, and will thereby divert business away from plaintiffs and in favor of their competitors. The Court therefore concludes that plaintiffs' alleged economic injury – lost sales to competitors who market materials other than treated wood – is plainly traceable to the approval of the Regional Conditions and SLOPES IV procedures and would be redressed by a ruling from this Court invalidating those actions.

The cases on which defendants rely do not require a different conclusion. Defendants cite *Grocery Manufacturers Ass'n v. EPA*, 693 F.3d 169 (D.C. Cir. 2012), to support their contention that standing cannot be premised on injuries resulting from the business decisions of third parties. (*See* Mot.at 15.) In that case, however, the business decision in question was made voluntarily by the plaintiffs themselves. The EPA approved a new type of fuel, and the plaintiff petroleum trade associations claimed they would be forced to start offering that product and would suffer injuries in the form of the costs and liabilities associated with introducing a new product. 693 F.3d at 176-77. As the Court of Appeals pointed out, the challenged agency action in that case

> [did] not force, require, or even *encourage* fuel manufacturers or any related entity to introduce the new fuel; it simply permit[ted] them to do so . . . . In short, the only real effect of EPA's [rule] is to provide fuel manufacturers the option to introduce a new fuel, E15. To the extent the petroleum group's members

> implement that option voluntarily, any injury they incur as a result is a "self-
> inflicted harm" not fairly traceable to the challenged government conduct.

*Id.* at 177 (emphasis added).  Unlike in *Grocery Manufacturers*, the harm to plaintiffs here does

not flow from their own "voluntary" strategic business decisions, but from the natural and

probable consequences the challenged agency actions have on the strategic business decisions

made by plaintiffs' customers.  (*See* Compl. ¶ 32.)

The other cases defendants rely on are similarly distinguishable, as the connection

between the agency action and the alleged injury in those cases was far more speculative than it

is here.  In *National Wrestling Coaches Ass'n v. Department of Education*, 366 F.3d 930 (D.C.

Cir. 2004), the plaintiffs challenged the government's interpretation of Title IX and alleged that

schools would choose to comply with the new test not by offering increased athletic

opportunities to female students, but by reducing opportunities for male students.  *Id.* at 937-38.

The Court of Appeals found that the alleged injury was neither traceable to the challenged

agency action nor would it necessarily redressable by the Court.  *See id.* at 943-44.  The Court

noted, *inter alia*, that Title IX and earlier regulations would have remained in place even if the

newly-articulated test were invalidated, and the schools would therefore still have been required

to take gender equity into account when designing their athletic programs.  Thus, plaintiffs could

not show that "a favorable ruling would alter the schools' conduct."  *Id.* at 944.  Similarly, in

*Simon v. Eastern Kentucky Welfare Rights Org.*, 426 U.S. 26 (1976), the plaintiffs challenged an

IRS ruling that allowed favorable tax treatment to hospitals that offered only emergency-room

services to indigent patients.  *See id.* at 28.  Their alleged injury was based on their belief that the

ruling made hospitals less likely to offer any additional services for indigent patients.  *Id.* at 42.

However, the Supreme Court ruled that it was "speculative whether the desired exercise of the

court's remedial powers . . . would result in the availability to [the plaintiffs] of such services"

and noted that it was "just as plausible that the hospitals . . . would elect to forego favorable tax treatment" to avoid having to render additional indigent services. *Id.* at 43.

This case involves far more than the "unadorned speculation" underlying the claims of injury in *National Wrestling* and *Simon*. As discussed above, the Court of Appeals has already acknowledged the determinative effect of CWA permitting regulations on consumers' decision-making. *See Home Builders*, 417 F.3d at 1280. Moreover, plaintiffs expressly allege a causal link between the challenged government action and their alleged harm. For example, plaintiffs allege that one company-plaintiff was advised by the Forest Service, one of its customers, "that [the Forest Service is] no longer allowed to specify treated wood in their outdoor structures" precisely because of the need to obtain an individualized CWA permit. (Compl. ¶ 7.) The company-plaintiffs also identify a host of other instances in which their customers informed them that they were "unable to use treated wood in or over water due to the exclusion of these products from the [section 404] Clean Water Act general permits." (*E.g.*, *id.* ¶ 6.) Plaintiffs' allegations are sufficient for the Court to conclude that, in the absence of the challenged Regional Conditions and SLOPES IV procedures, plaintiffs' customers would be more likely to use the treated wood products supplied or manufactured by plaintiffs.[3]

---

[3] The Court rejects defendants' argument that plaintiffs lack standing because "it is just as plausible that even without the treated wood provisions in the Regional Conditions and SLOPES IV procedures, the Corps may require use of an individual permit for projects using pressure-treated wood." (Mot. at 18.) It is true that district-level Corps engineers have the discretion to "suspend, modify, or revoke authorizations under a [nationwide permit]," 33 C.F.R. §§ 330.1(d); *see also id.* § 330.5, and thus could require individual section 404 permits for projects using treated wood even if a nationwide permit otherwise covered those projects. However, that the Corps has an alternative process by which it *could* require individual, rather than nationwide, permits for treated-wood projects does not undermine plaintiffs' Article III standing to challenge the *actual agency actions* taken. *Cf. Mendoza*, 2014 WL 2619844, at * 6 ("Plaintiffs asserting a procedural rights challenge need not show the agency action would have been different had it been consummated in a procedurally valid manner – the courts will assume this portion of the causal link."); *Bennett v. Donovan*, 703 F.3d 582, 590 (D.C. Cir. 2013) ("HUD is the government actor alleged to have caused appellants' injury, and HUD is the actor that *can* provide relief—that arrangement is sufficient to establish that relief is likely" even if "perhaps [HUD] would decide no such relief was appropriate" (emphasis added)). To hold otherwise would place plaintiffs in a

Thus, the Court concludes that plaintiffs' complaint adequately establishes the Article III standing of the company-plaintiffs – Permapost, Baxter, Conrad, and Western Wood Structures – for all claims in the complaint.  Because those parties have standing, the controversy is justiciable and the Court need not inquire into the standing of the associational plaintiffs who raise the same claims.  *See Mountain States Legal Found.*, 92 F.3d at 1232.

## II.   "PRUDENTIAL STANDING"

Defendants also move to dismiss certain of plaintiffs' claims for lack of "prudential standing" pursuant to the "zone of interests" test first formulated in *Association of Data Processing Service Organizations, Inc. v. Camp*, 397 U.S. 150 (1970).  (*See* Mot. at 26.)  The Supreme Court recently clarified that "'prudential standing is a misnomer' as applied to the zone-of-interests analysis."  *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, -- U.S. ---, 134 S. Ct. 1377, 1387 (2014) (quoting *Ass'n of Battery Recyclers, Inc. v. EPA,* 716 F.3d 667, 675-76 (2013) (Silberman, J., concurring)).

Nomenclature aside, the question remains the same:  whether plaintiffs interests are "'arguably within the zone of interests to be protected or regulated by the statute[s]'" they claim were violated.  *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, -- U.S. ---, 132 S. Ct. 2199, 2210 (2012) (quoting *Data Processing*, 397 U.S. at 153).  And the Court's task remains the same:  to "apply traditional principles of statutory interpretation" to determine "whether [plaintiffs] ha[ve] a cause of action under the statute[s]."  *Lexmark*, 134 S.Ct. at 1387-88.  "Although the zone-of-interests test 'is not meant to be especially demanding,'" *White Stallion Energy Ctr., LLC v. EPA*, 748 F.3d 1222, 1256 (D.C. Cir. 2014) (quoting *Clarke v. Sec. Indus. Ass'n,* 479 U.S. 388, 399 (1987)), "'the breadth of the zone of interests varies according to

---

jurisdictional Catch-22:  unable to challenge an agency action for lack of standing due to an alternative, yet hypothetical, agency action that itself is unchallengeable on ripeness grounds.

the provisions of law at issue.'" *Lexmark*, 134 S.Ct. at 1388 (quoting *Bennett*, 520 U.S. at 163).

If plaintiffs' interests do not fall within that zone of interests, their claim will be dismissed with

prejudice. *See id.* at 1387 n.4.[4]

A.      **Clean Water Act**

Plaintiffs' first three claims allege that the Corps violated several aspects of the APA's

procedural notice-and-comment requirements when issuing the challenged Regional Conditions.

(Compl. ¶¶ 34-45 (citing 5 U.S.C. § 553(b)-(d)).)  In Claims 4, 7, and 8, plaintiffs allege that the

Corps' actions pursuant to the CWA and its regulations were arbitrary and capricious under the

APA.  (*Id.* ¶¶ 46-50, 60-74 (citing 5 U.S.C. § 706).)

Section 702 of the APA requires that a complainant be "adversely affected or aggrieved

. . . within the meaning of a relevant statute." 5 U.S.C. § 702.  This requirement has been

interpreted to mean that the interest a plaintiff asserts must "arguably" be within the "zone of

interests" that is intended to be protected or regulated by the statute on which the claim is based.

*Data Processing*, 397 U.S. at 153; *accord Scheduled Airlines Traffic Offices, Inc. v. Dep't of

Def.*, 87 F.3d 1356, 1359 (D.C. Cir. 1996).  The Supreme Court has described the zone of

interest test under the APA as "generous."  *Clarke*, 479 U.S. at 400 n.16.  It does "not require

any 'indication of congressional purpose to benefit the would-be plaintiff'" and has always

"conspicuously included the word 'arguably' . . . to indicate that the benefit of any doubt goes to

the plaintiff."  *Patchak*, 132 S. Ct. at 2210 (quoting *Clarke*, 479 U.S. at 399-400).  "The test

forecloses suit only when a plaintiff's 'interests are so marginally related to or inconsistent with

---

[4] This Circuit historically treated prudential standing as a "jurisdictional concept."  *See, e.g.*, *Grocery Mfrs. Ass'n*, 693 F.3d at 179; *Steffan v. Perry*, 41 F.3d 677, 697 (D.C. Cir. 1994).  The Supreme Court recently abrogated that Circuit precedent by clarifying that the zone of interest inquiry "does not implicate subject matter jurisdiction."  *See Lexmark*, 134 S. Ct. at 1387 n.4 (favorably citing *Grocery Mfrs. Ass'n*, 693 F.3d at 183-85 (Kavanaugh, J., dissenting)).

the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit.'" *Id.* (quoting *Clarke*, 479 U.S. at 399-400).

Thus, the Court must delineate the zone of interests protected by the CWA to determine whether plaintiffs have a cause of action for its procedural and substantive claims regarding the Regional Conditions.[5]  Because the CWA contains a detailed declaration of goals and policies, the zone of interests protected by the Act "requires no guesswork."  *See Lexmark*, 134 S. Ct. at 1389.  In short, the "objective of th[e Act] is to restore and maintain the chemical, physical, and biological integrity of the Nation's waters," 33 U.S.C. § 1251(a), including "water quality which provides for the protection and propagation of fish, shellfish, and wildlife." *Id.* § 1251(a)(2); *see also PUD No. 1 of Jefferson Cnty. v. Wash. Dep't of Ecology*, 511 U.S. 700, 704 (1994).  "This objective incorporated a broad, systemic view of the goal of maintaining and improving water quality: as the House Report on the legislation put it, 'the word 'integrity' . . . refers to a condition in which the natural structure and function of ecosystems [are] maintained.'" *United States v. Riverside Bayview Homes, Inc.*, 474 U.S. 121, 132 (1985) (quoting H.R. REP. NO. 92-911, at 76 (1972)).[6]

---

[5] Contrary to the Court's suggestion in *Western Wood I*, 925 F. Supp. 2d at 74 n.2, whether plaintiffs have a cause of action for defendants' alleged violations of the APA's notice-and-comment rulemaking procedures depends on whether plaintiffs' interests fall within those protected or regulated by the CWA.  For in this Circuit a cause of action "to assert procedural protections is . . . derivative; a party within the zone of interests of any substantive authority generally will be within the zone of interests of any procedural requirement governing exercise of that authority, at least if the procedure is intended to enhance the quality of the substantive decision." *Int'l Bhd. of Teamsters v. Pena*, 17 F.3d 1478, 1484 (D.C. Cir. 1994); *see also Mendoza*, 2014 WL 2619844, at * 9 ("Although the plaintiffs here assert a cause of action under the APA['s notice and comment rulemaking provision], in considering whether plaintiffs are authorized to sue under that law we look to whether they fall within the zone of interests sought to be protected by the substantive statute pursuant to which the Department of Labor acted: the [Immigration and Nationality Act].").

[6] Plaintiffs incorrectly suggest that a statute's "overall purpose" is irrelevant to the zone of interest analysis.  (See Opp'n at 33-34.)  It is true that "[w]hether a plaintiff's interest is 'arguably . . . protected . . . by the statute' within the meaning of the zone-of-interests test is to be determined not by reference to the overall purpose of the Act in question . . . , but by reference to the particular provision of

Consistent with this objective, "[t]he permit program established under Section 404 . . . was intended to control the degradation of aquatic resources that results from any replacement of water with fill material, as well as the degradation that results from the discharge of dredged or fill material which contains toxic substances." *Bayou des Familles Dev. Corp. v. U.S. Corps of Eng'rs*, 541 F. Supp. 1025, 1036 (E.D. La. 1982) (citing S. REP. NO. 95-370, at 74-75 (1977)). The Corps has discretion under section 404(e) to issue nationwide permits "for any category of activities involving discharges or dredged or fill material," but only if it first determines that "the activities in such category are similar in nature, will cause only minimal adverse environmental effects when performed separately, and will have only minimal cumulative adverse effect on the environment." 33 U.S.C. § 1344(e).

Although the issuance of nationwide permits has significant economic implications, section 404(e) is not, as plaintiffs argue, "principally focused on reducing the economic impacts of clean water regulation." (Opp'n at 35.)  Plaintiffs' position confuses the incidental benefits of section 404(e) with its actual purpose:  to (no less than any other CWA provision) protect the integrity of the waters of the United States.  That the CWA begins with a prohibition against "the discharge of any pollutant by any person," 33 U.S.C. § 1311(a), and proceeds to *permit* certain discharges neither negates the regime's environmental imperative nor supplants it with an economic one.  This conclusion is only further underscored by the fact that section 404(e) *does not* enumerate compliance costs (or, indeed, costs of any kind) as a factor for the Corps to consider when determining whether to, in its sole discretion, issue a nationwide permit.  *See*

---

law upon which the plaintiff relies." *Bennett*, 520 U.S. at 175-76.  However, *Bennett* does not suggest that courts should construe the interests of a particular statutory provision without consideration of the broader goals of the entire statute.  Indeed, in its most recent prudential standing opinion, the Supreme Court considered the purposes of the Lanham Act as a whole to delineate the zone of interests protected section 1125(a) of that Act.  *Lexmark*, 134 S. Ct. at 1389; *see also Mendoza*, 2014 WL 2619844, at *9-10 (considering both the language of the specific provision and the overall purposes of the Immigration and Nationality Act when delineating the zone of interests).

*Town of Stratford v. Fed. Aviation Admin.*, 285 F.3d 84, 89 (D.C. Cir. 2002) (regulations and discretionary agency practice of considering economic effects of agency action cannot "extend prudential standing beyond" that apparent from the statute).  To the extent section 404(e) is meant to protect the economic interests of regulated parties,[7] it simply does not do so in a manner divorced from the statute's principal environmental purpose.

With this understanding of the CWA, the Court turns to whether the interests plaintiffs assert are "arguably" within the zone of interests regulated or protected by section 404(e).  As plead, plaintiffs' interests are purely economic.  (*See, e.g.*, Compl. ¶ 4 (challenged actions have "caused financial loss"); *id.* ¶ 6 (complaining of "lost business" for its members).)  Of course, plaintiffs need not be "pure of heart" (Opp'n  at 30) in their desire to enforce the CWA.  The D.C. Circuit has made clear that "a party need not share Congress' motives in enacting a statute to be a suitable challenger to enforce it," *Honeywell*, 374 F.3d at 1370, and "[p]arties motivated by purely commercial interests routinely satisfy the zone of interests test." *Amgen, Inc. v. Smith*, 357 F.3d 103, 109 (D.C. Cir. 2004).  However, this is the case only when the parties' economic interests "in practice can be expected to police the interests that the statute protects." *Mova Pharm. Corp. v. Shalala*, 140 F.3d 1060, 1075 (D.C. Cir. 1998).  Stated differently, the question is whether plaintiffs' interests are "sufficiently congruent with those of the intended beneficiaries [of the statute] that the litigants are not more likely to frustrate than to further . . . statutory objectives." *Scheduled Airlines*, 87 F.3d at 1359 (internal quotation marks omitted); *see also Amgen*, 357 F.3d at 109 ("Congruence of interests, rather than identity of interests, is the benchmark; the zone of interests test serves to exclude only those parties whose interests are not consistent with the purposes of the statute in question." (internal quotation marks omitted)).

---

[7] There is no basis on which to conclude that section 404(e) is meant to protect the economic interests of *non-regulated* parties.

As the Court concluded above, plaintiffs' economic interests as non-regulated parties are not protected by CWA § 404(e).  As to whether plaintiffs' economic interests are sufficiently congruent to the environmental interests protected by section 404(e), the Court is guided by the D.C. Circuit's recent opinion in *White Stallion*.[8]  In that case, the D.C. Circuit reaffirmed its decades-old line of cases holding that economically motivated, non-regulated parties fall outside of the zones of interests of environmental statutes.  748 F.3d at 1256-58.  Applying that established law, the Court of Appeals held that Julander, an oil-and-gas production company, could not challenge the EPA's decision not to adopt stricter air emission standards that would have required electric utility steam generating units to "fuel switch[]" from coal to natural gas. *Id.*  The Court so held even though Julander's economic interest in fuel switching (*i.e.*, higher demand for its natural gas products) dovetailed with the Clean Air Act's pollution prevention purposes.  *Id.* at 1257.

*White Stallion* relied on several earlier cases that foreclosed non-regulated parties from challenging the EPA's alleged underregulation of their competitors.  *See Ass'n of Battery Recyclers, Inc. v. EPA*, 716 F.3d 667, 674 (D.C. Cir. 2013) (Clean Air Act); *Cement Kiln Recycling Coalition v. EPA*, 255 F.3d 855, 870-71 (D.C. Cir. 2001) (Clean Air Act); *Hazardous Waste Treatment Council v. EPA* (*HWTC II*), 861 F.2d 277, 285 (D.C. Cir. 1988) (Resource Conservation and Recovery Act); *see also Hazardous Waste Treatment Council v. Thomas* (*HWTC IV*), 885 F.2d 918, 924 (D.C. Cir. 1989) (Resource Conservation and Recovery Act).  Those cases recognized that although a third party's interest in "increasing the regulatory burden on its competitors" may fortuitously coincide with a statute's environmental protection goals,

---

[8] The D.C. Circuit issued its opinion in *White Stallion* after the parties had fully briefed defendants' motion to dismiss.  On May 7, 2014, the Court requested supplemental briefing from the parties regarding whether "this action is distinguishable from *White Stallion* and the cases on which it relied."  (Order, May 7, 2014 [Dkt. No. 24].)

such a congruence of interests is often too marginal to establish prudential standing. *Cement Kiln*, 255 F.3d at 871; *accord Ass'n of Battery Recyclers*, 716 F.3d at 674. As the D.C. Circuit explained in *HWTC IV*

> [Plaintiffs'] immediate interest is in more stringent treatment standards, on the theory that such standards will result in their selling more treatment services, which will, in turn, generate more earnings. But there is not the slightest reason to think that treatment firms' interest in getting more revenue by increasing the demand for their particular treatment services will serve RCRA's purpose of protecting health and the environment. Every merchant wants to maximize its earnings, and any merchant will, to the extent practicable, steer its customers to those of its goods or services that generate the greatest profit margins. Thus, we would expect the treatment firms, like any other merchant, to pursue regulation that encourages the alternatives with the greatest profit potential at the expense of others (say, recycling or incineration) that might be less profitable.

885 F.2d at 924-25. Rather than acting as "suitable advocates of the environmental interests underlying the statute," the Court feared that non-regulated plaintiffs would "distort the regulatory process." *HWTC II*, 861 F.2d at 285.

This action poses a similar threat of regulatory distortion. The company-plaintiffs allege that they will lose money because "no economically-rational builder will seek to use treated wood on a project when the alternatives can be employed so much faster and cheaper" (Compl. ¶ 32), and they bemoan the regulatory irregularity present when treated wood projects are subject to nationwide permitting in some states (*e.g.*, Washington) but not others (*i.e.*, Oregon and Alaska). (*E.g.*, *id.* ¶ 67.) However, at no point in their complaint do plaintiffs allege that treated wood is equally or less environmentally harmful than the alternative products their customers will now use.

To be sure, the Court recognizes – as plaintiffs argue – that this case is somewhat distinct from *White Stallion* and its supporting authorities. (*See* Pls.' Suppl. Br., May 28, 2014 [Dkt. No. 26] at 3-4.) For one, it concerns a different statute. The Court, however, perceives no persuasive basis – statutory or otherwise – upon which the reasoning first applied to the Resource

Conservation and Recovery Act, *HWTC II*, 861 F.2d at 283, and then imported into the Clean Air Act, *Cement Kiln*, 255 F.3d at 871, is not equally applicable to the CWA, and section 404(e) in particular.

The more important distinction might seem to be that plaintiffs do not seek stricter regulations for their regulated competitors, but seek less onerous regulations for their regulated customers.  (*See* Pls.' Suppl. Br. at 4.)  The Court agrees with the government, however, that this is a "distinction without a difference" (*see* United States' Suppl. Br., June 12, 2014 [Dkt. No. 28] at 6) that does not cut in plaintiffs' favor.  Indeed, in the above-cited cases the plaintiffs' economic interests at least aligned, however fortuitously, with the environmental purposes animating the statutes.  *See, e.g.*, *HWTC II*, 861 F.2d at 282 ("In essence they suggest that tightening of environmental standards will generally foster not only a cleaner environment but also the member companies' profits, as it will expand the market for their services.").  Here, there is no such congruence:  plaintiffs' economic interests are purely deregulatory and in tension with section 404(e)'s environmental purposes.  The Court therefore concludes that plaintiffs' interests are not "arguably" within the zone of interests protected by CWA § 404(e) and that allowing plaintiffs to proceed would "more likely frustrate than further" the statute's objectives.  *See Scheduled Airlines*, 87 F.3d at 1359 (internal quotation marks omitted).[9]

---

[9] The Court's conclusion is consistent with the two out-of-Circuit district court opinions to have considered whether a non-regulated plaintiff's purely economic interests are "arguably" congruent with the interests protected by CWA § 404.  In *Borough of Carlstadt v. U.S. Army Corps of Engineers*, the court held that a Carlstadt lacked prudential standing to challenge the Corps' issuance of a section 404 permit because its interest "ha[d] nothing to do with water at all, but rather concern[ed] only [its] interest in protecting its finances" by preventing commercial development in a neighboring municipality.  2006 WL 305314, at *8 (D.N.J. Feb. 8, 2006).  In contrast, in *National Mitigation Banking Ass'n v. U.S. Army Corps of Engineers*, the court concluded that "[t]he economic interests of mitigation banks" – companies who preserve or construct wetlands to offset the filling of wetlands pursuant to section 404 permits elsewhere – "are very closely aligned with [the CWA's] objective, and are therefore at least 'arguably' within the zone of interests to be protected by the CWA."  2007 WL 495245, at *16 (N.D. Ill. Feb. 14, 2007).  Plaintiffs' interests here are much more similar to Calrstadt's than the mitigation banks'.

In a last-ditch effort to save their CWA claims, plaintiffs aver that they have third-party prudential standing to assert the rights of their customers.  (Opp'n at 36-37; Pls.' Suppl. Br. at 4-5.)  However, plaintiffs fail to allege *in their complaint* that they are suing on behalf of their customers.  And, even if properly pleaded, plaintiffs claim would fail.  "A plaintiff must ordinarily 'assert his own legal interests, rather than those of third parties.'"  *Rumber v. Dist. of Columbia*, 595 F.3d 1298, 1301 (D.C. Cir. 2010) (quoting *Gladstone Realtors v. Vill. of Bellwood*, 441 U.S. 91, 100 (1979)).  "A mere congruence of interests" between plaintiffs and their regulated customers "does not suffice" to render plaintiffs the proper parties to vindicate the rights of their customers.  *See Goodman v. FCC*, 182 F.3d 987, 992 (D.C. Cir. 1999).  For a "plaintiff may assert the rights of a third party only when there is 'some hindrance to the third party's ability to protect his or her own interests.'"  *Id.* (quoting *Powers v. Ohio,* 499 U.S. 400, 411 (1991)).  Plaintiffs have provided no reason for the Court to conclude that their customers are unable to personally assert their rights.[10]

### B.      Regulatory Flexibility Act

Plaintiffs' claims 6 and 11 allege that the Corps violated the mandatory procedures of the RFA when adopting the Regional Conditions and SLOPES IV procedures, respectively.  (*See* Compl. ¶¶ 56-59, 87-89.)  Specifically, plaintiffs challenge the Corps' failure to prepare a final regulatory flexibility analysis under 5 U.S.C. § 604 without certifying that no such analysis was necessary, as required by 5 U.S.C. § 605.  (*Id.*)

---

[10] In this regard, plaintiffs' reliance on *FAIC Securities, Inc. v. United States*, 768 F.2d 352 (D.C. Cir. 1985), and *National Cottonseed Products Ass'n v. Brock*, 825 F.2d 482, 490 (D.C. Cir. 1987), is misplaced.  Although this Circuit continues to use the "two sides of the coin" analogy from those cases to describe certain vendor-vendee congruence of interests, *see Ethyl Corp. v. EPA*, 306 F.3d 1144, 1148 (D.C. Cir. 2002), the Supreme Court in *Powers* abrogated those cases to the extent that they found third-party standing based solely on the vendor-vendee relationship without an inquiry into the impediment to third-party suit.  *See Powers*, 499 U.S. at 411; *see also Am. Immigration Lawyers Ass'n v. Reno*, 199 F.3d 1352, 1362 n.15 (D.C. Cir. 2000) (noting that when the "'*Powers* test' is applied, all three requirements must be met").

The RFA makes explicit, under section 611, the zone of interests it protects and the causes of action it provides.  *See* 5 U.S.C. § 611(c) ("Compliance or noncompliance by an agency with the provisions of this chapter shall be subject to judicial review only in accordance with this section.").  Judicial review of an agency's compliance or noncompliance with sections 604 and 605 is available only for "a small entity that is adversely affected or aggrieved by final agency action."  5 U.S.C. § 611(a).  This Circuit has clarified that the RFA only requires an agency to consider the economic impact of a proposed regulation on "regulated small entities." *Mid-Tex Elec. Co-op., Inc. v. FERC*, 773 F.2d 327, 342 (D.C. Cir. 1985).  That includes only "'small entities *which will be subject to the proposed regulation*' – that is, those "'small entities *to which the proposed rule will apply*.'"  *Cement Kiln*, 255 F.3d at 869 (quoting *Mid-Tex*, 773 F.2d at 342).

The company-plaintiffs have alleged that they are small entities as defined by the RFA. (Compl. ¶¶ 4, 6-7, 10.)  However, as noted above, the company-plaintiffs are not directly regulated by the Regional Conditions or the SLOPES IV procedures.  Because none of the plaintiffs are "subject to the requirements of the" Regional Conditions or SLOPES IV procedures, their interests do not fall within the zone of interests protected by the RFA and thus they lack prudential standing to bring their RFA claims.  *See Mid-Tex*, 773 F.3d at 342.

## C.      Endangered Species Act

Defendants rightly do not question plaintiffs' prudential standing or cause of action for its claims (5, 9, and 10) brought pursuant to the ESA's citizen suit provision, 16 U.S.C. § 1540(g). *See Bennett*, 520 U.S. at 176 (economic interests fall within the zone of interests protected by the ESA).  (*See* Mot. at 26 n.7.)  Plaintiffs' ESA claims accordingly survive defendants' motion to dismiss.

**CONCLUSION**

Although plaintiffs' complaint is sufficient at this stage to establish Article III standing, plaintiffs lack prudential standing for their APA-based claims under the CWA and their RFA claims.  For the foregoing reasons, it is hereby **ORDERED** that

1.  Plaintiffs' motion for leave to file a surreply [Dkt. No. 22] is **GRANTED**;

2.  Defendants' motion to dismiss [Dkt. No. 18] is **GRANTED IN PART**;

3.  Plaintiffs' claims under the Administrative Procedure and Clean Water Acts (Claims 1, 2, 3, 4, 7, and 8) and under the Regulatory Flexibility Act (Claims 6 and 11) are **DISMISSED WITH PREJUDICE** for failure to state a claim;

4.  Plaintiffs' only remaining claims are those alleged under the Administrative Procedure and Endangered Species Acts (Claims 5, 9, and 10); and

5.  The parties are to file by July 28, 2014, a joint proposed scheduling order for the defendants' filing of an administrative record and the parties' summary judgment briefing as to the remaining claims.


                                    _____/s/_____
                                    ELLEN SEGAL HUVELLE
                                    United States District Judge

Date:   July 7, 2014

23